## Exhibit B

## Asset Purchase Agreement

43056810.5/156171.00005

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of [●], is entered into between Oklahoma Forge, LLC, a Michigan limited liability company ("**Seller**"), and Forge Resources Group LLC, an Illinois limited liability company or its designee ("**Buyer**"). Capitalized terms used in this Agreement have the defined meanings provided herein or stated in Exhibit A, and Exhibit A includes cross-references with such definitions used herein.

## RECITALS

**WHEREAS**, Seller is engaged in the business of delivering open die forging, including rolled rings, discs, and pot die ("**Business**");

**WHEREAS**, on August 16, 2024 ("**Petition Date**"), an involuntary petition [Doc. 1] was filed against Seller under chapter 7 of title 11 of the United States Code ("**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of Oklahoma ("**Bankruptcy Court**"), thereby commencing Case No. 24-11060-M ("**Bankruptcy Case**"), and on November 22, 2024, an order for relief under chapter 7 was entered by this Court [Doc. 59] and, later that same day, an Agreed Order Converting Chapter 7 Case to a Case Under Chapter 11 was entered by this Court [Doc. 60];

**WHEREAS**, upon and subject to entry of a Bankruptcy Court order satisfactory to Buyer ("**DIP Order**"), Buyer will provide the Seller with a debtor-in-possession loan in the principal amount of up to two-hundred and fifty thousand dollars ($250,000) (together with interest, fees, costs and other charges permitted by the DIP Order, the "**DIP Obligations**"), to facilitate necessary credit for the Business to continue baseline operations until the Buyer can complete the purchase of Seller's assets hereunder;

**WHEREAS**, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, substantially all the assets, and certain specified liabilities, of the Business, subject to the terms and conditions set forth herein;

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## PURCHASE AND SALE

**Section 1.01   Purchase and Sale of Assets.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, convey, assign, transfer, and deliver to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title, and interest in, to, and under all of the tangible and intangible assets, properties, and rights of every kind and nature and wherever located (other than the Excluded Assets), which relate to, or are used or held for use in connection with, the Business (collectively, the "**Purchased Assets**"), including the following:

(a)   all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts, and other inventories ("**Inventory**");

(b)     all Contracts (the "**Assigned Contracts**") set forth on Section 1.01(b) of the disclosure schedules attached hereto (the "**Disclosure Schedules**") (*see* Schedule 1.01(b) – Assigned Contracts). The term "**Contracts**" means all contracts, leases, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures, and all other agreements, commitments, and legally binding arrangements, whether written or oral;

(c)     all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones, and other tangible personal property, (the "**Tangible Personal Property**"), including, but not limited to, the Tangible Personal Property set forth on Section 1.01(c) of the Disclosure Schedules (*see* Schedule 1.01(c) – Tangible Personal Property);

(d)     all of Seller's rights under warranties, indemnities, and all similar rights against third parties to the extent related to any Purchased Assets;

(e)     all insurance benefits, including rights and proceeds, arising from or relating to the Business, the Purchased Assets, or the Assumed Liabilities, including, but not limited to, the insurance benefits set forth on Section 1.01(e) of the Disclosure Schedules (*see* Schedule 1.01(e) – Insurance Benefits);

(f)     originals or, where not available, copies, of all books and records, including books of account, ledgers, and general, financial, and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, supplier purchasing histories, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records, and data (including all correspondence or instrumentality of such government or political subdivision, or any arbitrator, court, or tribunal of competent jurisdiction (collectively, "**Governmental Authority**")), sales material and records, strategic plans and marketing, and promotional surveys, material, and research ("**Books and Records**"); and

(g)     all goodwill and the going concern value of the Purchased Assets and the Business.

**Section 1.02   Excluded Assets.** Notwithstanding the foregoing, the Purchased Assets shall not include following the assets, properties, and rights including the followings (collectively, the "**Excluded Assets**"):

(a)     all cash and cash equivalents, but excluding all cash and cash equivalents currently due, or received and retained, as an insurance benefit;

(b)     all accounts receivable held by Seller ("**Accounts Receivable**");

(c)     all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums, and fees (including any such item relating to the payment of Taxes); and

(d)     those assets, properties, and rights set forth on Section 1.02 of the Disclosure Schedules (*see* Schedule 1.02 – Excluded Assets).

**Section 1.03    Assumed Liabilities.**

(a)     Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform, and discharge only the following Liabilities of Seller (collectively, the "**Assumed Liabilities**"), and no other Liabilities:

(i)     all Liabilities in respect of the Assigned Contracts but only to the extent that such Liabilities thereunder are required to be performed after the Closing Date, were incurred in the ordinary course of business, and do not relate to any failure to perform, improper performance, warranty, or other breach, default, or violation by Seller on or prior to the Closing; and

(ii)     those Liabilities of Seller set forth on Section 1.03(a)(ii) of the Disclosure Schedules (*see* Schedule 1.03 – Assumed Liabilities).

For purposes of this Agreement, "**Liabilities**" means liabilities, obligations, or commitments of any nature whatsoever, whether asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured, or otherwise.

(b)     Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be responsible to pay, perform, or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "**Excluded Liabilities**"). For purposes of this Agreement: (i) "**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person; and (ii) the term "**control**" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

**Section 1.04   Purchase Price.** The aggregate purchase price for the Purchased Assets shall be three-million five-hundred and fifty thousand $3,550,000 ("**Purchase Price**"), minus the principal, interest, fees, costs and other DIP Obligations under the DIP Order as of the Closing Date, plus the assumption of the Assumed Liabilities. Buyer shall pay the cash portion of the Purchase Price by wire transfer to Seller in immediately available funds in accordance with the wire transfer instructions set forth on Section 1.04 of the Disclosure Schedules (*see* Schedule 1.04 – Wire Transfer Information).

**Section 1.05   Allocation of Purchase Price.** The Purchase Price and the Assumed Liabilities shall be allocated among the Purchased Assets for all purposes (including Tax and financial accounting) as shown on the allocation schedule set forth on Section 1.05 of the Disclosure Schedules (the "**Allocation Schedule**"). The Allocation Schedule shall be prepared in

accordance with Section 1060 of the Internal Revenue Code of 1986, as amended. Buyer and Seller shall file all returns, declarations, reports, information returns and statements, and other documents relating to Taxes (including amended returns and claims for refund) ("**Tax Returns**") in a manner consistent with the Allocation Schedule.

**Section 1.06    Withholding Tax.** Buyer shall be entitled to deduct and withhold from the Purchase Price all Taxes that Buyer may be required to deduct and withhold under any provision of Tax Law. All such withheld amounts shall be treated as delivered to Seller hereunder.

**Section 1.07    Third-Party Consents.** To the extent that Seller's rights under any Purchased Asset may not be assigned to Buyer without the consent of another Person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and Seller, at its expense, shall use its reasonable best efforts to obtain any such required consent(s) as promptly as possible. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the Purchased Asset in question so that Buyer would not in effect acquire the benefit of all such rights, Seller, to the maximum extent permitted by Law and the Purchased Asset, shall act after the Closing as Buyer's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by Law and the Purchased Asset, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer.

## ARTICLE II

## CLOSING

**Section 2.01    Closing.** Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place remotely by electronic exchange of documents and signatures, after all of the conditions to Closing set forth in ARTICLE VI are either satisfied or waived, at 9:00 am central time, on a mutually agreed upon date to occur on or before February 15, 2025; excepting that, those conditions which, by their nature, are to be satisfied on the Closing Date, or at such other time, date or place as Seller and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**."

**Section 2.02    Closing Deliverables.**

(a)        At the Closing, Seller shall deliver to Buyer the following:

(i)        a bill of sale in the form of **Exhibit B** attached hereto in form and substance satisfactory to Buyer (the "**Bill of Sale**") and duly executed by Seller, transferring the Tangible Personal Property included in the Purchased Assets to Buyer;

(ii)        an assignment and assumption agreement in the form of **Exhibit C** attached hereto (the "**Assignment and Assumption Agreement**") and duly executed by Seller,

effecting the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities; and

(iii)    an Intellectual Property assignment agreement in the form of **Exhibit D** hereto (the "**Intellectual Property Assignment Agreement**");

(iv)    (A) tax clearance certificates from the taxing authorities in the jurisdictions that impose Taxes on Seller, or (B) where Seller has a duty to file Tax Returns in connection with the transactions contemplated by this Agreement, evidence of the payment in full or other satisfaction of any Taxes owed by Seller in those jurisdictions;

(v)    a certificate of the Secretary (or equivalent officer) of Seller certifying as to (A) the resolutions of the board of directors and the shareholders of Seller, which authorize the execution, delivery, and performance of this Agreement, the Bill of Sale, the Assignment and Assumption Agreement, Intellectual Property Assignment Agreement, and the other agreements, deeds, assumptions of leases, instruments, and documents required to be delivered in connection with this Agreement or at the Closing (collectively, the "**Ancillary Documents**") and the consummation of the transactions contemplated hereby and thereby, and (B) the names and signatures of the officers of Seller authorized to sign this Agreement and the other Ancillary Documents; and

(vi)    such other customary instruments of transfer or assumption, filings, or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to the transactions contemplated by this Agreement.

(b)    At the Closing, Buyer shall deliver to Seller the following:

(i)    the Purchase Price less the Purchase Price Remainder (and any amounts which may be withheld for outstanding Tax Liabilities);

(ii)    the Assignment and Assumption Agreement duly executed by Buyer;

(iii)    the Intellectual Property Assignment Agreement executed by Buyer; and

(iv)    a certificate of the Secretary (or equivalent officer) of Buyer certifying as to (A) the resolutions of the board of directors of Buyer, which authorize the execution, delivery, and performance of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby, and (B) the names and signatures of the officers of Buyer authorized to sign this Agreement and the other Ancillary Documents.

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that the statements contained in this ARTICLE III are true and correct as of the date hereof.

**Section 3.01   Organization and Authority of Seller.** Seller is a corporation duly organized, validly existing, and in good standing under the Laws of the State of Michigan. Seller has full corporate power and authority to enter into this Agreement and the other Ancillary Documents to which Seller is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Seller of this Agreement and any other Transaction Document to which Seller is a party, the performance by Seller of its obligations hereunder and thereunder, and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate, board, and shareholder action on the part of Seller. This Agreement and the Ancillary Documents constitute legal, valid, and binding obligations of Seller enforceable against Seller in accordance with their respective terms.

**Section 3.02   No Conflicts or Consents.** The execution, delivery, and performance by Seller of this Agreement and the other Ancillary Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of the certificate of incorporation, by-laws, or other governing documents of Seller; (b) violate or conflict with any provision of any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, other requirement, or rule of law of any Governmental Authority (collectively, "**Law**") or any order, writ, judgment, injunction, decree, stipulation, determination, penalty, or award entered by or with any Governmental Authority ("**Governmental Order**") applicable to Seller, the Business, or the Purchased Assets; (c) require the consent, notice, declaration, or filing with or other action by any individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity ("**Person**") or require any permit, license, or Governmental Order; (d) violate or conflict with, result in the acceleration of, or create in any party the right to accelerate, terminate, modify, or cancel any Contract to which Seller is a party or by which Seller or the Business is bound or to which any of the Purchased Assets are subject (including any Assigned Contract); or (e) result in the creation or imposition of any charge, claim, pledge, equitable interest, lien, security interest, restriction of any kind, or other encumbrance ("**Encumbrance**") on the Purchased Assets.

**Section 3.03   Financial Statements.** *Reserved.*

**Section 3.04   Undisclosed Liabilities.** *Reserved.*

**Section 3.05   Absence of Certain Changes, Events, and Conditions.** *Reserved.*

**Section 3.06   Assigned Contracts.** *Reserved.*

**Section 3.07   Title to Purchased Assets.** *Reserved.*

**Section 3.08   Condition and Sufficiency of Assets.** *Reserved.*

**Section 3.09   Inventory.** *Reserved.*

**Section 3.10   Accounts Receivable.** *Reserved.*

**Section 3.11   Material Customers and Suppliers.** *Reserved.*

**Section 3.12   Legal Proceedings; Governmental Orders.** *Reserved.*

**Section 3.13   Compliance with Laws.** *Reserved.*

**Section 3.14   Environmental Matters.** *Reserved.*

**Section 3.15   Taxes.** *Reserved.*

**Section 3.16   Brokers.** No broker, finder, or investment banker is entitled to any brokerage, finders, or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Seller.

**Section 3.17   Full Disclosure.** *Reserved.*

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents and warrants to Seller that the statements contained in this ARTICLE IV are true and correct as of the date hereof.

**Section 4.01   Organization and Authority of Buyer.** Buyer is a corporation duly organized, validly existing, and in good standing under the Laws of the State of Illinois. Buyer has full corporate power and authority to enter into this Agreement and the other Ancillary Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder, and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement and the Ancillary Documents constitute legal, valid, and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

**Section 4.02   No Conflicts; Consents.** The execution, delivery, and performance by Buyer of this Agreement and the other Ancillary Documents to which it is a party, and the

consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of the certificate of incorporation, by-laws, or other organizational documents of Buyer; (b) violate or conflict with any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice, declaration, or filing with or other action by any Person or require any permit, license, or Governmental Order.

**Section 4.03  Brokers.** No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer.

**Section 4.04  Legal Proceedings.** There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**ARTICLE V**

**COVENANTS**

**Section 5.01  Employees and Employee Benefits.**

(a)  Commencing on the Closing Date, Seller shall terminate all employees of the Business who are actively at work on the Closing Date, and, at Buyer's sole discretion, Buyer may offer employment, on an "at will" basis, to the employees set forth on Schedule 5.01(a) – Employees.

(b)  Seller shall be solely responsible, and Buyer shall have no obligations whatsoever for, any compensation or other amounts payable to any current or former employee, officer, director, independent contractor or consultant of the Business, including, without limitation, hourly pay, commission, bonus, salary, accrued vacation, fringe, pension or profit sharing benefits or severance pay for any period relating to the service with Seller at any time on or prior to the Closing Date and Seller shall pay all such amounts to all entitled persons on or prior to the Closing Date. Seller shall bear any and all obligations and liability under the WARN Act resulting from employment losses pursuant to this Section 5.01

(c)  Seller shall remain solely responsible for the satisfaction of all claims for medical, dental, life insurance, health accident or disability benefits brought by or in respect of current or former employees, officers, directors, independent contractors or consultants of the Business or the spouses, dependents or beneficiaries thereof, which claims relate to events occurring on or prior to the Closing Date. Seller also shall remain solely responsible for all worker's compensation claims of any current or former employees, officers, directors, independent contractors or consultants of the Business which relate to events occurring on or prior to the

Closing Date. Seller shall pay, or cause to be paid, all such amounts to the appropriate persons as and when due.

(d)     Each employee of the Business who becomes employed by Buyer in connection with the transactions contemplated by this Agreement shall be eligible to receive the salary and benefits maintained for employees of Buyer on substantially similar terms and conditions in the aggregate as are provided to similarly situated employees of Buyer.

(e)     On the Closing Date, Buyer shall make direct cash or cash equivalent payments to the listed employees in the amounts set forth on Schedule 5.01(e) – Employee Payments, so long as such employees (i) remain continuously employed by the Seller through the Closing Date, and (ii) enter into a mutually agreed upon employment agreement between the Buyer and the Seller for a period of not less than one (1) year.

**Section 5.02   Confidentiality.** From and after the Closing, Seller shall, and shall cause its Affiliates to, hold, and shall use its reasonable best efforts to cause its or their respective directors, officers, employees, consultants, counsel, accountants, and other agents ("**Representatives**") to hold, in confidence any and all information, whether written or oral, concerning the Business, except to the extent that Seller can show that such information: (a) is generally available to and known by the public through no fault of Seller, any of its Affiliates, or their respective Representatives; or (b) is lawfully acquired by Seller, any of its Affiliates, or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual, or fiduciary obligation. If Seller or any of its Affiliates or their respective Representatives are compelled to disclose any information by Governmental Order or Law, Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which is legally required to be disclosed, *provided that* Seller shall use reasonable best efforts to obtain as promptly as possible an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

**Section 5.03   Public Announcements.** Unless otherwise required by applicable Law, no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement.

**Section 5.04   Bulk Sales Laws.** The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer, or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer. Any Liabilities arising out of the failure of Seller to comply with the requirements and provisions of any bulk sales, bulk transfer, or similar Laws of any jurisdiction which would not otherwise constitute Assumed Liabilities shall be treated as Excluded Liabilities.

**Section 5.05   Receivables.** *Reserved.*

**Section 5.06    Name Change.** The Seller will (a) adopt, as of the Closing Date, a new entity name wholly dissimilar to its current name and any variations or derivations thereof, and (b) will within three (3) business days following the Closing file necessary amendments to its organizational documents to reflect such name change.  After the Closing, the Seller will (c) within five business days, file a motion in the Bankruptcy Case to change the case caption in its Bankruptcy Case to the new entity name, and (d) not use the Seller's pre-Closing name or any variation or derivation thereof by using either of the words "Oklahoma" and "Forge" in any commercial context.

**Section 5.07    Transfer Taxes.** All sales, use, registration, and other such Taxes and fees, including any penalties and interest, incurred in connection with this Agreement and the other Ancillary Documents, if any, shall be borne and paid by Seller when due. Seller shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees and Buyer shall cooperate with respect thereto as necessary.

**Section 5.08    Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Ancillary Documents.

**ARTICLE VI**
**CONDITIONS TO CLOSING**

**Section 6.01    Conditions to Obligations of All Parties.** The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)    No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(b)    Seller shall have received all consents, authorizations, orders and approvals from the Governmental Authorities referred to in Section 3.02 and Buyer shall have received all consents, authorizations, orders and approvals from the Governmental Authorities referred to in Section 4.02, in each case, in form and substance reasonably satisfactory to Buyer and Seller, and no such consent, authorization, order and approval shall have been revoked.

(c)    The entry of a debtor-in-possession financing order in a form acceptable to Buyer and Seller and entered by the Bankruptcy Court.

(d)     The entry of a Sale Order in a form acceptable to Buyer and Seller and entered by the Bankruptcy Court, and such Sale Order shall have become a Final Order in full force and effect and shall not have been stayed or vacated.

(e)      All leases shall have been released in full pursuant to the motion by the Seller filed to reject its leases, including, but not limited to, (i) the lease with Store Master Funding XIV, LLC, and (ii) the sublease with Duenner Supply Company.

**Section 6.02    Conditions to Obligations of Buyer.** The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)     The closing of (i) the Real Estate Purchase Agreement entered into by and between Store Master Funding XIV LLC and Forge Resources Group, LLC for (19.8) acres of land and real property improvements located at 5259 South 49th West Avenue, Tulsa, Oklahoma 74107, and (ii) the sublease with Duenner Supply Company for a segment of the property purchased pursuant to the Real Estate Purchase Agreement.

(b)     All Encumbrances relating to the Purchased Assets shall have been released in full pursuant to the Sale Order issued by the Bankruptcy Court, and Seller shall have delivered to Buyer written evidence, in form satisfactory to Buyer in its sole discretion, of the release of such Encumbrances.

(c)     Buyer has completed detailed due diligence investigation of the Business and Purchased Assets to the satisfaction of the Buyer.

(d)     Buyer has entered into a mutually agreed upon employment agreement between the Buyer and each of the employees on the list set forth on Schedule 5.01(e) – Employee Payments for a period of not less than one (1) year after the Closing Date.

(e)     The representations and warranties of Seller contained in this Agreement, the Ancillary Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such.

(f)     Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it prior to or on the Closing Date.

(g)     No Action shall have been commenced against Buyer or Seller, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

(h)     All approvals, consents and waivers that are listed shall have been received, and executed counterparts thereof shall have been delivered to Buyer at or prior to the Closing.

(i)     Seller shall have delivered to Buyer such other documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

## ARTICLE VII

## TERMINATION

**Section 7.01     Termination.** This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of Seller and Buyer;

(b)     by Buyer is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in ARTICLE VI and such breach, inaccuracy or failure has not been cured by Seller within ten (10) days of Seller's receipt of written notice of such breach from Buyer;

(c)     by Buyer in the event that any of the conditions set forth in Section 6.01 or Section 6.02 shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by February 15, 2025;

(d)     by Seller by written notice to Buyer if: Seller is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation and warranty made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in ARTICLE VI and such breach, inaccuracy or failure has not been cured by Buyer within ten (10) days of Buyer's receipt of written notice of such breach from Seller; or

(e)     by Buyer or Seller in the event that any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable.

**Section 7.02     Effect of Termination.** In the event of the termination of this Agreement in accordance with this ARTICLE VII, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except:

(a)     that the obligations set forth in this ARTICLE VII and ARTICLE VIII hereof shall survive termination; and

(b)     that nothing herein shall relieve any party hereto from liability for any willful breach of any provision hereof.

## ARTICLE VIII

## MISCELLANEOUS

**Section 8.01   Expenses.** All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**Section 8.02   Notices.** All notices, claims, demands, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient, or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 8.02):

| | |
|---|---|
| **If to Seller:** | 30800 Telegraph Road, Suite 2800<br>Bingham Farms, Michigan  48025 |
| with a copy to: | Crowe Dunlevy<br>222 North Detroit Avenue<br>Suite 600<br>Tulsa, Oklahoma 74120<br>Email: mark.craige@crowedunlevy.com<br><br>Attention: Mark A. Craige, Esq. |
| **If to Buyer:** | Forge Resources Group<br><br>PO Box 369<br><br>DeKalb, IL 60115<br><br>Attn: Kent Paul<br><br>Email:  kentp@forgerg.com |
| with a copy to: | Miller Canfield Paddock & Stone PLC<br>840 W. Long Lake, Suite 150<br>Troy, Michigan 48098<br>Email: richardson@millercanfield.com<br>Attention:  Jeffrey G. Richardson, Esq. |

**Section 8.03   Interpretation; Headings.** This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 8.04   Severability.** If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement.

**Section 8.05   Entire Agreement.** This Agreement and the other Ancillary Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Ancillary Documents, the Exhibits, and the Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 8.06   Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. Any purported assignment in violation of this Section shall be null and void. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 8.07   Amendment and Modification; Waiver.** This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No failure to exercise, or delay in exercising, any right or remedy arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy.

**Section 8.08   Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

(a)      Except to the extent inconsistent with United States Bankruptcy Code, 11 USC §§101 *et. seq.,* as amended (in which case the Bankruptcy Code shall govern), this Agreement and all claims or causes of action (whether in contract, tort or statute) that may be based upon, arise out of or relate to this Agreement or the Ancillary Documents or the negotiation, execution or performance of this Agreement or the Ancillary Documents (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement as an inducement to enter this Agreement) shall be governed by and construed under Michigan law, without regard to conflict of laws principles.  Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement

or the Ancillary Documents shall be brought against any of the parties exclusively in the Bankruptcy Court, or, if the Bankruptcy Court does not have or declines to exercise jurisdiction, in the federal courts of the United States of America within the Eastern District of Michigan, or the courts of the State of Michigan located in Oakland County, and each of the parties consent to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waive any objection to venue in those courts.  Process in any action or proceeding referred to in the preceding sentence may be served on any Party anywhere it the world.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER ANCILLARY DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY EXHIBITS AND SCHEDULES ATTACHED TO THIS AGREEMENT, THE OTHER ANCILLARY DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT: (I) NO REPRESENTATIVE OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION; (II) EACH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (III) EACH PARTY MAKES THIS WAIVER KNOWINGLY AND VOLUNTARILY; AND (IV) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 8.09   Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their duly authorized representatives.

Oklahoma Forge, LLC

By_____
Name:
Title:

Forge Resources Group LLC

By_____
Name:
Title:

# ASSET PURCHASE AGREEMENT

## SCHEDULES

Schedule 1.01(b) – Assigned Contracts

Under the Asset Purchase Agreement, Buyer has the right to designate any executory Contracts as Assigned Contracts at any time until the Closing Date.  If Buyer timely designates any such Contracts as Assigned Contracts, Debtor shall promptly move the Bankruptcy Court to authorize and approve the assumption and assignment of any such executory Contracts as Assigned Contracts. The assumption and assignment of such executory Contracts as Assigned Contracts shall be authorized and approved so long as such assumption and assignment satisfies the requirements of section 365 of the Bankruptcy Code, including sections 365(b) and (f) thereof, as determined by further Bankruptcy Court order.  Any cure costs associated therewith shall be the obligation of the Buyer.

Schedule 1.01(c) – Tangible Personal Property

*See* equipment list

Schedule 1.01(e) – Insurance Benefits

| Check# | Pay to: | Amount |
|---|---|---|
| 6686039 | OFI and Store Master Funding | 500,000 |
| 6750544 | OFI and Store Master Funding | 108,933 |
| 7162046 | OFI and Store Master Funding, ISAOA, ATIMA | 80,809 |
| 6933878 | OFI and Key Equipment | 69,900 |
| 7162049 | OFI and Loeb Term Solutions | 48,517 |
| 7076043 | OFI (OFI Deposited) | 149,150 |
|  | Total | 957,309.46 |

|  |  |  |
|---|---|---|
|  |  |  |

Schedule 1.02 – Excluded Assets


None


Schedule 1.03 – Assumed Liabilities


None


Schedule 1.04 – Wire Transfer Information



      Account Title:

      Account #:

      Address:


      Bank Information

      Name:

      Address:

      Routing /ABA:

      SWIFT:


Schedule 5.01(a) – Employees


- Beth Cox (Accounts Receivable / Human Resources)

- Jessica Philips (Sales Manager)

- Steve Upton (Plant Manager)

Schedule 5.01(e) – Employee Payments

- Jessica Philips (Sales Manager) - $83,720.00

- Steve Upton (Plant Manager) - $80,003.00

For avoidance of doubt, employee Beth Cox (Accounts Receivable / Human Resources) shall (i) receive zero ($0) dollars at the Closing Date, and (ii) not be subject to the continuing employment agreement requirements applicable to Jessica Philips and Steve Upton.

## EXHIBIT A - Definitions Cross-Reference Table

The following terms have the meanings set forth in the location in this Agreement referenced below:

| Term | Section |
| --- | --- |
| Accounts Receivable | Section 1.02(a) |
| Affiliate | Section 1.03(b) |
| Agreement | Preamble |
| Allocation Schedule | Section 1.05 |
| Ancillary Documents | Section 2.02(a)(v) |
| Assigned Contracts | Section 1.01(b) |
| Assignment and Assumption Agreement | Section 2.02(a)(ii) |
| Assumed Liabilities | Section 1.03(a) |
| Balance Sheet | Section 3.03 |
| Balance Sheet Date | Section 3.03 |
| Bill of Sale | Section 2.02(a)(i) |
| Books and Records | Section 1.01(f) |
| Business | Recitals |
| Buyer | Preamble |
| Closing | Section 2.01 |
| Closing Date | Section 2.01 |
| Contracts | Section 1.01(b) |
| Control | Section 1.03(b) |
| Disclosure Schedules | Section 1.01(b) |
| DIP Obligations | Recitals |
| Encumbrance | Section 3.02 |
| Excluded Assets | Section 1.02 |
| Excluded Liabilities | Section 1.03(b) |
| Financial Statements | Section 3.03 |
| Governmental Authority | Section 1.01(f) |
| Governmental Order | Section 3.02 |
| Inventory | Section 1.01(a) |
| Law | Section 3.02 |
| Liabilities | Section 1.03(a) |
| Person | Section 3.02 |
| Purchased Assets | Section 1.01 |
| Purchase Price | Section 1.04 |
| Representatives | Section 5.01 |
| Seller | Preamble |
| Tangible Personal Property | Section 1.01(c) |
| Taxes | Section 3.15 |
| Tax Returns | Section 1.05 |

<u>Additional Definitions Used in the Agreement but Defined Below</u>

"**Environmental Law**" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient or indoor air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act of 1910, as amended, 7 U.S.C. §§ 136 et seq.; the Oil Pollution Act of 1990, as amended, 33 U.S.C. §§ 2701 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"**Final Order**" means a final order of the Bankruptcy Court, which shall be in full force and effect and not stayed, and as to which no appeal, petition for certiorari or other proceeding for reconsideration has been timely filed, or if timely filed, such appeal, petition for certiorari or motion to reconsider has been dismissed or denied with no further appeal and the time for filing such appeal has passed, and such order shall not be reversed, vacated, amended, supplemented, or otherwise modified, in each case, without the prior written consent of Buyer.

"**Intellectual Property**" means any and all (a) trademarks and service marks, brands, certification marks, logos, trade dress, trade names, designs and other similar indicia of source or origin, including all applications, registrations and renewals of any of the foregoing, together with the goodwill connected with the use of and symbolized by the foregoing ("**Trademarks**"); (b) copyrights, including all applications, registrations and renewals of any of the foregoing, and works of authorship, whether or not copyrightable (collectively, "**Copyrights**"); (c) trade secrets, confidential know-how, discoveries, improvements, technology, business and technical information, databases, data compilations and collections, tools, methods, processes, techniques, specifications, and other confidential and proprietary information (collectively, "**Trade Secrets**"); (d) patents, registered industrial designs, design patents, certificates of invention, and other indicia of invention ownership issued or granted by any Governmental Authority and patent applications for any of the foregoing, together with all continuations, divisionals, reexaminations and reissues thereof or other post-grant forms of any of the foregoing, equivalents or counterparts of any of the foregoing (collectively, "**Patents**"); (e) Software; (f) websites, internet domain name registrations and social media account or user names (including "handles"), all associated web addresses, URLs, websites and web pages, social media sites and pages, and all content and data thereon or relating thereto and registrations and applications for registration of any of the foregoing (collectively,

"**Domain Names**"); and (g) all other intellectual and industrial property rights and assets, and all rights, interests and protections that are associated with any of the foregoing throughout the world.

"**Sale Order**" means a Final Order of the Bankruptcy Court, to be issued by the Bankruptcy Court pursuant to sections 105 and 363 of the Bankruptcy Code in a form and substance acceptable to Buyer, which includes, but is not limited to, provisions (a) approving this Agreement and the Sale, (b) approving the Sale of the Purchased Assets to Buyer free and clear of all liens, claims, encumbrances and other interests of every and any kind or nature whatsoever, whether at law or in equity, pursuant to section 363(f) of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, (c) finding that (i) Buyer purchased the Purchased Assets for reasonably equivalent value, (ii) the sale of the Purchased Assets was negotiated at arm's length, and (iii) Buyer is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code, and (d) providing that the Sale Order is immediately effective upon entry, notwithstanding the 14 day stay in Bankruptcy Rules 6004(h).

**Exhibit B – Bill of Sale**

## BILL OF SALE

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Oklahoma Forge, LLC, a Michigan limited liability company ("**Seller**"), does hereby grant, bargain, transfer, sell, assign, convey and deliver to Forge Resources Group LLC, an Illinois limited liability company or its designee ("**Buyer**"), all of its right, title, and interest in and to the Tangible Personal Property, as such term is defined in the Asset Purchase Agreement by and between Seller and Buyer, dated as of [●], to have and to hold the same unto Buyer, its successors and assigns, forever.

Buyer acknowledges that Seller makes no representation or warranty with respect to the assets being conveyed hereby except as specifically set forth in the Asset Purchase Agreement.

Seller for itself, its successors and assigns, hereby covenants and agrees that, at any time and from time to time upon the written request of Buyer, Seller will do, execute, acknowledge, and deliver or cause to be done, executed, acknowledged, and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney, and assurances as may be reasonably required by Buyer in order to assign, transfer, set over, convey, assure, and confirm unto and vest in Buyer, its successors and assigns, title to the assets sold, conveyed, and transferred by this Bill of Sale.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Seller has duly executed this Bill of Sale as of [●].

Oklahoma Forge, LLC

By_____
Name:
Title:

Forge Resources Group LLC

By_____
Name:
Title:

**Exhibit C – Assignment and Assumption Agreement**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "**Agreement**"), effective as of [●] ("**Effective Date**"), is by and between Oklahoma Forge, LLC, a Michigan limited liability company ("**Seller**"), and Forge Resources Group LLC, an Illinois limited liability company or its designee ("**Buyer**").

**WHEREAS**, Seller and Buyer have entered into a certain the Asset Purchase Agreement, dated as of [●] ( "**Purchase Agreement**"), pursuant to which, among other things, Seller has agreed to assign all of its rights, title and interests in, and Buyer has agreed to assume all of Seller's duties and obligations under, the Assigned Contracts (as defined in the Purchase Agreement).

**NOW, THEREFORE**, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      <u>Definitions</u>. All capitalized terms used in this Agreement but not otherwise defined herein are given the meanings set forth in the Purchase Agreement.

2.      <u>Assignment and Assumption</u>. Seller hereby sells, assigns, grants, conveys and transfers to Buyer all of Seller's right, title and interest in and to the Assigned Contracts. Buyer hereby accepts such assignment and assumes all of Seller's duties and obligations under the Assigned Contracts and agrees to pay, perform and discharge, as and when due, all of the obligations of Seller under the Assigned Contracts accruing on and after the Effective Date.

3.      <u>Terms of the Purchase Agreement</u>. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements and indemnities relating to the Assigned Contracts are incorporated herein by this reference. The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

4.      <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Michigan without giving effect to any choice or conflict of law provision or rule (whether of the State of Michigan or any other jurisdiction).

5.      <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

6.      <u>Further Assurances</u>. Each of the parties hereto shall execute and deliver, at the reasonable request of the other party hereto, such additional documents, instruments, conveyances and assurances and take such further actions as such other party may reasonably request to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have executed this Assignment and Assumption Agreement to be effective as of [●].

Oklahoma Forge, LLC

By_____
Name:
Title:

Forge Resources Group LLC

By_____
Name:
Title:

**Exhibit D – Intellectual Property Assignments**

## INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

This Intellectual Property Assignment Agreement ("**IP Assignment**"), dated as of [●], is made by, located at Oklahoma Forge, LLC, a Michigan limited liability company [● // address] ("**Assignor**"), in favor of Forge Resources Group LLC, an Illinois limited liability company or its designee [● // address] ("**Assignee**"), the purchaser of certain assets of Assignor pursuant to the Asset Purchase Agreement, between Assignee and Assignor dated as of [●] (the "**Purchase Agreement**"),

WHEREAS, under the terms of the Purchase Agreement, Assignor has conveyed, transferred, and assigned to Assignee, among other assets, the intellectual property of Assignor, and has agreed to execute and deliver this IP Assignment;

NOW THEREFORE, parties agree as follows:

1.      Assignment. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby irrevocably conveys, transfers, and assigns to Assignee, and Assignee hereby accepts, all of Assignor's right, title, and interest in and to the following (the "**Assigned IP**"):

(a)      the Intellectual Property Rights, including the registrations and applications for Intellectual Property Rights set forth on Schedule 1;

(b)      all rights to claim priority to any Intellectual Property Rights;

(c)      all rights of any kind whatsoever of Assignor accruing under any of the foregoing provided by applicable law of any jurisdiction, by international treaties and conventions, and otherwise throughout the world;

(d)      any and all royalties, fees, income, payments, and other proceeds now or hereafter due or payable with respect to any and all of the foregoing; and

(e)      any and all claims and causes of action with respect to any of the foregoing, whether accruing before, on, or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, dilution, misappropriation, violation, misuse, breach, or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages.

2.      <u>Recordation and Further Actions</u>. Assignor authorizes, as applicable, the U.S. Patent and Trademark Office, U.S. Copyright Office and any other similar government authorities throughout the world, to record this assignment. Assignee shall have the right to record this Agreement with any applicable Governmental Authorities so as to perfect its ownership of the Intellectual Property Rights. Assignor shall take such steps and actions, and provide such cooperation and assistance to Assignee and its successors, assigns, and legal representatives, including the execution and delivery of any affidavits, declarations, oaths, exhibits, assignments,

powers of attorney, or other documents, as may be reasonably necessary to effect, evidence, or perfect the assignment of the Assigned IP to Assignee, or any assignee or successor thereto.

3. <u>Terms of the Purchase Agreement</u>. The parties hereto acknowledge and agree that this IP Assignment is entered into pursuant to the Purchase Agreement, to which reference is made for a further statement of the rights and obligations of Assignor and Assignee with respect to the Assigned IP. The representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

4. <u>Moral Rights</u>. Assignor hereby waive any "moral" rights with respect to the Intellectual Property Rights, including but not limited to rights of attribution and integrity arising from all or any part of the copyrights included in the Intellectual Property Rights, together with all claims for damages and other remedies asserted on the basis of moral rights, and transfer, convey and assign unto Assignee any waivers granted to Assignor of any such moral rights, in each case, to fullest extent permitted by applicable laws.

5. <u>Counterparts</u>. This IP Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same agreement. A signed copy of this IP Assignment delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this IP Assignment.

6. <u>Successors and Assigns</u>. This IP Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

7. <u>Governing Law</u>. This IP Assignment and any claim, controversy, dispute, or cause of action (whether in contract, tort, or otherwise) based upon, arising out of, or relating to this IP Assignment and the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of the United States and the State of Michigan, without giving effect to any choice or conflict of law provision or rule (whether of the State of Michigan or any other jurisdiction).

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF,** the Parties hereto have duly executed under seal and delivered this Agreement, as of the Effective Date.

**ASSIGNOR:**                                      **ASSIGNEE:**

Oklahoma Forge, LLC                        Forge Resources Group LLC


By:_____    By:_____
    Name:                                          Name:

    Title:                                            Title:

**Schedule 1**

<u>Trade Names</u>

Oklahoma Forge

Oklahoma Forge, LLC

<u>Website Domain</u>

oklahomaforge.com

**Exhibit E – Transition Services Agreement -** *Reserved*

# Equipment List  E

| Location in Plant | Category | Classification | Size | OEM | Model | Serial# | Year Built | Machine Description |
|---|---|---|---|---|---|---|---|---|
| Press Ring Area | Ring Mill | Process Machinery | 100 Ton | SMS Meer Wagner | R100 | N/A | 2014 | 113" OD X 16-1/2" High Ring Forming Mill, With 100 Ton Cone Rolls, 100 Ton Mandrel, Hydraulic Cone & Mandrel Travels, Side Guide Rolls, Laser Od Measurement System, Dedicated Hydraulic System With [2] 60 HP / [2] Approximately 40 HP, And (1) Approximately 20 HP Motors, Fluid Reservoir, Valves, Kone Cranes 4 Ton Single Girder Top Running Bridge Crane With 12' Span X Approximately 30' Run-Out & Remote Control, Motor Control Center With Siemens Drives, Dedicated Amcot Mdl. St-150 150 Ton Cooling Tower With 5 HP Motor & [2] Trane Chillers (S/N: 99616), Control Room With Overall System Pc-Based Control With Component Controls, Kone Cranes Dedicated 10 Ton Single Girder Top Running Bridge Crane – Approximately 12' Span X 40' Run-Out, Radio Crane Control, Closed Loop Cone & Mandrel Cooling System, Dedicated Hotsy Pressure Washer |
| Press Ring Area | Ring Mill | Process Machinery | 125 Ton | Wagner | R125 | N/A | | 115" OD X 72" High Ring Forming Mill, Finished Ring Size, 125 Ton Cone Rolls, 125 Ton Mandrel, Hydraulic Cone Assembly Movement, Hydraulic Mandrel Adjustment, Side Guide Rolls With Hydraulic Adjustment, Power Overhead Clamp, Closed Loop Cone & Mandrel Coolant System, Hydraulic Cone Adjustment, Dedicated Hydraulic System With Fluid Reservoir, [2] 7-1/2 HP / 15 HP / [3] 50 HP Motors, Valves, Hydraulic Lines, Control Room With Siemens Control Panels, Overall System Pc Based Control Station With Component Controls, Dual Joystick Controls, Dedicated 2 Ton Rolling A-Frame, Dedicated Hotsy Pressure Washer |
| Press Ring Area | Forging Press | Process Machinery | 3,000 Ton | Lake Erie Engineering Corp. | | N/A | | 3,000 Ton 4-Post Hydraulic Forging Press, With 4" X 6' Bed, 74" Daylight, 33" Stroke, [2] Hydraulic Side Manipulating Arms, Dedicated Hydraulic System With [8] 150 HP Motors, Fluid Reservoir, Sliding Die With Rotating Head, Circulation Pump, Operator's Room With Allen Bradley Panelview 5510 Touch Screen Programmable Logic Control & Joystick, Allen Bradley Panelview 5510 Touch Screen Maintenance Control With Remote Access, Component Access Screen With Real Time Diagnostics, All Related Motors, Pumps, Valves, Hydraulic Lines, Filters, Etc. |
| Press Ring Area | Ring Mill | Process Machinery | 80 Ton | Rheinstahl Wagner | 8050 | N/A | | 54" OD X 14" High Ring Turning Mill, With 80 Ton Mandrel Side, 50 Ton Cone Side, 54" Max Forming Diameter, Approximately 50 HP Cone Roll Drive, 18" Cone Height Power Adjustment, 88" Cone Side Base Adjustment, Side Guide Rolls, Pit-Mounted Hydraulic System With 30 HP / Approximately 10 HP / 30 HP Pumps, 200 HP Main Drive Motor, 40 HP Cylinder Pump |

| Location in Plant | Category | Classification | Size | OEM | Model | Serial# | Year Built | Machine Description |
|---|---|---|---|---|---|---|---|---|
| Press Ring Area | Forging Press | Process Machinery | 1,500 Ton | Loewy Hydropress Inc. | | CH39729A | | 1,500 Ton 4-Post Hydraulic Forging Press, With 48" Diameter Bed, 38" Daylight, 25" Stroke, Dedicated Hydraulic System With [6] 150 HP Motors, Fluid Reservoir, Valves, Pipes & Filters, Control Room With Touch Screen Programmable Logic Control, Control Cabinet, All Related Hydraulic Lines, Controls, Pumps, Valves [Note: Machine Requires Approximately 12' Pit, Has Dedicated Cooling Tower] |
| Rolling Stock | Forklift | Material Handling | 13,000 | Hyundai | 130D-9 | HHKHFT227J0000060 0 | 2018 | 13,000 Lb. Diesel-Powered Forklift Truck, With 158" Max Lift Height, Dual Side Shift, 8' Forks, Solid Tires, Enclosed Cab With Heat & A/C, 1,404 Hours |
| Rolling Stock | Forklift | Material Handling | 30,000 | Caterpillar | DP135 | 5DP10071 | | 30,000 Lb. Diesel-Powered Forklift Truck, With Approximately 180" Max Lift Height, Dual Side Shift, 8' Forks, Solid Tires, Enclosed Cab, Approx. 14,205 Hours |
| Rolling Stock | Forklift | Material Handling | 15,500 | Hyundai | 70D-9 | HHKHFA03LK000115 5 | 2018 | 15,500 Lb. Diesel-Powered Forklift Truck, With 157" Max Lift Height, 70° Manipulator Arms With 360° Rotation, Solid Tires, Windshield, 1,463 Hours |
| Rolling Stock | Forklift | Material Handling | 15,500 | Hyundai | 70D-9 | HHKHFA03HK000115 6 | 2018 | 15,500 Lb. Diesel-Powered Forklift Truck, With 157" Max Lift Height, 70° Manipulator Arms With 360° Rotation, Solid Tires, Windshield, 2,293 Hours |
| Rolling Stock | Forklift | Material Handling | 15,500 | Hyundai | 70D-9 | HHKHFA03JK000101 9 | 2018 | 15,500 Lb. Diesel-Powered Forklift Truck, With 157" Max Lift Height, 70° Manipulator Arms With 360° Rotation, Solid Tires, Windshield, 2,752 Hours |
| Rolling Stock | Forklift | Material Handling | 15,500 | Hyundai | 70D-9 | HHKHFA03KK000102 1 | 2018 | 15,500 Lb. Diesel-Powered Forklift Truck, With 157" Max Lift Height, 70° Manipulator Arms With 360° Rotation, Solid Tires, Windshield, 3,903 Hours |
| Rolling Stock | Forklift | Material Handling | 15,000 | Hyundai | 70D-9 | HHKHFA03PJ0000091 7 | 2018 | 15,500 Lb. Diesel-Powered Forklift Truck, With 157" Max Lift Height, 70° Manipulator Arms With 360° Rotation, Solid Tires, Enclosed Cab With Heat & A/C, 935 Hours |
| Rolling Stock | Forklift | Material Handling | 15,500 | Caterpillar | DP70 | T120C-60141 | | 15,500 Lb. Diesel-Powered Forklift Truck, With 146" Max Lift Height, Wide Carriage With 70° Manipulator Arms With 360° Rotation, Solid Tires, Windshield, 13,972 Hours |
| Saw Area | Bandsaw | Metalworking or Shop Machinery | | Cosen | C-800NC | C1040149 | 2018 | 31-1/2" X 33-1/2" Dual Column Horizontal Bandsaw, With 10 HP Saw Motor, 3 HP Hydraulic System, 1/2 HP Coolant System, Hydraulic Clamping, 36" Wide X 24" Long Power Roller Infeed Conveyor, Power Feed With 20" Index, Plc Saw Control, Chip Auger, 36" X 70" Gravity Roller |

| Location in Plant | Category | Classification | Size | OEM | Model | Serial# | Year Built | Machine Description |
|---|---|---|---|---|---|---|---|---|
| Rolling Stock | Forklift | Material Handling | 30,000 | Caterpillar | DP135 | SDP10151 | | 30,000 Lb. Diesel-Powered Forklift Truck, With 161" Max Lift Height, 70" Manipulator Arms With 360° Rotation, Solid Tires, Windshield, Approx. 13,074 Hours |
| Heat Treating Area | Furnace | Process Machinery | | | | | | Custom-Built Rail-Fed Car Bottom Gas Fired Heat Treating Furnace, With 1675° Max Temperature, Fiber Module Lining, [4] Exhaust Stacks, Temperature Regulators, 12-1/2' X 16' Rail Car, 12-1/2' X 16' X 11' High Chamber, Thermo-Coupler Temperature Control, [4] Cooling Fans, Control Panel With Digital High Limit Temperature Control, Honeywell Temperature Charter With Digital Readout, [7] Burners |
| Machine Shop | Vert Mill | Metalworking or Shop Machinery | | King Machine Tool Co. | | | | Twin Column Vertical Boring Mill, With 80" Diameter 4-Jaw Table With 40 HP Rotation Motor, 4-Position Tool Holder On Right Head, Swivel Heads, Approximately 5' Cross Travel, Approximately 42" Under Rail |
| Rolling Stock | Forklift | Material Handling | 17,600 | Doosan | D80S-2 | GS-00212 | | 17,600 Lb. Diesel-Powered Forklift Truck, With 142" Max Lift Height, 70" Manipulator Arms With 360° Rotation, Solid Tires, Windshield, 12,360 Hours |
| Rolling Stock | Forklift | Material Handling | 17,600 | Doosan | D80S-2 | GS-00174 | | 17,600 Lb. Diesel-Powered Forklift Truck, With 142" Max Lift Height, 70" Manipulator Arms With 360° Rotation, Solid Tires, Windshield, 20,515 Hours |
| Saw Area | Bandsaw | Metalworking or Shop Machinery | | HEM | 200D-30 | 1124612 | 2012 | 26" X 30" Horizontal Bandsaw, With 15 HP Saw Motor, Power Head Downfeed, 2-Cylinder Hydraulic Clamp, 36" X Approximately 25' Power Roller Infeed Conveyor, 36" X 65" Power Roller Outfeed Conveyor, Coolant System, Control Panel, Approximately 5 HP Hydraulic System |
| Heat Treating Area | Furnace | Process Machinery | | | | | | Custom-Built Rail-Fed Car Bottom Gas Fired Heat Treating Furnace, With 1675° Max Temperature, Fiber Module Lining, [10] Exhaust Stacks, Temperature Regulators, 10' X 25-1/2' Rail Car, 10' X 25-1/2' X 11' High Chamber, Control Cabinet With Digital Temperature Control, [4] Cooling Fans, Control Panel With Digital High Limit Temperature Control, Honeywell Temperature Charter With Digital Readout, [10] Burners |
| Rolling Stock | Forklift | Material Handling | 15,850 | Doosan | D80S-2 | GS00053 | | 15,850 Lb. Diesel-Powered Forklift Truck, With 181" Max Lift Height, 70" Manipulator Arms With 360° Rotation, Solid Tires, Enclosed Cab, 25,471 Hours |
| Rolling Stock | Forklift | Material Handling | 16,700 | Caterpillar | DP90 | T32B-60102 | | 16,700 Lb. Diesel-Powered Forklift Truck, With 157" Max Lift Height, Dual Side Shift, 93" Forks, Solid Tires, 8,121 Hours |

| Location in Plant | Category | Classification | Size | OEM | Model | Serial# | Year Built | Machine Description |
|---|---|---|---|---|---|---|---|---|
| Heat Treating Area | Furnace | Process Machinery | | | | | | Custom-Built Furnace, Gas-Fired, Fiber-Lined, Pass Through Type, 11.5' X 11.5' X 5.8' High Chamber, 2450° Max Temperature, [4] Burners, [2] Exhaust Stacks, Nanodac / Eurotherm, Control Panel With Temperature Grapher |
| Heat Treating Area | Furnace | Process Machinery | | | | | | Custom-Built Furnace, Gas-Fired, Fiber-Lined, Pass Through Type, 11.5' X 11.5' X 5.8' High Chamber, 2450° Max Temperature, [4] Burners, [2] Exhaust Stacks, Nanodac / Eurotherm, Control Panel With Temperature Grapher, Digital Temperature Control With Lcd Display, Digital Over Temperature Control, Power Doors With Pneumatic Actuation |
| Heat Treating Area | Furnace | Process Machinery | | | | | | Custom-Built Furnace, Gas-Fired, Fiber-Lined, Pass Through Type, 11.5' X 11.5' X 5.8' High Chamber, 2450° Max Temperature, [4] Burners, [2] Exhaust Stacks, Nanodac / Eurotherm, Control Panel With Temperature Grapher, Digital Temperature Control With Lcd Display, Digital Over Temperature Control, Power Doors With Pneumatic Actuation |
| Heat Treating Area | Furnace | Process Machinery | | | | | | Custom-Built Furnace, Gas-Fired, Fiber-Lined, Pass Through Type, 11.5' X 11.5' X 5.8' High Chamber, 2450° Max Temperature, [4] Burners, [2] Exhaust Stacks, Nanodac / Eurotherm, Control Panel With Temperature Grapher, Digital Temperature Control With Lcd Display, Digital Over Temperature Control, Power Doors With Pneumatic Actuation, Graph Recorder |
| Heat Treating Area | Furnace | Process Machinery | | | | | | Custom-Built Furnace, Gas-Fired, Fiber-Lined, Pass Through Type, 11.5' X 11.5' X 5.8' High Chamber, 2450° Max Temperature, [4] Burners, [2] Exhaust Stacks, Nanodac / Eurotherm, Control Panel With Temperature Grapher, Digital Temperature Control With Lcd Display, Digital Over Temperature Control, Power Doors With Pneumatic Actuation |
| Heat Treating Area | Furnace | Process Machinery | | | | | | Custom-Built Single Door Furnace, Gas-Fired, Fiber- Lined, Pass Through Type, 11.5' X 11.5' X 5.8' High Chamber, 2450° Max Temperature, [4] Burners, [2] Exhaust Stacks, Nanodac / Eurotherm, Control Panel With Temperature Grapher, Digital Temperature Control With Lcd Display, Digital Over Temperature Control, Power Doors With Pneumatic Actuation |
| Rolling Stock | Forklift | Material Handling | 13,650 | Unicarriers | L1F6F70V | 30S30239 | 2018 | 13,650 Lb. Diesel-Powered Forklift Truck, With 189" Max Lift Height, 70" Manipulator Arms With 360° Rotation, Solid Tires, Windshield, 1,796 Hours |

42832522.16/156171.00005

| Location in Plant | Category | Classification | Size | OEM | Model | Serial# | Year Built | Machine Description |
|---|---|---|---|---|---|---|---|---|
| Rolling Stock | Forklift | Material Handling | 13,500 | Doosan | D70S-2 | GF-00328 | | 13,500 Lb. Diesel-Powered Forklift Truck, With 157" Max Lift Height, 70" Manipulator Arms With 360° Rotation, Solid Tires, Windshield, 7,580 Hours |
| Saw Area | Bandsaw | Metalworking or Shop Machinery | | Cosen | C-520NC | C1070S33 | 2018 | 20-1/2" X 22" Dual Column Horizontal Bandsaw, With 10 HP Saw Motor, 2 HP Hydraulic Pump, 1/4 HP Coolant System, Hydraulic Clamping, 30" Wide X 20' Long Powered Roller Conveyor, Power Stock Feed With Approximately20" Index, 30" X 4' Gravity Roller Outfeed Conveyor, Chip Auger, Plc Length Control |
| Miscellaneous Throughout | Misc | Misc | | | | | | Miscellaneous Throughout Facility, Including But Not Limited To:  Banding Reels, 5' X 5' X 5,000 Lb. Digital Scale, Hammond 3 HP Pedestal Grinder, [5] Port-A-Cool High-Output Water Cooled Fans, [8] Sections Miscellaneous Size Pallet Racks, Work Tables, Vises, Barrel Pumps, 2-Door Flammable Storage Cabinets, Drum Carts, High-Output Floor Fans, Wall Fans, Foreman's Desk, Rolling Scaffold, Quincy 5 HP Vertical Air Compressor With 80- Gal. Tank, Forklift Man Lift Cage, Multiquip Essick Approximately 1 Cu. Yd. Portable Gas Powered Cement Mixer, [5] Portable Air Conditioners, Approximately 1,000-Gal. Air Storage Tank, Wash Bay With Hot Water Pressure Washer, Portable Lights, 2-Door Cabinets, Spare Motors, Torpedo Heaters, Air Tanks, North Star Gas Powered Steam Cleaner, Paint Mixing / Dispensing Cart, 26-Camera Surveillance System With Pc & Power Back-Up, Time Clock, Lockers, Break Room With [2] Refrigerators, Microwave, [2] Folding Tables, [18] Folding Chairs, Manitowoc Reach-In Ice Chest, Etc. |
| Heat Treating Area | Furnace | Process Machinery | | | | | | Custom-Built Rail-Fed Car Bottom Gas Fired Heat Treating Furnace, With 1675° Max Temperature, Fiber Module Lining, [4] Exhaust Ports With Common Stack, Temperature Regulators, 78" X 115-1/2" Rail Car, 78" X 115-1/2" X 7-1/4" High Chamber, Thermo-Coupler Temperature Control, [4] Cooling Fans, Control Panel With Digital High Limit Temperature Control, Honeywell Temperature Charter With Digital Readout, [2] Burners |
| Press Ring Area | Air Compressor | Plant Support | 125 HP | Kaeser | CSD125 | 1241 | 2018 | 125 HP Screw Type Air Compressor, With Sigma Control 2 Plc Control, Approx.. 26,334 Hours. Air Receiving Tank |
| Rolling Stock | Flatbed Truck | Rolling Stock | | Ford | F550 | | 2011 | Super Duty Single Axle Flatbed Truck, With 6.7 Liter Power Stroke Diesel-Powered Engine, Automatic Transmission, 18' Bed, 85,793 Miles; VIN: 1FDUF5GT5BEC26517; License Plate: 67308V |

| Location in Plant | Category | Classification | Size | OEM | Model | Serial# | Year Built | Machine Description |
|---|---|---|---|---|---|---|---|---|
| Rolling Stock | Flatbed Truck | Rolling Stock | | Ford | F550 | | 2012 | Super Duty Single Axle Flatbed Truck, With 6.7 Liter Power Stroke Diesel-Powered Engine, Automatic Transmission, 18' Bed, 93,623 Miles; VIN: 1FDUF5GT9CEA22241; License Plate: V65653 |
| Rolling Stock | Forklift | Material Handling | 13,800 | Doosan | D70S-2 | FX-00105 | | 13,800 Lb. Diesel-Powered Forklift Truck, With 177" Max Lift Height, 70" Manipulator Arms With 360° Rotation, Solid Tires, Enclosed Cab, 2,621 Hours |
| Rolling Stock | Boom Lift | Rolling Stock | | Genie | Z-60/34 | Z6007-8243 | 2007 | Articulating Boom Lift, With 60' Max Lift Height, 34' Horizontal Reach, 4Wd, Dual Fuel, Joystick Control, 500 Lb. Lift Capacity, 3,004 Hours |
| Rolling Stock | Front End Loader | Rolling Stock | | Case | 570MXT | JJG030308 5 | 2006 | Front End Loader, With 75 HP Diesel-Powered Engine, 81" Smooth Edge Bucket, Gannon 7" Box Blade, 4Wd, Approx. 3,276 Hours |
| Machine Shop | Lathe | Metalworking or Shop Machinery | | Warner & Swasey | #3A | 1273559 | | Square Head Turret Lathe, With 20" 3-Jaw Chuck, Taper Attachment, 6-Position Tailstock On Cross Slide, Coolant System, 6-1/2" Hole Thru Spindle, Outboard Chuck Capability, 30 HP Spindle Motor |
| Rolling Stock | Forklift | Material Handling | 9,000 | Linde | H45D-04 | H2X352.03 01045 | | 9,000 Lb. Diesel-Powered Forklift Truck, With 180" Max Lift Height, 5' Forks, Side Shift, Solid Tires, 7,165 Hours |
| Machine Shop | Vert Mill | Metalworking or Shop Machinery | | Bullard | | 10674 | | 48" Twin Column Vertical Boring Mill, With 50" Diameter 4-Jaw Chuck With 25 HP Rotation Motor, Swivel Heads, 4-Position Tool Holder On Right Head, Approximately 24" Power Cross Travels, Power Rail Adjustment, Newall Dp2700 2-Axis Digital Readout |
| Saw Area | Bandsaw | Metalworking or Shop Machinery | | HEM | 200D-30 | 180382 | 1982 | 26" X 30" Horizontal Bandsaw, With 15 HP Saw Motor, Power Head Downfeed, 2-Cylinder Hydraulic Clamp, 36" X Approximately 30' Power Roller Infeed Conveyor, 36" X 9' Power Roller Outfeed Conveyor, Coolant System, Control Panel, Approximately 5 HP Hydraulic System |
| Saw Area | Bandsaw | Metalworking or Shop Machinery | | HEM | 200D-30 | 180082 | 1982 | 26" X 30" Horizontal Bandsaw, With 15 HP Saw Motor, Power Head Downfeed, 2-Cylinder Hydraulic Clamp, 36" X Approximately 30' Power Roller Infeed Conveyor, 36" X 9' Power Roller Outfeed Conveyor, Coolant System, Control Panel, Approximately 5 HP Hydraulic System |
| Saw Area | Bridge Crane | Plant Support | | | | | | Gaffey 10 Ton Single Girder Top Running Bridge Crane, With 40' Span X 60' Run-Out, Electric Cable Hoist, 20,000 Lb. Digital Crane Scale With Lifting Magnet, Radio Control |

| Location in Plant | Category | Classification | Size | OEM | Model | Serial# | Year Built | Machine Description |
|---|---|---|---|---|---|---|---|---|
| Heat Treating Area | Furnace | Process Machinery | | | | | | Custom-Built Rail-Fed Car Bottom Gas Fired Heat Treating Furnace, With 1675° Max Temperature, Fiber Module Lining, [1] Exhaust Stack, Temperature Regulators, 12-1/2' X 16' Rail Car, 91" X 185" X 86" High Chamber, Thermo-Coupler Temperature Control, [4] Cooling Fans, Control Panel With Digital High Limit Temperature Control, Honeywell Temperature Charter With Digital Readout, [4] Burners, Power Door |
| Machine Shop | Vert. Lathe | Metalworking or Shop Machinery | | Bullard | | 2475 | | 60" Vertical Turret Lathe, With 60" 4-Jaw Chuck, 22" Height Under Rail, 30" Cross Travel, 5-Position Head, Wizard 2-Axis Digital Readout, Digital Rpm Readout, 30 HP Table Rotation Motor, Power Height Adjustment & Cross Travel, 4-Position Side Head |
| Maintenance Building | Misc | Metalworking or Shop Machinery | | | | | | Miscellaneous in Maintenance Building 1 Including; Dewalt 8" Bench Grinder, Steel Work Table, Vise, Ridgid Chain Type Hold-down, Oxy / Acetylene Torch Set, 2-Door Cabinet, [2] Sections Of Pallet Racking, [8] Sections Of Parts Racking, Magnetic Base Drill, 16" Rotary Welding Positioner With 8" 3-Jaw Chuck, Portable Air Conditioner, Portable Heater, Hand / Portable Power / Rechargeable / Pneumatic Tools, Torpedo Heater, Large Wrenches, Pipe Bender, Ridgid Mdl. 535 2" Portable Pipe Threader With Dies, Shop Fox 20" Pedestal Drill Press With 1-1/2 HP Motor, Lincoln Power Mig 255C 250-Amp Mig Welder With Digital Readout Of Volts & Wire Feed Speed, Wellsaw 58B Approximately 7" X 12" Portable Horizontal Bandsaw With 3/4 HP motor (S/N: 23425), Hand Truck, Paint Shaker, 2-Door Flammable Storage Cabinet, Central Machinery 6" Belt / 9" Disc Sander, Paint Mixer, Shop Vacs, Esab Migmaster 215 Pro 200-Amp Mig Welder, L-Tec Pulse 450 450-Amp Mig Welder With Wire Feeder, Ladder, Port-A- Cool High-Output Water-Cooled Fan, Big Red 10 Ton Bench Top Hydraulic Press, Tool Boxes, Etc. |
| Press Ring Area | Air Compressor | Plant Support | 100 HP | Kaeser | CSD100S | 1078 | | 100 HP Screw Type Air Compressor, With Sigma Plc Control, 91,943 Hours, Drypoint Model RAX800NA Air Dryer S/N 210016729 |
| Rolling Stock | Forklift | Material Handling | 6,700 | Doosan | D35S-2 | K7-00482 | | 6,700 Lb. Diesel-Powered Forklift Truck, With 185" Max Lift Height, Side Shift, 6' Forks, Solid Tires |
| Rolling Stock | Forklift | Material Handling | 5,900 | Hyundai | 30L-7A | HHKHHF09 A0000218 4 | | 5,900 Lb. Propane-Powered Forklift Truck, With Approximately 180" Max Lift Height, Side Shift, 6' Forks, Solid Tires, 3,153 Hours |

| Location in Plant | Category | Classification | Size | OEM | Model | Serial# | Year Built | Machine Description |
|---|---|---|---|---|---|---|---|---|
| Rolling Stock | Forklift | Material Handling | 5,820 | Toyota | 7FDU30 | 62046 | | 5,820 Lb. Diesel-Powered Forklift Truck, With 131-1/2" Max Lift Height, Side Shift, 69" Forks, Solid Tires, 12,219 Hours |
| Press Ring Area | Air Compressor | Plant Support | 100 HP | Kaeser | CSD100 | 1287 | 2010 | 100 HP Screw Type Air Compressor, With Sigma Plc Control |
| Rolling Stock | Forklift | Material Handling | 5,500 | Doosan | 30S-5 | S-00197 | | 5,500 Lb. Diesel-Powered Forklift Truck, With 186" Max Lift Height, Side Shift, 5' Forks, Solid Tires, 5,943 Hours |
| Machine Shop | Lathe | Metalworking or Shop Machinery | | King | | | | 42" Vertical Turret Lathe, With 42" 4-Jaw Chuck, Approximately 30" Under Rail, 5-Position Head, 30" Power Cross Travel, 20 HP Rotation Motor, 4-Position Side Head, Newall Dp700 2-Axis Digital Readout |
| Machine Shop | Vert Lathe | Metalworking or Shop Machinery | | Bullard | | | | 42" Vertical Turret Lathe, With 42" 4-Jaw Chuck With Approximately 15 HP Rotation Motor, 5-Position Head, Approximately 18" Power Cross Travel, Approximately 24" Height Under Rail, 4-Position Side Head, and 20" Power Travel |
| Rolling Stock | Forklift | Material Handling | 4,500 | Caterpillar | P5000 | AT18C01121 | 2011 | 4,500 Lb. Diesel-Powered Forklift Truck, With 188" Max Lift Height, Side Shift, 6' Forks, Solid Tires, 8,543 Hours |
| Maintenance Building | Sweeper | Plant Support | | Powerboss | Armadillo 6X | | | Ride-On Floor Sweeper |
| Machine Shop | Lathe | Metalworking or Shop Machinery | | Bullard | | 22529 | | 36" Vertical Turret Lathe, With 36" 4-Jaw Chuck With Approximately 15 HP Rotation Motor, 5-Position Head, 18" Power Cross Travel, Approximately 24" Height Under Rail, 4-Position Side Head With 20" Power Travel |
| Maintenance Building | Lathe | Metalworking or Shop Machinery | | Victor | 20100 | 712047 | | 20" X 100" Engine Lathe, With Inch / Metric Threading, 12" 3-Jaw Chuck, 31-1500 Rpm 16-Speed 10 Hp Spindle, Steady Rest, Foot Brake, Taper Attachment, Quick Change Tool Post, Chaser Dial, 3-1/2" Hole Thru Spindle |

42832522.16/156171.00005

| Location in Plant | Category | Classification | Size | OEM | Model | Serial# | Year Built | Machine Description |
|---|---|---|---|---|---|---|---|---|
| Maintenance Building | Misc. | Metalworking or Shop Machinery | | | | | | Miscellaneous in Maintenance Building 2 Including; [2] Bench Grinders, Hand / Portable Power / Pneumatic / Rechargeable Tools, Electric Jack Hammer, Rolling & Stationary Tables, Carts, [2] Steelmax 14" Cut-Off Saws, Gas Powered Auger Drill, Northrock Mdl. 3 Concrete Vibrator, Wheel Barrels, Hand Trucks, Powerhouse 9000 Gas Powered Generator, Rolling Jacks, Push Mower, [2] Battery Charger / Jumpers, Jack Stands, Vise, Oxy / Acetylene Torch Set, [7] Parts Racks, 2-Door Cabinets, 1 & 2-Door Flammable Storage Cabinets, Shop Vac Wet / Dry Vacuum, Torpedo Heater, Motor Stand, Spare Hydraulic Press Head, Etc. |
| Machine Shop | Bandsaw | Metalworking or Shop Machinery | | HEM | H160S | | | 16' x 25" Horizontal Bandsaw, With Approximately 2 HP Saw Head, Power Head Downfeed, Power Clamping, Coolant System |
| Rolling Stock | Pickup Truck | Rolling Stock | | Ford | Ranger | | 2004 | Regular Cab Pickup Truck, With 3 Liter V6 Gas Engine, Automatic Transmission, Approx. 110,560 Miles |
| Rolling Stock | Floor Scrubber | Rolling Stock | | Tennant | 6550 | 65508330 | | Floor Scrubber, Rider Type, Propane |
| Maintenance Building | Air Compressor | Plant Support | 10 HP | Kaeser | SM10 | 1298 | 2006 | 10 HP Screw Type Air Compressor, With Sigma Control Basic Plc Control, 18,693 Hours, Non-Functioning Built-In Air Dryer |
| Press Ring Area | Air Dryer | Plant Support | | Kaeser | TF171E | 100000327 1879 | | 600-Cfm Refrigerated Air Dryer, With R-134A Refrigerant, [2] Condensers, Plc Control |
| Heat Treating Area | Evener | Process Machinery | | | | | | Custom-Built Hydraulic Ring Evener, With 25 HP Hydraulic System, 7' Horizontal Stroke, Controls |
| Machine Shop | Lathe | Metalworking or Shop Machinery | | Warner & Swasey | #3A | 3161050 | 1955 | Round Head Turret Lathe, With 21" 3-Jaw Chuck, 6-Position Tailstock, 6-1/2" Hole Thru Spindle, Outboard Chuck Capability, 40 HP Motor, 4-Position Tool Post, 12-456 Rpm 24-Speed Spindle |

42832522.16/156171.00005

| Location in Plant | Category | Classification | Size | OEM | Model | Serial# | Year Built | Machine Description |
|---|---|---|---|---|---|---|---|---|
| Press Ring Area | Quench | Process Machinery | | | | | | Custom-Built Quenching Pit, With Approximately 8' Diameter X 4' Deep Pit, Closed Loop Processed Water System With Diaphragm & Centrifugal Pumps, Approximately 10,000 Lb. Capacity Hydraulic Basket Lift System, All Related Process Piping, Valves, Pumps, Temperature Monitor, Approximately 20' Deep Fluid Pit |
| Press Ring Area | Welder | Metalworking or Shop Machinery | | Miller | Bobcat 225 | MD400941 R | | Miller Bobcat 225 225-Amp / 11,000-Watt Gas Powered Mig / Tig / Stick Welder / Generator With 747 Hours (S/N: Md400941R) with Tow-Behind Single Axle Trailer |
| Rolling Stock | Forklift | Material Handling | 17,600 | Doosan | D80S-2 | GS-00019 | | 17,600 Lb. Diesel-Powered Forklift Truck, With 142" Max Lift Height, 70" Manipulator Arms With 360° Rotation, Solid Tires, Windshield, 21,142 Hours |
| Machine Shop | Misc | Metalworking or Shop Machinery | | | | | | Miscellaneous in Machine Shop Including Hammond Double End Pedestal Grinder, Assorted Air Circulators, Metal Work Tables, Port-A-Cool Air Chiller, Wall Mounted Air Hose Reels, Vises, Ladders, Welding Screen, Toolboxes, Etc. |
| Machine Shop | Vert Mill | Metalworking or Shop Machinery | | Bridgeport | | 173628 | 1953 | Vertical Milling Machine, With 2 HP Variable Speed Work Head, 9" X 42" Work Table With Servo Power Feed, Te-Co 6" Machining Vise, One Shot Lube System |
| Maintenance Building | Bandsaw | Metalworking or Shop Machinery | | Wellsaw | 58B | 23425 | | Horizontal Band Saw |
| Maintenance Building | Cement Mixer | Metalworking or Shop Machinery | | MQ Whiteman | WM120SHHD | B1910012 | | 12 Cu. Ft. Mortar Mixer, With Honda Gas Engine |
| Maintenance Building | Welder | Metalworking or Shop Machinery | | Miller | BIG BLUE 400D | | | 450-Amp / Approximately 8,000-Amp Diesel-Powered Powered Mig / Tig / Stick Welder / Generator, With 2,470 Hours |
| Machine Shop | Jib Crane | Plant Support | | Abell Howe | | | | 1/4 Ton Floor Standing Free Spinning Jib Arm Crane, With Approximately 12' Arm, Electric Chain Hoist With Pendant Control |
| Machine Shop | Jib Crane | Plant Support | | | | | | 1/4 Ton Floor Standing Free Spinning Jib Arm Crane, With Approximately 8' Arm, Electric Chain Hoist With Pendant Control |
| Maintenance Building | Cement Mixer | Misc | | MQ Whiteman | EM-700 | C2353229 | | 7 Cu. Ft. Mortar Mixer, With Honda Gas Engine |

| Location in Plant | Category | Classification | Size | OEM | Model | Serial# | Year Built | Machine Description |
|---|---|---|---|---|---|---|---|---|
| Maintenance Building | Welder | Metalworking or Shop Machinery | | Esab | MULTI MASTER 300X | MBJ837004 | | 300-Amp Mig / Tig / Stick Welder, With Built-In Wire Feeder, Mobile Base |
| Rolling Stock | Cart | Rolling Stock | | John Deere | Gator | | | Gator, Gas Powered, With Rear Dump Bed |
| Rolling Stock | Forklift | Material Handling | 17,600 | Doosan | D80S-2 | GS-00071 | | 17,600 Lb. Diesel-Powered Forklift Truck, With 142" Max Lift Height, 70" Manipulator Arms With 360° Rotation, Solid Tires, Windshield, 22,156 Hours |
| Maintenance Building | Plasma Cutter | Metalworking or Shop Machinery | | Thermal Dynamics | CUTMASTER 60i | | | 60-Amp Portable Plasma Cutter |
| Maintenance Building | Welder | Metalworking or Shop Machinery | | Lincoln | 255C | | | Mig Welder |
| Maintenance Building | Welder | Metalworking or Shop Machinery | | Miller | MILLERMATIC 252 | LH490594B | 2007 | 250-Amp Mig Welder, With Built-In Wire Feeder, Digital Readout Of Volts & Wire Feed Speed |
| Maintenance Building | Saw | Metalworking or Shop Machinery | | Hoska | HS150 | | | Abrasive Cut-Off Saw, With 1 HP Motor, Approximately 6" Blade |
| Machine Shop | Lathe | Metalworking or Shop Machinery | | Yamazaki | Mazak-24 | | | Engine Lathe, 24" Swing, 120" Long |
| Maintenance Building | Shop Press | Metalworking or Shop Machinery | | | | | | Approximately 20 Ton Hand Hydraulic Shop Press |

42832522.16/156171.00005