**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| OKLAHOMA FORGE, LLC, d/b/a | ) | **Case No. 24-11060-M** |
| OKLAHOMA FORGE, INC.,** | ) | **Chapter 11** |
| | ) | |
| **Debtor.** | ) | |

## FINAL ORDER (I) AUTHORIZING POST-PETITION CREDIT, (II) GRANTING SENIOR SECURED LIENS AND SUPERPRIORTY CLAIMS UNDER SECTIONS 364(C) AND (D) OF THE BANKRUPTCY CODE, (III) GRANTING ADEQUATE PROTECTION LIENS, AND (IV) GRANTING RELATED RELIEF

On the 7th day of January, 2025, there came on for hearing before this Court the Motion for an Order (I) Authorizing Post-Petition Credit, (II) Granting Senior Secured Liens and Superpriority Claims under Sections 364(c) and (d) of the Bankruptcy Code, (III) Granting Adequate Protection Liens, and (IV) Granting Related Relief (the "Financing Motion") filed on the 4th day of December, 2024 [Doc. 73] by Oklahoma Forge, LLC, as Debtor and Debtor in Possession (the "Debtor"). As a result of subsequent negotiations between the parties, Debtor, with the consent of all parties appearing, now seeks, *inter alia*, pursuant to 11 U.S.C. §§ 105,[1] 361, 362(d), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(k), 503(b), and 507, and Rules 2002, 4001, and 9014, the following relief:

    (i)    authority for the Debtor to obtain post-petition loans and other extensions of credit and accommodations from Ellwood Group Inc. ("DIP Lender"), under a senior secured lien and superpriority claim multi-draw term facility in an aggregate principal amount of up to $200,000

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. "Rule" references are to the Federal Rules of Bankruptcy Procedure, and "Civil Rule" references are to the Federal Rules of Civil Procedure. References to "LBR" are to the Local Rules of Bankruptcy Practice of the United States District Court for the Northern District of Oklahoma.

(inclusive of the $60,000 in interim financing) on a final basis (this Final Order the "Final DIP Order"), plus interest accruing thereon at the non-default, simple rate of 8% per annum (10% on and after the occurrence of an Event of Default under any Final DIP Order), fees (including a DIP Facility fee in the amount of 4% of the total DIP Facility) and a maturity date of 75 days from the date of this Final DIP Order, and, after the occurrence of an Event of Default (as defined below), reasonable expenses, and other reasonable costs and charges of DIP Lender (collectively, "DIP Obligations), in accordance with the terms and conditions set forth in any Final DIP Order (the "DIP Facility");

(ii)     authority for the Debtor to authorize and perform under this Final DIP Order, and to execute, deliver, and perform all other related agreements and documents creating, evidencing, or securing indebtedness or obligations of the Debtor to the DIP Lender on account of the DIP Facility (as such documents may hereafter be amended, modified, supplemented, ratified, assumed, extended, renewed, restated, or replaced, and including this Final DIP Order, the "DIP Facility Documents");

(iii)     subject to the priorities set forth in this Final DIP Order, authority of the Debtor to grant automatically perfected first-priority and priming liens and security interests to DIP Lender pursuant to Bankruptcy Code §§ 364(c) and 364(d) and superpriority claims to DIP Lender pursuant to Bankruptcy Code § 364(c)(1) and 503(b)(1), in all of the Debtor's existing and future assets and other property and interests in property, excluding Debtor's accounts and any cash proceeds therefrom including all cash in Pathward's possession ("Accounts") but specifically including all other Prepetition Collateral (as defined below), to secure the payment and performance of the DIP Obligations;

(iv)     approval of the terms and conditions of the DIP Facility and the DIP Facility Documents in all respects; and

(v)     modification of the automatic stay of Bankruptcy Code § 362 (the "Automatic Stay") to the extent provided in this Final DIP Order.

1.     On December 5, 2024, this Court entered an order [Doc. 79], setting a hearing on the Financing Motion to consider entry of this Final DIP Order as a final order for January 7, 2025 , 2024, at 10:00 a.m. (the "Final Hearing"), and requiring that any responses or objections to this Final DIP Order being entered as a final  order be filed no later than 12:00 p.m. on January 6, 2024. That order was served on December 6, 2024, as evidenced by the certificate of mailing filed with this Court [Doc. 81]. The Objections to the Motion were filed on December 16th, 2024, by the United States Trustee [Doc. 99] and Ellwood National Steel Company, Ellwood Quality Steels Company, Lehigh Specialty Melting Inc. and Metro Machine Works,

Inc.(collectively, the "Objections").  After consideration of the statements of all counsel presented to the Court made at the Final Hearing (as defined in paragraph 7 below) the parties agreed to the entry of this Final Order.

2.     Based upon the additional findings and conclusions, all of which are incorporated herein, and the findings and conclusions made herein, and, most importantly, the fact that all parties appearing before the Court consent to and support the terms and provisions contained in this Order, the Court hereby grants the relief in this Final DIP Order.  Therefore, consistent with Bankruptcy Code §§ 361, 362, 363, 364, 503(b), and 507, this Court hereby FINDS and ORDERS:

3.     It is uncontested that the Debtor and the DIP Lender have negotiated at arm's length and have acted in good faith in the negotiation and preparation of the DIP Facility Documents, including this Final DIP Order, have been represented by counsel, and intend to be and are bound by the terms of the DIP Facility Documents.  The terms and conditions of this Final DIP Order and the other DIP Facility Documents reflect the Debtor's exercise of prudent business judgment under the circumstances of this Case, are consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

### Statement Of Jurisdiction

4.     This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B), (D), (G), (K), (M), and (O).

### Notice

5.     Sufficient and adequate notice of the Financing Motion, the period for filing objections thereto, and the Final Hearing thereon has been given pursuant to Rules 2002, 4001, 9006, and 9014 and the LBR 4001-1.C., and as required by §§ 102, 105, 361, 362, 363, and 364.

No further notice of the relief sought in the Financing Motion and granted in this Final DIP Order is necessary or required.

## Factual And Procedural Background

6.      On August 16, 2024 [Doc. 1] (the "Petition Date"), a petition for involuntary relief under Chapter 7 was filed against the Debtor and, on November 22, 2024, an Agreed Order Converting Chapter 7 Case to a Case Under Chapter 11 was entered by the Court [Doc. 60]. The Debtor has continued in the management and possession of its business and property as a debtor in possession pursuant to Bankruptcy Code §§ 1107 and 1108.

7.      On December 18, 2024, the Court conducted an interim hearing on the Financing Motion ("Interim Hearing"). The Court has considered any timely Objections to the Financing Motion being granted on an interim basis at the Interim Hearing, and the statements and arguments of counsel appearing at the Interim Hearing. Such Objections, including any reservations of rights contained therein, are resolved by the entry of this Order.

8.      An Official Committee of Unsecured Creditors appointed December 13, 2024, in this case. [ECF. 95]. The appointment has just occurred and counsel for the Committee has not been chosen (the "Committee"). No trustee has been requested or appointed in this Case.

## The Debtor's Stipulations

9.      The Debtor stipulates and represents that:

(i)      The DIP Lender holds substantial prepetition unsecured claims against the Debtor and has made a competing offer to purchase the DIP Collateral (defined below) under an Asset Purchase Agreement ("APA") to be filed with this Court, under Bankruptcy Code §§ 105, 363, and 365 ("Sale"). To afford the Debtor, DIP Lender and any other prospective buyer with the time necessary to complete negotiations, marketing, conducting a stalking horse sale process, documentation, obtain court approval of, and close on a sale under Bankruptcy Code §§ 105, 363, and 365 ("Sale") the Sale of the DIP Collateral to the winning bidder at the Sale (the "Buyer"), DIP Lender has agreed to advance the DIP Facility, subject to the lien priorities set forth in this Final DIP Order, on a senior secured lien and superpriority administrative expense basis, pursuant to Bankruptcy Code §§ 105, 364(c) and (d) and this Final DIP Order. The proceeds of the DIP Facility will be used to preserve and protect the estate in accordance with the Budget

(defined below), including the payment of professional fees included in the Budget. If the DIP Lender or one of its affiliates is the Buyer, then at the closing of the Sale the amount of the DIP Obligations will be credited and offset against the purchase price of the DIP Collateral, otherwise the DIP Obligations will be repaid at closing on the sale of the DIP Collateral. The cash portion of the purchase price, net of any termination fee, taxes, prorations, and customary closing costs, will be paid to Loeb.

(ii)     On the Petition Date, the DIP Collateral was subject to the lien claims of the following two creditors: (1) Loeb Term Solutions, LLC ("Loeb"), which claims a first-priority lien in the LTS Priority Collateral (the "Loeb Collateral"), as defined in and subject to an Intercreditor Agreement dated August 11, 2022 (the "Loeb Lien Claims"), and (2) Pathward, NA ("Pathward") which claims a first-priority lien in all, or substantially all, of Debtor's personal property assets that do not constitute LTS Priority Collateral under the Intercreditor Agreement dated August 11, 2022, including the Accounts and any of proceeds held by Pathward (the "Pathward Lien Claims" and "Pathward Collateral" and, collectively with the Loeb Collateral, the "Prepetition Collateral"). Each of Loeb and Pathward claims a second-priority lien in the first-priority Prepetition Collateral of the other Prepetition Lender.

(iii)    As of the Petition Date, the Debtor owed at least $4,056,823.39 to Loeb and approximately $586,160.56 less cash proceeds from the Debtor's Accounts of approximately $419,591.84 held by Pathward leaving a net amount owed, after application, of approximately$166,568.72 to Pathward for contractual debts that are secured by the Loeb Lien Claims and the Pathward Lien Claims in the Prepetition Collateral. The debts owed to Loeb and Pathward under the Prepetition Claim Documents as well as the Loeb Lien Claims and the Pathward Lien Claims in the Prepetition Collateral are collectively the "Prepetition Lenders' Claims").

(iv)    The Debtor is in default of its debts and obligations to Loeb and Pathward under the terms and provisions of their respective loan documents. These defaults exist, have not been timely cured, and are continuing. The filing of this bankruptcy case ("Case") has accelerated the obligations to Loeb and Pathward.

(v)     All cash of the Debtor's bankruptcy estate, wherever located, including all cash equivalents in the form of negotiable instruments (other than Chubb Checks[2]) that were on the Petition Date in the Debtor's or Pathward's possession, custody, or control, and all future proceeds of Accounts which come into the possession, custody or control of Debtor or Pathward after the Petition Date, constitute cash collateral of Pathward (collectively, the "Pathward Cash Collateral"). The Debtor will not use Pathward Cash Collateral in this Case except to pay the Pathward Lien Claims or with the express written consent of Pathward. For the avoidance of doubt, the Chubb Checks referred to in paragraph 26 of this Final DIP Order do not constitute Pathward Cash Collateral.

---

[2] The Chubb Checks are ("Chubb Checks") issued by Chubb Federal Insurance Company ("Chubb"), but expressly excluding Chubb Check no. 6933878  (or its replacement check), which shall be delivered to Loeb (the "Loeb Chubb Check") shall be held by the Debtor as DIP Collateral and distributed in accordance with further order of the Court.

(vi)  Each of Loeb and Pathward has consented in writing to the terms and conditions and entry of this Final DIP Order at the conclusion of the Final Hearing, including, without limitation, (a) the grant of a first-priority, senior and priming lien to DIP Lender in the DIP Collateral under Bankruptcy Code §§ 364(c)(2) and (d), and (b) the waiver of any right Loeb or Pathward (or any of their respective successors or assigns) has or may have to make any credit bid for all or any portion of the DIP Collateral, whether under Bankruptcy Code §363(k) or otherwise, and (c) the waiver of any right to object to the entry of this Final DIP Order or this Final DIP Order becoming a Final DIP Order at the conclusion of the Final Hearing.

(vii)  The Debtor does not to the best of its knowledge, information and Belief does not know of any and the Debtor shall not assert any claim, counterclaim, setoff, or defense of any kind, nature, or description against the DIP Lender, Loeb or Pathward. Any Committee, examiner or trustee appointed in this case maintains the right to investigate any such claims, counterclaims, setoffs, or defenses and to pursue or assert the same.

### Necessity of DIP Facility

10.  Good, adequate, and sufficient cause has been shown to justify the granting of the relief requested herein. The ability of the Debtor to maximize the value of its estate depends upon the Debtor's ability to access the proceeds of the DIP Facility. This Case is a non-operating, liquidating case whereby the Debtor has agreed to sell substantially all its assets and properties, except for the Accounts.

11.  Without the DIP Facility, the Debtor will not have the funds necessary to maintain, sell or otherwise liquidate its assets, provide financial information, or pay employee compensation, payroll taxes, overhead, and other expenses necessary to maximize the value of the Debtor's estate. DIP Lender is willing to provide the DIP Facility to or for the benefit of the Debtor only in accordance with the terms of the DIP Facility Documents and this Final DIP Order. Accordingly, the entry into the DIP Facility is actual and necessary to preserve the Debtor's estate.

12.  The Debtor has sought to obtain financing from other sources and is unable to obtain credit allowable under § 503(b)(1), pursuant to §§ 364(a) and (b), or on terms more favorable to the Debtor than the terms of the DIP Facility.

13.  The terms of the DIP Facility and this Final DIP Order, including, without

limitation, the related fees and priming liens granted in accordance herewith and therewith, are fair, just, and reasonable under the circumstances, are ordinary and appropriate for secured financing to a debtor in possession, reflect the Debtor's exercise of its sound business judgment consistent with its fiduciary duties, and is supported by reasonably equivalent value and fair consideration. Good cause has, therefore, been shown for the relief sought in the Financing Motion. Any credit extended under the terms of this Final DIP Order, the DIP Facility Documents, and the DIP Facility shall be deemed to have been extended in good faith by the DIP Lender, as the term "good faith" is used in Bankruptcy Code § 364(e), and the DIP Lender shall be entitled to all protections afforded thereunder, including, without limitation, the full protections of § 364(e) of the Bankruptcy Code in the event that this Final DIP Order or any provision thereof is vacated, reversed, or modified, whether on appeal or otherwise.

## Use of Pathward Cash Collateral

14. Upon entry of this Final DIP Order, the Debtor shall not use any of the Pathward Cash Collateral without the express written consent of Pathward.

## DIP FACILITY

### Authorization to Obtain Credit

15. The Debtor is hereby authorized to obtain and use credit only in accordance with this Final DIP Order, and the Budget. No promissory note or other writing shall be necessary or required to evidence the DIP Obligations or the DIP Facility.

16. The Debtor is hereby authorized to obtain post-petition loans and other extensions of credit on a final basis from the DIP Lender in the aggregate principal amount of up to $200,000 on a final basis, pursuant to the terms of this Final DIP Order, any Final DIP Order, and the terms of the DIP Facility Documents, and the DIP Facility shall only be used in accordance with the Budget (or as otherwise provided in this Final DIP Order, any Final DIP Order, or the

DIP Facility Documents).

17.     The DIP Facility will bear interest at the rate of 8% prior to default and 10% after default.  The DIP Facility will mature upon the earlier to occur of an event of default or 75 days from the date of this Order.  The DIP Lender will receive a facility fee of 4% upon the repayment of the DIP Loan.  The DIP Loan shall be paid in full from the sale of the DIP Collateral, either as a credit against the purchase price of the DIP Collateral or in cash at closing upon the sale of the DIP Collateral.

## First Priority Liens and Superpriority Administrative Claims

18.     Effective as of the Petition Date, and in accordance with the priorities set forth in paragraphs 21 through and including 23 below, DIP Lender is entitled to and is hereby granted a first-priority administrative expense claim, and security interests and other liens in, on and against the DIP Collateral (as defined in paragraph 20 below), and the protections of "good faith", arms-length, credit providers, under Bankruptcy Code §§ 364(c)(1)-(3), 364(d)(1), and 364(e), to secure the payment and performance of the DIP Obligations and the DIP Facility in full. Loeb and Pathward have expressly consented to the security interests, liens and claims granted to the DIP Lender in this Final DIP Order, conditioned upon DIP Lender or a related party submitting a bid to purchase the DIP Collateral, and each acknowledges that the relief provided in this Final DIP Order adequately protects its respective interests in the Prepetition Collateral.

19.     The security interests and other liens securing the DIP Obligations and DIP Facility granted in this Final DIP Order (the "DIP Liens") are effective as of the Petition Date, are valid and automatically perfected security interests and liens (such that no additional steps need be taken by the DIP Lender to perfect such DIP Liens), and are hereby granted in and attach to any and all assets and properties of the Debtor and the Debtor's bankruptcy estate, including, without limitation, all real and personal, tangible and intangible, property, including the Chubb Checks,

now owned or hereafter acquired, wherever located, and the proceeds and products of the foregoing, including, without limitation, the Prepetition Collateral, but expressly excluding the Accounts (collectively, exclusive of Accounts, the "DIP Collateral"). The DIP Collateral shall not include (a) rights or causes of action under §§ 544, 547, and 548 and the proceeds thereof or (b) the Accounts and the proceeds thereof.

20.     The DIP Obligations shall be secured by a senior, first-priority, priming lien in, on and against the DIP Collateral in favor of DIP Lender, which lien shall prime and be senior to all existing and future liens of the Prepetition Lenders (or their respective successors or assigns, if any), including the Loeb Lien Claims and the Pathward Lien Claims, pursuant to sections 364(c)(2) and (d) of the Bankruptcy Code ("Priming Lien").

21.     The DIP Liens, including the Priming Lien, the Loeb Lien Claims, and the Pathward Lien Claims shall be subject and junior to the Carve-Out.

22.     In addition to the Priming Lien, on account of the DIP Facility in the amount of the DIP Obligations, DIP Lender is hereby granted superpriority administrative claims and all other benefits and protections to the maximum extent provided under §§ 364(c)(1) and 503(b)(1) (the "DIP Superpriority Claim"), senior in priority and right and time of payment to any and all unsecured claims and, except for the Carve-Out, senior in priority and right and time of payment to any other administrative or priority claims against the Debtor or its estate, including, without limitation, administrative or priority claims of the kinds specified in or arising or ordered under §§ 105(a), 326, 328, 330, 331, 365, 503(b), 506(c), 506(d), 507(b), 546(c), 726, 1113, and 1114, and any other provisions of the Bankruptcy Code. Without limitation of any other rights DIP Lender has or may have in connection with the DIP Superpriority Claim or otherwise, the DIP Superpriority Claim shall be indefeasibly paid in full and in cash from the proceeds of any sale of

the Debtor's assets upon the closing of any such sale, after first paying all claims secured by the DIP Collateral.

## Cash Collateral Accounts and Other Cash Collateral

23. The Debtor shall immediately, and shall continue to, segregate, remit, and deposit all Pathward Cash Collateral in the Debtor's possession, custody, or control in respect of the Accounts and which the Debtor may receive in the future in respect of the Accounts.

## ADEQUATE PROTECTION

### Budgeted Cash Collateral Usage

24. So long as no Event of Default (as defined below) shall have occurred, the Debtor is authorized to and shall use the advances under the DIP Facility strictly in accordance with a budget in form and substance acceptable to DIP Lender (the "Budget"). A draft of the budget is attached hereto as **Exhibit 1**. An updated Budget for each successive four-week period (or longer time agreed between the Debtor and the DIP Lender) shall be provided to DIP Lender not less than one week prior to the end of the time period covered by the then-effective Budget and shall be effective upon agreement by the Debtor and the DIP Lender regarding the updated Budget. There shall be an Event of Default if (i) total disbursements for any weekly time period of the Budget exceeds the total disbursements allowed in the Budget by more than 10%, (ii) total disbursements for any line item in the Budget for any weekly time period shall exceed the amount in the Budget by more than 10% or $5,000, whichever is greater, or (iii) the Budget amount is exceeded by any amount for certain specific items to be agreed to by the Debtor and the DIP Lender.

25. Prior to the occurrence of an Event of Default, amounts set forth in the Budget for the fees and expenses of the Debtor's professionals shall be set aside weekly and will be held by the Debtor in a segregated account (the "Professional Fee Escrow"). The amount paid

by the Debtor in any month for the fees and expenses of the Estate professionals, from advances under the DIP Facility, shall only be paid upon allowance or authorization by the Court from funds on deposit in the Professional Fee Escrow and shall not exceed the amount set forth in the Budget for such month or in the Professional Fee Escrow. Amounts set aside in the Professional Fee Escrow shall be credited against the Carve-Out and are not intended to be duplicative thereof.

26. The consent of the DIP Lender to extend credit extends only to amounts provided under the DIP Facility that are actually incurred in accordance with the Budget or paid to DIP Lender to satisfy DIP Obligations. Upon the occurrence of an Event of Default, DIP Lender's agreement to extend credit shall automatically and immediately terminate unless such Event of Default is waived in writing by DIP Lender in its sole and absolute discretion.

27. Except as may specifically be provided in the Budget including, without limitation, for ordinary course payroll, benefits, and expense reimbursements, the Debtor agrees that no transfer of any funds or property shall be made to any of the Debtor's insiders, as that term is defined in Bankruptcy Code §101.

28. The Budget, and any modifications to, or amendment, or update of, the Budget shall be in form and substance acceptable to and approved by the DIP Lender. The Budget may be modified in writing only with the prior written consent of the DIP Lender and may be amended or modified without the need for further approval by this Court.

## Automatic Perfection

29. This Final DIP Order shall be sufficient and conclusive evidence of the priority, perfection, attachment, and validity of all of the DIP Liens in, on and against the DIP Collateral granted and created in this Final DIP Order, and such DIP Liens shall constitute valid, automatically perfected, and unavoidable security interests and liens, with the priorities granted in

this Final DIP Order, effective as of the Petition Date, without the necessity of creating, filing, recording, or serving any financing statements, mortgages, or other documents that might otherwise be required under federal, state or local law in any jurisdiction or the taking of possession, giving of any notice, or taking any other action to validate or perfect the DIP Liens granted to DIP Lender by this Final DIP Order and DIP Facility Documents.

30. If DIP Lender shall, in its sole and absolute discretion, elect for any reason to file any Uniform Commercial Code financing statements, mortgages, deeds of trust, or other recordable documents, or the giving of any notice, to further evidence perfection of its interests in property of the estate or the DIP Collateral, DIP Lender on its own, or, upon the request of DIP Lender, the Debtor, is authorized and directed to execute or file, or cause to be executed or filed, all such financing statements or other documents, and the filing, recording, or service or other notice (as the case may be) of such financing statements or similar documents shall be deemed to have been made at the time of and on the Petition Date, and the signatures of any persons designated by the Debtor, whether by letter to DIP Lender or by appearing on any one or more of the agreements or other documents respecting the DIP Liens granted in this Final DIP Order, shall bind the Debtor and its estate. DIP Lender may, in its sole and absolute discretion, file a certified copy of this Final DIP Order in any filing or recording office in any county or other jurisdiction in which the Debtor has real or personal property, and, in such event, the subject filing or recording officer is authorized and directed to file or record such documents or certified copy of this Final DIP Order. By virtue of the terms of this Final DIP Order, to the extent that DIP Lender has filed Uniform Commercial Code financing statements, mortgages, deeds of trust, or other security or perfection documents under the name of the Debtor, such filings shall be deemed to properly perfect its DIP Liens granted under this Final DIP Order without further action by DIP Lender.

## Authorization To Act

31.     The Debtor is hereby authorized and directed to perform all acts, take any action, and execute, and comply with the terms of such other documents, instruments and agreements, as DIP Lender may request or require as evidence of and for the perfection and protection of the DIP Collateral, or that may be otherwise deemed necessary or desirable by DIP Lender to effectuate the terms and conditions of this Final DIP Order and the DIP Facility.

32.     Until such time as the DIP Obligations shall have been indefeasibly paid and satisfied in full in accordance with the DIP Facility Documents or this Final DIP Order, and without further order of the Court: (a) the Debtor shall use the DIP Facility proceeds strictly in accordance with the terms of the Budget and the other terms of this Final DIP Order; (b) the Debtor shall not, without prior order from the Court (after notice to DIP Lender), engage in any transaction that is not in the ordinary course of the Debtor's business; provided however that this clause (c) is not intended to permit or authorize the Debtor to move this Court to reconsider, alter, amend, strike or otherwise directly or indirectly affect any provision of this Final DIP Order without the prior written consent of DIP Lender; and (d) the Debtor shall timely comply with all of the covenants and other provisions set forth in the DIP Facility Documents.

## Prepetition Liens

33.     The Debtor, or any other party in interest other than the DIP Lender, shall have the right to object to the validity, priority, or extent of any Prepetition Liens, or the allowance of such debts secured thereby, or to institute any actions or adversary proceedings with respect thereto.  Except to the extent expressly set forth in this Final DIP Order, the DIP Liens granted to DIP Lender pursuant to this Final DIP Order shall not at any time be (a) made subject or subordinated to, or made *pari passu* with, the Prepetition Liens or any other lien or security interest existing on the Petition Date, or any other claim, lien, or security interest created under Bankruptcy

Code §§ 363 or 364; or (b) subject to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under Bankruptcy Code § 551.

## No Additional Liens

34.     Until such time as the DIP Obligations shall have been indefeasibly paid and satisfied in full in accordance with the DIP Facility Documents and this Final DIP Order, the Debtor shall not be permitted or authorized to obtain credit secured by a lien or security interest in the DIP Collateral, other than the DIP Facility and DIP Liens, without the prior written consent of DIP Lender or, if such lien or security interest is to be granted on a fully subordinated basis, both in terms of lien priority and time or right of payment to the DIP Liens and the DIP Superpriority Claim, order of the Court upon reasonable notice.

## Automatic Stay

35.     The Automatic Stay is hereby vacated and modified to the extent necessary to permit (a) the Debtor and the DIP Lender to carry out all acts and take all actions necessary to implement and enforce the DIP Facility, DIP Facility Documents, and this Final DIP Order; (b) all acts, actions, and transfers contemplated herein, and the transfer of funds and payments to DIP Lender by the Debtor as provided herein; and (c) consistent with the terms of this Final DIP Order, DIP Lender, at its option, to pursue its rights and remedies as to the DIP Collateral in accordance with the DIP Facility Documents, the Final DIP Order, and applicable law.

## Collateral Insurance and Deposits

36.     The Debtor shall maintain, with financially sound and reputable insurance companies, insurance of the kind covering the DIP Collateral, and in accordance with the DIP Facility Documents (covering such risks in amounts as shall be satisfactory to DIP Lender and shall name DIP Lender as loss payee thereunder).

37.     To the extent the Debtor has made or makes any deposits for the benefit of

utility companies or any other entity (and the Debtor shall not make any such deposits which are not included in the Budget without first obtaining consent of DIP Lender), such deposits shall be, and hereby are, upon any return of same to the Debtor, subject to the DIP Liens of the DIP Lender in respect of the DIP Facility granted by this Final DIP Order.

## Reporting Requirements

38.     The Debtor is authorized and directed to provide to DIP Lender (and its counsel) all the documentation and reports required under the DIP Facility Documents, unless DIP Lender waives or modifies such requirements in writing.

39.     DIP Lender, Prepetition Lenders and their respective agents and advisors shall have full access, upon reasonable notice during normal business hours, to the Debtor's business records and business premises, and to the DIP Collateral and Prepetition Collateral, to enable any or all of the DIP Lender or Prepetition Lenders or their respective agents and advisors to (a) review, appraise, and evaluate the physical condition of the DIP Collateral and Prepetition Collateral; and (b) inspect and review the financial records and all other records of the Debtor concerning the operation of the Debtor's business and the progress of the Sale.  The Debtor shall fully cooperate with any or all the DIP Lender or Prepetition Lenders regarding such reviews, evaluations, and inspections, and shall make its employees and professionals available to any or all of the DIP Lender or Prepetition Lenders, as applicable, and their respective agents and advisors to conduct such reviews, evaluations, and inspections.

## Interest, Fees, Costs And Expenses Of DIP Lender

40.     Interest shall accrue and be paid on all advances made by DIP Lender under this Final DIP Order at the non-default, simple rate of 8% per annum (10% on and after the occurrence of an Event of Default under this Final DIP Order), and, in addition thereto, Debtor shall pay a DIP Facility fee in the amount of 4% of the total DIP Facility; and, reimburse DIP

Lender for all reasonable fees, costs, charges, and expenses, subject to Court approval if there is a dispute regarding reasonableness, including reasonable attorneys' fees and expenses, incurred by DIP Lender after the occurrence of an Event of Default in order to enforce and collect the DIP Obligations (as applicable, or that are otherwise incurred as a result of the Case, collectively, the "DIP Lender's Costs"). The DIP Lender's Costs shall be DIP Obligations owed to DIP Lender, regardless of whether such DIP Lender's Costs are set forth in the Budget and shall be secured by the DIP Collateral and afforded all priorities and protections afforded to the DIP Facility under this Final DIP Order and the DIP Facility Documents. For the avoidance of doubt, DIP Lender's Costs and DIP Obligations shall not include the costs and expenses, including reasonable attorneys' fees and expenses, incurred in negotiating and documenting the DIP Facility. Nothing in this Final DIP Order waives any right of the (a) DIP Lender to request at any time that the Court provide additional or further protection of its interests in the DIP Collateral (including its cash collateral), or to seek further or additional adequate protection in the event the adequate protection provided herein proves to be inadequate, or (b) Debtor to contest any such additional request.

### Professional Fees of The Estate

41.      DIP Lender and Prepetition Lenders hereby consent to the professional retained pursuant to orders of this Court by the Debtor (the "Estate Professionals") retaining the $55,093.25 retainers held as of the Petition Date, provided that such retainers are used first for payment of allowed fees and expenses of such firms holding such retainers prior to any payment from the Professional Fee Escrow. DIP Lender and Prepetition Lenders consent, subject to the terms and conditions set forth in this Final DIP Order, to a carve out from the DIP Collateral and Prepetition Collateral for the payment of (i) fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930, (ii) allowed professional fees of the Committee, and (iii) the allowed

professional fees and expenses of Estate Professionals in an amount not to exceed (a) the amounts set forth in the Budget and paid into the Professional Fee Escrow to be used to pay fees earned and expenses incurred prior to the occurrence of an Event of Default, plus (b) an aggregate amount not to exceed $25,000 to be used to pay fees earned and expenses incurred subsequent to the occurrence of an Event of Default (collectively, the "Carve-Out"). For the avoidance of doubt, DIP Lender shall have no obligation to advance funds under the DIP Facility or otherwise to pay or satisfy all or any portion of the Carve-Out. Rather, the Carve-Out is the first and senior Lien on the DIP Collateral. Payments from the Carve-Out shall be subject to any terms and conditions of the engagement agreements and appurtenant orders for the employment of Estate Professionals. So long as no Event of Default shall have occurred and be continuing, the Debtor shall be permitted to pay Budgeted compensation and reimbursement of expenses allowed by the Court and payable under §§ 330 and 331, as the same may be due and payable and from the Professional Fee Escrow. Other than the Carve-Out set forth above, DIP Lender and Prepetition Lenders do not consent to any carve-out from the DIP Collateral or Prepetition Collateral for payment of any fees and expenses of the Estate Professionals. For the avoidance of doubt, the Carve-out shall not be used by any party to pay for the prosecution of any claims against the DIP Lender.

42. Until such time as the DIP Obligations shall have been indefeasibly paid and satisfied in full in accordance with the DIP Facility Documents, any remaining unapplied retainer funds at the conclusion of an Estate Professional's engagement shall be immediately returned as DIP Collateral and distributed in accordance with the priorities set forth in paragraph 21 of this Final DIP Order. All payments of fees and expenses to any Estate Professionals or use of cash collateral shall constitute diminution in the value of the DIP Collateral for all purposes. DIP Lender expressly retains the right to object to any fees or expenses of any Estate Professional

as to reasonableness or on any other grounds.

43.     Notwithstanding the foregoing, and irrespective of the Carve-Out, in no event shall the Carve-Out, the Professional Fee Escrow, or the proceeds of any loans, advances, or other funds made available by the DIP Lender to or for the benefit of the Debtor (including from cash collateral) be used for the payment or reimbursement of any fees, expenses, costs, or disbursements of any Estate Professional or other persons for the purpose of: (a) objecting to or contesting in any manner, or in raising any defenses to, the validity, extent, perfection, priority, or enforceability of the DIP Facility, the DIP Facility Documents, this Final DIP Order, or any liens or security interest granted thereby or with respect thereto, including the DIP Liens, or any other rights or interests of the DIP Lender under any DIP Facility Document; (b) modifying the DIP Lender's rights under any DIP Facility Documents or this Final DIP Order without DIP Lender's prior written consent; or (c) asserting or declaring any liens or security interests granted under any of the DIP Facility Documents, or this Final DIP Order to have a priority other than the priority set forth in this Final DIP Order.

## No Surcharge

44.     No costs or expenses of administration which have or may at any time be incurred in this Case (or in any successor Chapter 7 case) shall be charged against any of the DIP Lender or DIP Collateral pursuant to Bankruptcy Code § 506(c), or under the "equities of the case" exception to Bankruptcy Code §552(b), or any similar principle of law, or otherwise, without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by any of the DIP Lender, or an order of this Court after notice and an opportunity to be heard is provided to all affected parties.

## Events of Default/Remedies

45.      The occurrence of any of the following shall constitute an Event of Default under this Final DIP Order upon notice which shall be filed in this case and sent to the Debtor, Loeb, Pathward, the Committee and the United States Trustee by DIP Lender: (a) any default, violation, or breach by Debtor of any of the terms of this Final DIP Order; (b) the occurrence of the Expiration Date (as defined below); (c) any challenge to the extent, validity, priority, or unavoidability of the DIP Liens securing the DIP Facility is commenced by Debtor or an order is entered sustaining any such challenge commenced by any party other than the Debtor; (d) the occurrence of any default or Event of Default under any DIP Facility Document; (e) any representation or warranty made by Debtor under this Final DIP Order or the DIP Facility proves to have been false, materially inaccurate, or materially misleading; or (f) the failure of Debtor to make any payments that are set forth in the Budget and that are required to be paid under this Final DIP Order; (any of the foregoing events of default being referred to in this Final DIP Order, individually, as an "Event of Default", or collectively, as "Events of Default").

46.      Immediately upon the occurrence of any Event of Default, and at all times thereafter, and without further act or action by DIP Lender, or any further notice, hearing, or order of this Court: (a) DIP Lender may terminate any and all obligations of DIP Lender in connection with the DIP Facility or under this Final DIP Order and the other DIP Facility Documents; (b) DIP Lender may declare all or any part of the DIP Facility to be immediately accelerated and due and payable for all purposes, rights, and remedies; and (c) the DIP Lender shall be under no obligation to make any further advances to the Debtor under the DIP Facility or otherwise;  Notwithstanding the occurrence of an Event of Default or anything in this Final DIP Order, all  the rights, remedies, benefits, and protections provided to the DIP Lender under this Final DIP Order shall survive any

Event of Default.

47.     Furthermore, upon the occurrence of any Event of Default, and after the giving of ten-calendar-day notice by DIP Lender to the Debtor, Loeb, Pathward, the Committee, and the United States Trustee and without cure of the Event of Default or petition to the Court for relief within that ten-calendar-day period, then without further act or action by DIP Lender, or any further notice, hearing, or order of this Court, the Automatic Stay shall be immediately terminated in respect of DIP Lender and DIP Lender shall be and is hereby authorized, in its sole and absolute discretion, to take any and all actions and remedies that DIP Lender may deem appropriate to proceed against, take possession of, protect, and realize upon the DIP Collateral and any other property of the estate of Debtor, including, without limitation:  (i) any right or remedy set forth in this Final DIP Order; (ii) any right or remedy that the DIP Lender may deem appropriate to proceed against, take possession of, foreclose upon, sell (in whole or in part), protect, and realize upon the DIP Collateral and any other property of any of the Debtor's estate upon which the DIP Lender has been or may hereafter be granted liens and security interests, including the DIP Liens, to obtain repayment of the DIP Obligations and the DIP Facility; (iii) the commencement of actions for specific performance and for the foreclosure upon any DIP Collateral; (iv) the sale of the DIP Collateral, and the exercise, without interference, and, if necessary, as the attorney-in-fact for Debtor, of any rights of Debtor in the management, possession, operation, protection, or preservation of the DIP Collateral; (v) the receipt of proceeds from the sale of any DIP Collateral directly to the DIP Lender; (vi) if appropriate, the right to seek and obtain the appointment of a receiver over any or all of the Debtor and/or the DIP Collateral; and (vii) the right to reproduce, copy, download, or otherwise take possession of any records or data, tangible or electronic, constituting DIP Collateral, provided that the DIP Lender shall not be obligated to take title to any

of the DIP Collateral in the pursuit of any of the DIP Lender's rights and remedies and the Debtor shall cooperate with the DIP Lender in conjunction with the exercise of any right and the pursuit of any remedy by DIP Lender, without limitation.

48.     Upon or after the occurrence of any Event of Default, DIP Lender may, in Its sole and absolute discretion, advance funds to the Debtor, and all such advances (i) shall not constitute a waiver, limitation, or modification of DIP Lender's rights and remedies pursuant to the DIP Facility Documents, this Final DIP Order, and applicable law and (ii) shall be and hereby are granted all of the protections granted to DIP Lender under this Final DIP Order in connection with the DIP Facility.

### Other Terms

49.     The DIP Lender shall have the right to credit and offset all or any portion of the DIP Obligations against the purchase price in the Sale if the DIP Lender is the Buyer (under Bankruptcy Code §363(k) or otherwise, whether the DIP Obligations are secured in whole or in part by the Priming Lien. The Prepetition Lenders (on behalf of themselves and their successors and assigns, if any) have consented thereto, and the Court hereby acknowledges and approves such consent. DIP Lender shall have the right to credit and offset the full amount of the DIP Obligations against the purchase price of all or any portion of the DIP Collateral in the Sale, (i) without any obligation or requirement of DIP Lender to pay or otherwise satisfy any liens senior to the DIP Liens in, on or against the DIP Collateral, (ii) without such senior liens surviving the Sale of the DIP Collateral in, on or against the DIP Collateral, and (iii) with all such senior liens being transferred to the cash proceeds of the Sale, and the Prepetition Lenders (on behalf of themselves and their successors and assigns, if any) have consented thereto, and the Court hereby acknowledges and approves such consent.   These rights shall not be modified, altered, or eliminated by or in any event without the prior written consent of DIP Lender.  DIP Lender is also

authorized to assign its right to credit and offset the DIP Obligations in whole or in part to any affiliate(s) or assign(s) of DIP Lender, to be exercised by such affiliate(s) or assign(s) in connection with the Sale (or any other sale or liquidation of all or any portion of the DIP Collateral). Each of the Prepetition Lenders (on behalf of itself and its successors and assigns, if any) waives and releases any right it may have under section 363(k) of the Bankruptcy Code or otherwise to credit bid all or any portion of its Prepetition Lenders' Claims in the Sale of the DIP Collateral.

50. The Debtor and the DIP Lender are authorized to implement, in accordance with the terms of the DIP Facility Documents, any modifications or amendments to any DIP Facility Document which they believe in good faith are not material and adverse to the Debtor. Any modifications or amendments of any DIP Facility Document which Debtor and DIP Lender in good faith believe are material and adverse to any of the Debtor, Loeb or Pathward shall be subject to prior approval by this Court upon motion by the Debtor; *provided* that the DIP Lender shall be entitled to request approval of the Court with respect to any modification or amendment. For the avoidance of doubt, all amendments and modifications to any DIP Facility Document shall require the approval of DIP Lender.

51. Other than the Carve-Out, no priority or other claims shall be allowed that are or will be prior to or on parity with the DIP Liens or DIP Superpriority Claims of DIP Lender against the Debtor and its estate.

52. No obligations incurred, or payments or other transfers made by or on behalf of Debtor on account of the DIP Obligations or the DIP Facility shall be avoidable or recoverable from DIP Lender under any section of the Bankruptcy Code, or any other federal, state, or other applicable law. The DIP Lender shall not be required to file a proof of claim in this Case with respect to the DIP Obligations.

53.     The terms hereunder and under the DIP Facility Documents, the DIP Liens granted to DIP Lender under this Final DIP Order, and the rights of DIP Lender pursuant to this Final DIP Order with respect to the DIP Collateral, shall not be altered, modified, extended, impaired, or affected by any plan of reorganization of the Debtor without the prior written approval of DIP Lender.

54.     The terms and provisions of this Final DIP Order and any actions taken pursuant hereto shall survive entry of any order that may be entered converting the Case to a case under Chapter 7 or dismissing the Case, except for any obligations of DIP Lender under the DIP Facility Documents (all of which shall immediately terminate upon entry of such an order).  The terms and provisions of this Final DIP Order, as well as the priorities in payment, liens, and security interests granted pursuant to this Final DIP Order and the DIP Facility Documents, shall continue in this and any superseding case under the Bankruptcy Code of the Debtor, and such priorities in payment, liens, and security interests shall maintain their priority as provided by this Final DIP Order until such time as the DIP Obligations shall have been indefeasibly paid and satisfied in full in accordance with the DIP Facility Documents and this Final DIP Order and DIP Lender shall have no further obligation or financial accommodation to the Debtor.

55.     The provisions of this Final DIP Order shall inure to the benefit of the Debtor, DIP Lender, and they shall be binding upon (a) the Debtor and its successors and assigns, including any trustee or other fiduciary hereafter appointed as legal representative of the Debtor or with respect to property of the estate of the Debtor, whether under Chapter 11 of the Bankruptcy Code, any confirmed plan, or any subsequent Chapter 7 case, and (b) all creditors of the Debtor and other parties in interest.

56.     If any or all of the provisions of this Final DIP Order are hereafter modified,

vacated, or stayed without the prior written agreement of DIP Lender, such modification, vacation, or stay shall neither affect (a) the validity of any obligation, indebtedness, or liability incurred by Debtor to DIP Lender before the effective date of such modification, vacation, or stay, nor (b) the validity, enforceability, or priority of any security interest, lien, priority, or other protection authorized, granted, or created hereby or pursuant to any of the DIP Facility Documents. Notwithstanding any such modification, vacation, or stay, any indebtedness, obligations, or liabilities incurred by Debtor to DIP Lender before the effective date of such modification, vacation, or stay shall be governed in all respects by the original provisions of this Final DIP Order, and DIP Lender shall be entitled to all the liens, rights, remedies, privileges, and benefits granted herein and pursuant to the DIP Facility Documents with respect to all such indebtedness, obligations, or liabilities.

57.    To the extent the terms and conditions of the DIP Facility Documents are in express conflict (as opposed to being additive, limiting, or more specific than this Final DIP Order) with the terms and conditions of this Final DIP Order, the terms and conditions of this Final DIP Order shall control.

58.    No approval, agreement, or consent requested of DIP Lender by the Debtor pursuant to the terms of this Final DIP Order or otherwise shall be inferred from any action, inaction, or acquiescence of DIP Lender other than a written instrument acceptable to DIP Lender that is signed by DIP Lender and expressly provides such approval, agreement, or consent, without limitation.  Nothing herein shall in any way affect the rights of DIP Lender as to any non-Debtor entity, without limitation.

59.    Unless expressly and specifically provided otherwise herein, nothing herein shall be deemed or construed to waive, limit, modify, or prejudice the claims, rights, protections,

privileges, and defenses of DIP Lender afforded pursuant to the Bankruptcy Code.

60.     To the extent any findings of fact may constitute conclusions of law, and vice versa, they are hereby deemed as such.

61.     All headings in this Final DIP Order are descriptive and for reference only, and do not have separate meaning or change any terms therein.

62.     In the event a person who is the holder of a lien or claim that is junior or subordinate to the DIP Liens or DIP Superpriority Claims of the DIP Lender receives the proceeds of such DIP Collateral prior to complete and indefeasible satisfaction of all DIP Obligations under the DIP Facility Documents and all obligations under the Prepetition Claim Documents, and termination of the commitments in accordance with the DIP Facility Documents, such junior or subordinate holder shall be deemed to have received, and shall hold, the proceeds of any such DIP Collateral in trust for the DIP Lender and Prepetition Lenders, as applicable, and shall immediately turnover such proceeds for application to the DIP Obligations under the DIP Facility Documents and, thereafter, the Prepetition Lenders under the Prepetition Claim Documents.

63.     This Final DIP Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Lender may have under the Bankruptcy Code or applicable law, or any prior order of this Court, or to bring or be heard on any matter brought before this Court.

64.     Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor, or any direct, indirect, or incidental beneficiary.

### Notice: Expiration Date/Maturity

65.     The Debtor's counsel shall serve this Final DIP Order on all of the following parties:  (a) the Office of the United States Trustee; (b) the attorneys for DIP Lender; (c) all creditors known to the Debtor who have or may assert liens against any of the Debtor's assets,

including each of the Prepetition Lenders; (d) the United States Internal Revenue Service; (e) the 20 largest unsecured creditors of the Debtor; (f) any party in interest who has filed a notice of appearance or upon whom service must be effected under the Rules or the LBR; (g) the Committee; (h) all parties required to be served pursuant to Rule 2002 and (i) all parties listed on the Official Matrix, and such notice shall be sufficient and adequate, and no other or further notice shall be required.

66.    DIP Lender's consent and commitment to provide credit under the DIP Facility Documents and this Final DIP Order, subject to satisfaction of the conditions precedent set forth in paragraph 16, and the funding and Budget limitations above, shall be effective upon entry of this Final DIP Order to and including the earliest of: (a) notice of the occurrence of an Event of Default, or (b) 90 days after the date of this Final DIP Order at 4:00 p.m. (Central Time) on such date, or (c) the closing of the Sale pursuant to the entry of a Bankruptcy Court order approving the sale, or another sale of substantially all of the assets of the Borrower the earliest of (a), (b), or (c), the "Expiration Date"), at which time all DIP Obligations shall mature and be due and payable, and DIP Lender's obligation to continue funding the DIP Facility under the DIP Facility Documents and the Final DIP Order shall terminate (unless extended by written agreement of the Debtor and DIP Lender, a copy of which , together with an updated Budget, shall be promptly filed with this Court by the Debtor).

67.    This Final DIP Order shall take effect immediately upon execution hereof, notwithstanding the possible application of Bankruptcy Rules 6004(g), 7062, 9014, or otherwise, and the Clerk of the Court is hereby directed to enter this Final DIP Order on the Court's docket in this case.

DATED: January 07, 2025
_____

BY THE COURT:

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

APPROVED FOR ENTRY:

/s/Mark A. Craige
Mark A. Craige, OBA No. 1992
Crowe & Dunlevy, P.C.
6th Floor
222 North Detroit Avenue
Tulsa, Oklahoma 74120
918.592.9800 Telephone Number
918.592.9801 Facsimile Number
mark.craige@crowedunlevy.com

*Attorneys for Debtor*

# **EXHIBIT 1**

## **DIP BUDGET**

Oklahoma Forge
Cash Forecast
At 11/19/24

INITIAL WEEKS

| Week Ending | After Filing Date 11/22/24 | 11/29/24 | 12/6/24 | 12/13/24 | 12/20/24 | 12/27/24 | 1/3/25 | 1/10/25 | 1/17/25 | 1/24/25 | 1/31/25 | 2/7/25 | 2/14/25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Collections** | | | | | | | | | | | | | |
| Continental | | | | | | | | 1,946 | | | | | |
| Hadady | | | | | | | | | 4,662 | | | | |
| J&J Alloys | | | | | | | | 2,678 | | | | | |
| Less Pathward 100% | | | | | | | | (4,624) | (4,662) | | | | |
| DIP Loan Proceeds | | | | | | | | 200,000 | | | | | |
| Capital Contribution | | 2,326 | | | | 21,125 | | | | | | | |
| **Projected Collections** | | 2,326 | | | | 21,125 | | 200,000 | | | | | |
| **Disbursements** | | | | | | | | | | | | | |
| ADP Payroll - all | | 2,452 | | | | 21,098 | | 10,461 | | 10,461 | | 10,461 | |
| Water / Sewer - Office | | | | | | | | 550 | | | | | |
| Electric - Office | | | | | | | | 450 | | | | 250 | |
| Gas - Office | | | | | | | | 500 | | | | 500 | |
| Electric - Shop - Deposit | | | | | | | | 4,550 | | | | 500 | |
| Insurance - Liability/ Prop | | | | | | | | 750 | | | | | |
| Insurance - Work Comp | | | | | | | | 300 | | 300 | | | |
| Insurance - Group | | | | | | | | 5,469 | | 5,469 | | | |
| Office Supplies / Misc | | | | | | | | 200 | | | | 200 | |
| Copier/Printer/Fax | | | | | | | | 250 | | | | 250 | |
| Telephone | | | | | | | | 100 | | | | 100 | |
| Cox - Internet | | | | | | | | 150 | | | | 150 | |
| Hummingbird - IT | | | | | | | | 850 | | | | | |
| Leadline - Website | | | | | | | | 100 | | | | 50 | |
| Rent | | | | | | | | 37,410 | | | | 37,410 | |
| Grounds / Trash / Misc | | | | | | | | 250 | | 250 | | 250 | |
| Bank Charges | | 359 | | | | | 350 | | | | | 350 | |
| Employment Contracts | | | | | | | | | | | | | |
| Legal | | | | | | | | | | | | | 60,000 |
| Trustee Fees | | | | | | | | | | 460 | | | |
| Payment - Loeb | | | | | | | | | | | | | |
| Miscellaneous | | | | | | | | 300 | 300 | 300 | 300 | 300 | 300 |
| **Total Disbursements** | | 2,811 | | | | 21,098 | 350 | 62,640 | 300 | 11,471 | 6,069 | 50,771 | 60,300 |
| **Net Cash Flow** | | (485) | | | | 27 | (350) | 137,360 | (300) | (11,471) | (6,069) | (50,771) | (60,300) |
| **Beginning Cash** | 3,350 | 3,350 | 2,865 | 2,865 | 2,865 | 2,865 | 2,865 | 2,515 | 139,875 | 139,575 | 128,104 | 122,035 | 71,264 |
| **Ending Cash** | 3,350 | 2,865 | 2,865 | 2,865 | 2,865 | 2,892 | 2,515 | 139,875 | 139,575 | 128,104 | 122,035 | 71,264 | 10,964 |

1/7/2025