# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| OKLAHOMA FORGE, LLC d/b/a OKLAHOMA FORGE, INC., | : | Case No. 24-11060-M |
| | : | |
| | : | Related to Doc. Nos. 122 |
| Debtor. | : | |
| | : | |

## LIMITED OBJECTION TO DEBTOR'S MOTION FOR AN ORDER (1) AUTHORIZING SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (2) APPROVING DISTRIBUTIONS OF SALE PROCEEDS, AND (3) GRANTING RELATED RELIEF

Ellwood National Steel Company ("ENS"), Ellwood Quality Steels Company ("EQS"), and Ellwood Group, Inc. ("EGI") (EQS, ENS, and EGI are collectively the "Ellwood Companies" or "Objectors") file this Limited Objection ("Objection") to the Debtor's *Motion for an Order (1) Authorizing Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Encumbrances and Other Interests, (2) Approving Distribution of Sale Proceeds, and (3) Granting Related Relief* (the "Sale Motion") [Doc. No. 122].

## PRELIMINARY STATEMENT.

The Ellwood Companies do not object to the sale of the Debtor's assets. In fact, an Ellwood Company affiliate is a competing bidder for these assets. The Ellwood Companies do object to the Debtor's Sale Motion and Debtor's designation of stalking horse bidder because of the unfair tactics employed by Debtor and a lack of full disclosure regarding conflicts of interest between the Debtor and its private equity parent.

Debtor was placed into an involuntary bankruptcy when it tried to undertake actions that would be to detriment of its unsecured creditors while favoring insiders of the Debtor. That

questionable strategy continued following entry of the order for relief when Debtor moved the Court to approve a private sale (ECF 90), and it continues through the current sale process where Debtor selected the stalking horse bid that would protect the interests of Debtor's private equity parent, without disclosing those interests to creditors and this Court. Because the sale favors an insider, the court must apply heightened scrutiny and should give no weight to Debtor's choice of bidder or judgment as to what is a highest and best offer, nor should the Court given any weight to Debtor's assessment of the estate's rights with respect to the Landlord in the event Debtor chooses to try to side with Landlord which would be in the interest of Debtor's insider but not the Debtor's estate.

## BACKGROUND

**A.     The Involuntary Petition**

1.      On August 16, 2024 (the "Petition Date"), the Ellwood Companies and Lehigh Specialty Melting, Inc. filed an involuntary petition on behalf of the Debtor under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Oklahoma at Case Number 24-11060 (the "Bankruptcy Case"). [Doc. No. 1.]

2.      Metro Machine Works, Inc. filed a motion to join as a fourth petitioning creditor on October 8, 2024. [Doc. No. 25.]

3.      The Debtor filed a request to convert the Bankruptcy Case to one under Chapter 11 on November 21, 2024, which the Court granted by order dated November 22, 2024. [Doc. Nos. 56 and 60].

4.      EQS and ENS are pre-petition unsecured creditors of the Debtor and are collectively owed $762,043.00. [Doc. No. 1.]

B.  **The Connor Declaration**

5. On December 12, 2024, the Debtor filed the Declaration of James J. Connor, Manager of Oklahoma Forge, LLC In Support of Chapter 11 Case and First Day Motions [Doc No. 91] (the "Connor Declaration").

6. According to the Connor Declaration, the Debtor is an independent metal forge founded in 1957. *Connor Declaration* ¶ 4.

7. The Debtor is currently owned by private equity fund Fidelis Holdings LLC ("Fidelis") and was purchased by Fidelis in July of 2022 (*see* https://fidelis-llc.com/our-companies/#fabrication and *Connor Declaration* ¶ 16).

8. The Debtor "acquired its assets from the Steven Duenner Family but did not have the resources to acquire the Real Property". *Connor Declaration* ¶ 14. The Connor Declaration also states:

> To facilitate that acquisition, Store Capital, through its affiliate, agreed to acquire the Real Property for approximately $5,000,000 and lease the same to the Debtor under a long-term lease for $37,410.83 per month. For the Sale to proceed, Store Capital has agreed to accept a price of $4,500,000 from FRG for the real estate, subject to an acceptable contract between Store and FRG.

*Connor Declaration* ¶ 14.

9. The Connor Declaration also discloses the existence of loan facilities from Loeb Term Solutions, LLC ("Loeb") in the original amount of $4,760,480 and Pathward, NA ("Pathward") in the original amount of $8,000,000.

10. What is not disclosed in the Connor Declaration, is if Fidelis (or any of its affiliates, subsidiaries, or other insiders) guaranteed the loans from Loeb and Pathward or the lease from SC.

3

11. Debtor's Schedules and Statement of Financial Affairs disclose that no payments were made to General Unsecured Creditors within 90 days of the filing of the Bankruptcy Case (see answer to Question 3 of SOFA indicating "None"). [Doc. No. 97].

12. This is contrasted by the answer to Question 4.1 of the SOFA, which indicates that *an excess of $1,860,000 was transferred to Fidelis and certain other affiliates in the year prior to the filing of this Bankruptcy Case*. [Doc. No. 97].

13. James Connor signed the Declaration as the "manager" of the Debtor.

14. Mr. Connor is also the Chief Financial Officer of Fidelis Holdings Group. This is not disclosed in his Declaration.

15. Given the transfers disclosed to Fidelis in the Debtor's SOFA, there are significant issues with Mr. Connor's and thus the Debtor's independence and whether anyone is properly exercising their fiduciary duties on behalf of the Debtor for the benefit of all creditors. [Doc. No. 97, at page 56 of 58].

16. Mr. Connor provides in the Declaration that the Debtor ceased its operations on or about August 1, 2024 (more than two weeks prior to the filing of the involuntary petition), due to a lack of liquidity to continue its operations (perhaps caused by payment of management fees to Fidelis).

**C.  The Private Sale Motion**

17. On December 12, 2024, the Debtor filed a *Motion for Order Authorizing Sale of Substantially All of the Debtors Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (2) Approving Distribution of Sale Proceeds, and (3) Granting Related Relief. Free and Clear of Liens* [ECF Doc. 90] (the "Private Sale Motion") seeking the approval of private sale of the Debtor's assets to Forge Resources Group, LLC ("FRG").

18. The terms of the Private Sale Motion provided for both (i) a Purchase Price of $3,500,000 for the sale of substantially all of the tangible and intangible assets of the Debtor, and (ii) an agreement with SC to purchase the Real Estate for $4,500,000.[1]

19. The assets to be sold in the private sale included $957,309.46 in "Insurance Benefits" listed on Schedule 1.01(e) of the proposed APA free and clear of all liens, claims encumbrances and interests in the form of six checks from Chubb Insurance Company (the "Insurance Proceeds").

20. Following a hearing on December 18, 2024, where this Court indicated that it would deny the Private Sale Motion, this Court entered the *Final Order (I) Authorizing Post-Petition Credit, (II) Granting Senior Secured Liens and Superpriority Claims Under Sections 364(C) and 364(D) of the Bankruptcy Code, (III) Granting Adequate Protection Liens, and (IV) Granting Related Relief* (the "DIP Order") [Doc No. 139], with EGI as the DIP Lender.

21. The Ellwood Companies sought additional information about the sale of the Insurance Proceeds pursuant to a letter sent to the Debtor and dated January 15, 2025, to which the Debtor did not respond. [ECF No. 148, Exhibit A].

---

[1] *See* Connor Declaration which states as follows:

> After the above marketing efforts were pursued for approximately seven months, on August 20, 2024, the Debtor signed a Letter of Intent to sell substantially all its business assets to Forge Resources Group or its assignee ("FRG"). The Letter of Intent was for $8.4 million cash but included both the land on which Debtor operates, but does not own, and Debtor's personal property. The Letter of Intent expired by its terms but FRG continued to express an interest in the Sale on substantially the same terms. **As a result, subject to definitive documentation acceptable to FRG, the parties have structured the transaction such that the purchase price for the personal property assets of FRG will be $3,550,000 in a section 363(b) sale ("Sale") and the purchase price for the non-debtor real estate will be $4,500,000.** A definitive asset purchase agreement for the personal property assets is currently being finalized.

*Declaration of James J. Conner, Manager of Oklahoma Forge LLC. In Support of Chapter 11 Case and First Day Motion* ¶ 7 [Doc. No. 91] (emphasis added).

**D.     The Bidding Procedures Motion and Sale Motion**

22.     On December 30, 2024, the Debtor filed the Sale Motion and its related *Motion for an Order (A) Establishing Bidding Procedures in Connection with the Sale of Substantially All of the Debtor's Assets, (B) Approving the Form and Manner of Notices, (C) Scheduling Dates for an Auction and Sale Hearing, and (D) Authorizing and Approving the Form of a Stalking Horse Asset Purchase Agreement and Termination Fee* (the "Bidding Procedures Motion").  [Doc. No. 122].

23.     The Sale Motion seeks approval of the Bankruptcy Court to sell substantially all the Debtor's assets, including equipment and other personal property (both tangible and intangible) owned by the Debtor and utilized at its metal forge facility (the "Sale Assets"), and the Bidding Procedures Motion sets forth the process by which such Sale Assets will be sold.

24.     The Bidding Procedures Motion also avers that the Debtor does not own the real property upon which its metal forge facility is located (5259 South 49th West Avenue, Tulsa, Oklahoma 74107) (the "Real Property"); rather, the Real Property is owned by Store Master Funding XIV, LLC, an affiliate of Store Capital, LLC ("SC"), and the Debtor leases the Real Property from SC for $37,410.83 per month.

25.     The Debtor represents that it is not affiliated with SC but did not disclose whether the lease between SC and the Debtor is guaranteed and if it is, by whom? Fidelis, the sellers, a related party, or someone else?.  It also appears that Fidelis, the private equity company that owns the Debtor, has other businesses located at the Real Property.  Indeed, Landlord attached the Lease to its objection and stated in Section 1.09 that the Guarantors are Fidelis Holdings, LLC, a Michigan limited liability company, and JDIN, LLC, a Michigan limited liability company.

26. On December 20, 2024, TSK Partners LLC d/b/a McInnes Rolled Rings, a subsidiary of EGI ("MRR"), submitted an offer to purchase substantially all the Debtor's assets (but not the real estate) for $3,600,000. [ECF No. 148, Exhibit B].

27. On December 24, 2024, the Debtor and Forge Resources Group LLC ("FRG") executed an Asset Purchase Agreement of the same date (the "APA"), whereunder FRG, identified in the Bid Procedures Motion as the Stalking Horse Bidder, agreed to purchase the Purchased Assets for the sum of $4,250,000.00 (the "Stalking Horse Bid"). The Stalking Horse Bid also requires, as a condition to closing, that SC sell the Real Estate to FRG for "$3,800,000 or less." There is also a provision relating to the sublease with Duenner Supply Company (the "DSC Sublease"), but it is not clear what is occurring with respect to the DSC Sublease. *Bid Procedures Motion*, Ex 1 at § 6.01(a).

28. Paragraph 12 of the Debtor's Sale Motion [Doc. No. 122, at pages 38-39] states as follows:

> Direction to Surrender the Purchased Assets. All persons or entities in possession or control of any of the Purchased Assets, either presently or on or before the Closing Date, are directed to surrender possession or control of the Purchased Assets to the Purchaser on the Closing Date. By way of example and not by way of limitation, all checks and other instruments issued by Chubb Federal Insurance Company or any affiliate thereof ("Chubb Proceeds") shall be turned over and delivered to the Purchaser, properly endorsed (without recourse, representation or warranty), by Debtor or any other holder of Chubb Proceeds, to pay to the order of Purchaser or any assignee of Purchaser designated by Purchaser in writing at or before Closing. In addition, the Debtor or the holder of any Chubb Proceeds, as applicable, shall cooperate with the Purchaser in taking reasonably requested actions by Purchaser to cause the maker of the Chubb Proceeds or an subsequent holder thereof, as applicable, to reissue the Chubb Proceeds in the name of the Purchaser or any assignee of Purchaser that has been designated by Purchaser at or before Closing in writing."

29. Paragraph 12 of the Debtor's Sale Motion clearly provides that the Chubb Proceeds in the amount of $957,309.46 are going to FRG.

30. If the terms of the Sale Motion are taken at face value, and when the Insurance Proceeds are considered, the actual amount of FRG's bid for the Debtor's assets in terms of net benefit to the estate is $3,292,690.54, or $307,309.46 *less* than the $3.6 million bid submitted by MRR.

31. The Ellwood Companies filed an Objection to the Bidding Procedures Motion (the "<u>Bidding Procedures Objection</u>"), based on the Debtor's failure to disclose necessary information regarding existing conflicts of interest, the lack of transparency regarding the structure of the agreement between the Debtor and FRG, and the absorption of the Insurance Proceeds by FRG.

32. The Ellwood Companies specifically noted in the Bidding Procedures Objection the Debtor's failure to disclose whether Fidelis (or any of its affiliates, subsidiaries, or other insiders) guaranteed the loans from Loeb and Pathward or the lease from SC, and the proposed absorption of the Insurance Proceeds by FRG.

33. On January 21, 2025, the Debtor filed a Reply to the Bidding Procedures Objection (the "<u>Reply</u>"), admitting therein that "Fidelis is a guarantor of the Debtor's obligations to Store Master Funding XIV, LLC, Loeb Term Solutions, LLC, and Pathward, Inc. JDIN, LLC is another company in the Fidelis portfolio which also guaranteed the Debtor's lease with Store Master Funding XIV, LLC." [ECF No. 153, p. 4].

34. The Debtor also "admits Schedule H inadvertently omitted the Fidelis guarantees of Store Master Funding XIV, LLC, Loeb Term Solutions, LLC and Pathward Inc." [ECF No. 153, p. 5].

35. Regarding the Insurance Proceeds, the Debtor avers in the Reply that "[t]he only Chubb Check going to FRG is in the amount of $48,517," and the FRG APA was amended to conform to the statement in the Reply. [ECF No. 153, p. 2].

36. On January 7, 2025, this Honorable Court granted the Bidding Procedures Motion and ordered responses to the Sale Motion by February 14, 2025. [ECF No. 140].

37. Additionally, Ellwood Companies believe that the objection of the Landlord should be overruled. The fixtures are property of the estate. The lease expressly authorizes Debtor to remove fixtures on Lease termination (See Section 3.04 of the Lease attached to ECF 135).

## ARGUMENT

38. The Debtor proposes to sell the Purchased Assets pursuant to section 363(b) of the Bankruptcy Code, which provides that a debtor in possession may sell property of the estate outside of the ordinary course of business after notice and a hearing. 11 U.S.C. § 363(b).

39. The sale of essentially all a debtor's assets under section 363(b) is subject to special scrutiny, and "the bankruptcy judge must weigh all of the facts and circumstances of the case" to "determine whether safeguards are necessary to protect rights that could be exercised in the context of plan confirmation." *In re Gulf Coast Oil Corp*., 404 B.R. 407, 422-23 (Bankr. S.D. Tex. 2009); *see also In re Silicon Graphics, In*c., No. 09-11701 (MG), 2009 Bankr. LEXIS 1350, at *9 (Bankr. S.D.N.Y. Apr. 24, 2009) (explaining that a sale process utilizing an auction with a stalking horse bidder and requiring court approval mandates transparency).

40. Factors considered by bankruptcy courts when asked to approve a section 363(b) sale include, but are not limited to, the business justification for the proposed sale, the structure of the proposed asset purchase agreement, whether the assets were aggressively marketed in an active market, and the parties that will benefit from the sale. *Id*. at 423-26.

41. "The 'business judgment' test applies to determine whether a sale under § 363(b) should be approved." *Allen v. Absher (In re Allen)*, 607 F. App'x 840, 843 (10th Cir. 2015). Under this standard, the party seeking approval of the sale must show "sound business reasons for the

sale." *Id.* "In making this determination, courts consider evidence of '[a]ny improper or bad motive,' whether '[t]he price is fair and the negotiations or bidding occurred at arm's length,' and whether the trustee followed '[a]dequate procedures, including proper exposure to the market and accurate and reasonable notice to all parties in interest.'" *Id*. (citing *In re Castre, Inc*., 312 B.R. 426, 428 (Bankr. D. Colo. 2004).

42. In *Newsome v. Gallacher*, 722 F.3d 1257, 1266 (10th Cir. 2013), the Court of Appeals for the 10th Circuit wrote that "when the subsidiary becomes insolvent[,] . . . the subsidiary's 'creditors take the place of the shareholders as the residual beneficiaries of any increase in value,' and the director therefore owes fiduciary duties to the creditors as well as the corporation.") (citing *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007)). Furthermore, in *VFB LLC v. Campbell Soup Co*., 482 F.3d 624, 635 (3d Cir. 2007) the United States Court of Appeals for the Third Circuit observed that a duty of loyalty against the parent corporation arises when the subsidiary represents a minority interest in addition to the parent such as when the subsidiary is insolvent and the creditor's investment is at risk.

43. In the sale context, the United States Bankruptcy Court for the District of Massachusetts vacated a sale because the purchaser colluded with a stockholder of the debtor, the stockholder's brother and law partner (who was also a personal friend of the purchaser), and the attorney for the debtor, in an effort to obtain the debtor's property at the lowest possible price, and because the purchaser concealed from and misrepresented to the bankruptcy court his relationship with the parties and the less than arms-length dealings with the debtor. *In re Tri-Cran, Inc*., 98 B.R. 609, 619-622 (Bankr. D. Mass. 1989).

44. Here, the Sale to the Debtor's "chosen" bidder cannot be approved without applying strict scrutiny because the Sale Motion lacks sufficient transparency regarding the structure of the

agreement between the Debtor and FRG, the purported purchase of the Real Property by FRG through a private sale, who will benefit from the sale at the expense of the Debtor, and the conflicts of Jim Conner, the Manager of the Debtor and CFO of Fidelis.

A.  **The Debtor has continuously failed to disclose necessary information regarding the Sale, including existing conflicts between the Debtor, Fidelis, and FRG.**

45. Throughout these proceedings, the lack of necessary disclosures has created valid suspicion regarding the intent behind this hurried sale. While the Debtor's actual intent and the interrelationships between the parties remain unclear, what is obvious is that the Debtor is only providing required information when absolutely pressed to do so. For example, it took objections from the Ellwood Companies for the Debtor to: (i) address the issue of the Insurance Proceeds and modified their absorption by FRG after the Ellwood Companies raised the issue in the Bidding Procedures Objection, and (ii) admit to omitting relevant information regarding Fidelis' guarantees of obligations owed by the Debtor, Store Master Funding XIV, LLC, Loeb Term Solutions, LLC and Pathward Inc.

46. Further, the Connor Declaration and the Debtor's Schedules are materially misleading. In the Schedules, the Debtor only lists one co-Debtor, Duenner Supply[2], with respect to the Pathward debt. *See* ECF 97 at Schedule H. However, SC filed a Limited Objection to the Sale Motion at ECF 135 (the "SC Sale Objection"). Attached to the SC Sale Objection is a copy of the Lease dated June 13, 2023, by and between SC and the Debtor (the "SC Lease"). In the SC Lease, Section 1.09 identifies the "Guarantors" as Fidelis Holdings, LLC, a Michigan limited liability company, and JDIN, LLC, a Michigan limited liability company and Section 4.08 of the Lease required the "Guarantors" to execute a "Guaranty" when the SC Lease was signed. ECF 135 at Ex A, §§ 1.09 and 4.08.

---

[2] A review of the Fidelis website shows that Fidelis also owns Duenner Supply Company.

47. Given the material misstatement in the Schedules about the lack of a Guaranty of the SC lease which was only revealed when SC filed the SC Sale Objection, one can only speculate that Fidelis is putting its finger on the scale to force a linked sale of both the Real Property and the Sale Assets instead of trying to maximize the value of the Sale Assets for the benefit of the Debtor. Clearly, considering what has happened to date, we are not dealing with a fair and open sale process.

48. While having undisclosed factors that affect a sale going on in the background may be acceptable when the seller of assets is not a Debtor under Chapter 11 of Title 11, this goes against the very fundamental principles of disclosure and fairness that the bankruptcy system is built upon. *See, e.g.*, *In re Engineering Products Co.*, 121 B.R. 246 (Bankr. E.D. Wis. 1990) (for a sale to take place pursuant to section 363 of the Bankruptcy Code, numerous standards must be met including full disclosure and fair dealing on part of all interested parties); *see also In re Medical Software Solutions*, 286 B.R. 431 (Bankr. D. Utah 2002) (debtor must uphold its fiduciary duty of full disclosure to potential bidders, creditors, and shareholders). This would also create significant issues with this Court determining that the sale has taken place in good faith, as is required under 11 U.S.C. § 363(m). Failing to disclose the Guaranty of the SC Lease and favoring the sale to FRG highlights the conflicted situation with Fidelis and James Connor.

49. While Objectors do not oppose the Debtor's attempt to sell the Sale Assets, the Objectors strongly object to the unfair sale process set forth in the Sale Motion because of the Debtor's failure to disclose, in full transparency, certain material details of the Debtor's relationship to FRG, the reasons for the Debtor's selection of FRG as the Stalking Horse Bidder, the Debtor's relationships with its parent private equity company Fidelis, the relationships between Fidelis, Pathward, Loeb, and SC, the undisclosed Fidelis Guaranty of the SC Lease, and the conflict

situation of the Debtor's Manager James Connor, whose primary job appears to be the CFO of Fidelis, the beneficiary of multiple transfers disclosed on the Debtor's SOFA at a time when the Debtor was not paying its trade vendors like the ENS and EQS.

50. Debtor's manager owes conflicting duties to Fidelis Holdings, LLC and the Debtor at the same time. Specifically, as CFO of Fidelis Holdings, James Connor owed duties to Fidelis Holdings, LLC to minimize its liabilities under any loan guaranties and under the lease guaranty. And as Manager of the Debtor, an insolvent company that is operating as a Debtor in Possession under Chapter 11 of the Bankruptcy Code, James Connor owes a fiduciary duty to the Debtor's creditors. These duties are incompatible.

51. Mr. Connor has concealed the existence of the conflict by, among other things, failing to disclose the existence of the Guaranty of the Lease in the schedules, and by concealing from the Court that in addition to being the Manager of the Debtor, he is also the CFO of Fidelis. This is not disclosed anywhere in the Connor Declaration. This type of material omission of critical facts is just as misleading as if Mr. Connor had made an affirmative misstatement that he did not hold an officer position with Fidelis. *See, e.g., Adler v. Ng (In re Adler)*, 395 B.R. 827, 841 (E.D.N.Y. 2008) (Both omissions and affirmative statements constitute statements under oath and can constitute a false oath for purposes of Section 727(a)(4)(A).); *Estate of Bishop v. Mulholland (In re Mulholland)*, Nos. 7-10-14587 JR, 10-1154 J, 2011 Bankr. LEXIS 3559, at *12 (Bankr. D.N.M. Sep. 16, 2011) (same, citing cases). And by pairing this omission with filing Schedules that failed to disclose the existence of the Fidelis Guaranty, the Debtor has misled both the Court and creditors in seeking the relief sought in the Sale Motion.

52. These conflicts do expose that this sale and bidder selection is done to benefit an insider of the Debtor. In *In re Bidermann Indus. USA,* 203 B.R. 547, 551 (Bankr. S.D.N.Y, 1997),

the Court noted that when a sale was being made to the debtor's chief executive officer, it would be subject "to heightened scrutiny because they are rife with the possibility of abuse".

53. This transaction requires strict scrutiny. As so eloquently stated in *Bidermann*:

Thirty years ago Judge Henry Friendly, sitting on the Second Circuit Court of Appeals, declared that the conduct of bankruptcy proceedings not only should be right but must seem right. *Knapp v. Seligson (In re Ira Haupt & Co.),* 361 F.2d 164, 168 (2d Cir. 1966). In this case, the fiduciaries must have blinded themselves to Judge Friendly's counsel.

*Id.* 203 B.R. at 547.

**B.  Due to the conflicts, the business judgment rule does not apply.**

54. Because of the conflict issues raised in this Objection and the Bidding Procedures Objection, the business judgment rule should not apply, and the Court owes no deference to the decision of the Debtor in selecting FRG as the stalking horse bidder. *Warren v. Campbell Farming Corp.*, 400 F. App'x 312, 314-15 (10th Cir. 2010) (noting precedent from other jurisdictions which hold that the business judgment rule does not apply to director conflict-of-interest transactions, and certifying to the Montana Supreme Court the question of whether the business judgment rule applies to challenges based upon a director's conflict of interest) (citing *In re Croton River Club, Inc.*, 52 F.3d 41, 44 (2d Cir. 1995) ("It is black-letter, settled law that when a corporate director or officer has an interest in a decision, the business judgment rule does not apply.")); *Warren v. Campbell Farming Corp.*, 271 P.3d 36, 44 (Mt. 2011) (concluding that "the business judgment rule does not apply to challenges based upon a director's conflict of interest, a position commonly expressed by commentators.") (citing Jennifer Berger, Carol Jones, & Britta Larsen, Fletcher Cyclopedia of the Law of Private Corporations, vol. 3A, § 1040, 50-53 (Perm. ed. West 2002) (footnotes omitted) ("To gain the protection of the business judgment rule, a director must have been disinterested, independent, and informed.

55. A director is interested where the director has a financial or pecuniary interest in a transaction other than that which devolves to the corporation or to all of the shareholders generally. Accordingly, where the director appears on both sides of a transaction the rule will not protect the decision or the director making it. . . . The business judgment rule does not protect corporate fiduciaries who engage in self-dealing or make decisions affected by inherent conflict of interest.")); *In re Stoico Rest. Grp.*, No. 00-2109-KHV, 2001 U.S. Dist. LEXIS 353, at *8-9 (D. Kan. Jan. 8, 2001) (citing Delaware law and holding that "[i]f a conflicting directorial interest exists, the business judgment rule does not apply unless the questioned transaction is approved by a majority of disinterested directors," and that "[c]onflicting directorial interest exists whenever a director is a party on both sides of a transaction or expects to receive a material personal financial benefit from the transaction as opposed to a financial advantage that would benefit all stockholders generally.") (citation omitted); *Hasan v. CleveTrust Realty Inv'rs*, 729 F.2d 372, 377 (6th Cir. 1984) (applying Massachusetts law and stating that "[i]n cases in which the directors of a corporation are charged with self-dealing, the Massachusetts courts have not applied the business judgment rule. . . Those courts will 'vigorously scrutinize the situation' where a director's duty of loyalty to the corporation is in conflict with his or her self-interest.") (citations omitted).

## **CONCLUSION**

56. Based on the foregoing, the Debtor failed to demonstrate its business justification for the proposed sale, and it cannot satisfy the strict scrutiny to proceed under 11 U.S.C. § 363(b).

WHEREFORE, the Objectors respectfully request that this Honorable Court issue an order denying the Sale Motion with respect to the stalking horse bidder, and granting such other and further relief as the Court deems just and proper.

Dated: February 14, 2025

Respectfully submitted,

/a/ *Stephen J. Moriarty*
Stephen J. Moriarty (OK ID 6410)
FELLERS, SNIDER, BLANKENSHIP,
BAILEY & TIPPENS, P.C.
100 N. Broadway, Suite 1700
Oklahoma City, OK 73102
(405) 232-0621
smoriarty@fellerssnider.com

-and-

Michael A. Shiner (PA ID 78088)
*Admitted pro hac vice*
Beverly Weiss Manne (PA ID 34545)
*Admitted pro hac vice*
TUCKER ARENSBERG, P.C.
1500 One PPG Place
Pittsburgh, PA 15222
(412) 566-1212
mshiner@tuckerlaw.com
bmanne@tuckerlaw.com

*Counsel for Ellwood National Steel Company and Ellwood Quality Steels Company*