| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| OKLAHOMA FORGE, LLC d/b/a | : | Case No. 24-11060-M |
| OKLAHOMA FORGE, INC., | : | |
| | : | Related to Doc. No. 317 |
| Debtor. | : | |
| | : | |

**THE ELLWOOD COMPANIES' OBJECTION
TO DEBTOR'S MOTION FOR AN ORDER (1) AUTHORIZING SALE OF
SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL
LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (2) APPROVING
DISTRIBUTION OF SALE PROCEEDS, AND (3) GRANTING RELATED RELIEF**

Ellwood National Steel Company ("**ENS**"), Ellwood Quality Steels Company ("**EQS**"),

and Ellwood Group, Inc. ("**EGI**") (EQS, ENS, and EGI collectively the "**Ellwood Companies**")

along with TSK Partners LLC d/b/a McInnes Rolled Rings ("**TSK**" and with the Ellwood

Creditors, "**Objectors**") file this Objection ("**Objection**") to Debtor's Motion [Doc. 317] for an

Order (1) Authorizing Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens,

Claims, Encrumbrances and Other Interests, (2) Approving Distribution of Sale Proceeds, and (3)

Granting Related Relief ("**Motion**").

## BACKGROUND

1.      On August 16, 2024, ("**Petition Date**"), creditors EQS, ENS, and Lehigh Specialty

Melting, Inc. filed an involuntary petition against Oklahoma Forge, LLC d/b/a Oklahoma Forge,

Inc. ("**Debtor**") under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court

for the Northern District of Oklahoma at Case Number 24-11060 ("**Bankruptcy Case**").  [Doc.

No. 1] and following Debtor's consent to the Petition and request for conversion to Chapter 11,

the Court entered an order for relief, under Chapter 11 on November 22, 2024. [ECF Nos. 56, 60].

2.     The Debtor seeks court approval of a sale ("**Sale**") of substantially all its assets, including equipment and other personal property (both tangible and intangible) owned by the Debtor and utilized at its metal forge facility ("**Sale Assets**").

3.     The Debtor's metal forge facility and all its Sale Assets are located on real property ("**Real Property**") owned by Store Master Funding XIV, LLC, an affiliate of Store Capital, LLC ("**STORE**").

4.     The Debtor leases the Real Property from STORE pursuant to the terms of a lease agreement dated June 13, 2023 ("**Lease**").

5.     The Debtor's obligations under the Lease are guaranteed by the Debtor's parent, Fidelis Holdings, LLC ("**Fidelis**"). [Doc. No. 153, p. 4, 5].

6.     Fidelis subsidiary and Debtor affiliate Duenner Supply ("**Duenner**") subleases space at the Real Property from the Debtor (the "**Duenner Sublease**") and also guarantees the Lease.[1]

7.     On December 12, 2024, the Debtor filed a Motion for Order Authorizing Sale of Substantially All of the Debtors Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (2) Approving Distribution of Sale Proceeds, and (3) Granting Related Relief. Free and Clear of Liens [ECF Doc. 90] ("**Private Sale Motion**") seeking the approval of private sale of the Debtor's assets to Forge Resources Group, LLC ("**FRG**"). The terms of the Private Sale Motion provided for both (i) an agreement to purchase substantially all of the Debtor's assets for $3,500,000, and (ii) an agreement by FRG to purchase the real estate upon which the Debtor operates its business from STORE for $4,500,000.

---

[1] In paragraph 64 of the Motion, the Debtor admitted that it failed to disclose the Fidelis guarantees on the Debtor's schedules, Private Sale Motion, First Sale Motion, and Bidding Procedures Motion. The Debtor also did not disclose the fact that James Connor, the manager of the Debtor, is also the CEO of Fidelis, and this information came to light when Objectors deposed Mr. Connor.

8.     In addition to the objection of the United States Trustee, the Ellwood Companies objected to the Private Sale Motion at the hearing on January 7, 2025, and Debtor withdrew the Motion. [ECF No. 138].

9.     On December 30, 2024, the Debtor filed a Motion for an Order (1) Authorizing Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Encumbrances and Other Interests, (2) Approving Distribution of Sale Proceeds, and (3) Granting Related Relief ("**First Sale Motion**") [Doc. No. 122] and its related Motion for an Order (A) Establishing Bidding Procedures in Connection with the Sale of Substantially All of the Debtor's Assets, (B) Approving the Form and Manner of Notices, (C) Scheduling Dates for an Auction and Sale Hearing, and (D) Authorizing and Approving the Form of a Stalking Horse Asset Purchase Agreement and Termination Fee ("**Bidding Procedures Motion**") [ECF No. 122].

10.     On December 20, 2024, TSK submitted an offer to purchase substantially all the Debtor's assets (but not the real estate) for $3,600,000.  [ECF No. 148, Exhibit B].

11.     On December 24, 2024, the Debtor and FRG executed an Asset Purchase Agreement ("**APA**"), whereunder FRG, identified in the Bid Procedures Motion as the Stalking Horse Bidder, agreed to purchase the Sale Assets for $4,250,000.00 ("**Stalking Horse Bid**").  The Stalking Horse Bid also required, as a condition to closing, that STORE sell the Real Estate to FRG for "$3,800,000 or less."

12.     On January 6, 2025, STORE filed a Limited Objection to the Sale Motion ("**STORE Objection**") where it alleged that STORE, and not the Debtor, owned substantially all of the Debtor's equipment. [Doc. 135].

13.     On February 17, 2025, Loeb Term Solutions, LLC ("**Loeb**"), the first lienholder on the Debtor's assets, filed a Reply to Limited Objections ("**Loeb Reply**") [Doc. No. 208], attaching

a copy of an Access Agreement dated September 15, 2023 ("**Access Agreement**")[2] by and among the Debtor, STORE, Loeb.

14.　　Pursuant to the Access Agreement, STORE acknowledged and agreed (a) that Loeb held a security interest "in all personal property" of the Debtor, "including and without limitation the machinery and equipment described in" the Exhibit A to the Access Agreement.  Exhibit A to the Access Agreement identifies the same equipment that is listed on the Debtor's schedules, is described as the Sale Assets in the Sale Motion, and is listed on exhibits to both the FRG and TSK APAs; and (b) Sale Assets are personal property and will not be deemed to be fixtures or part of the realty.[3]  [ECF No. 208, Exhibit 1, p. 1; ECF No. 122, pp. 87-98; ECF. No. 231, pp. 37-48; ECF No. 238, pp. 32-43].

15.　　On January 7, 2025, this Court granted the Bidding Procedures Motion ("**Bidding Procedures Order**").  [ECF No. 140].

16.　　On January 21, 2025, the Debtor filed a revised proposed order designating FRG as the Stalking Horse Bider.  [ECF No. 152].

17.　　On February 15, 2025, STORE filed a Supplemental Limited Objection and Reservation of Rights to Debtor's Motion for an Order (1) Authorizing Sale of Substantially All of The Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests,

---

[2] At the March 17, 2025 evidentiary hearing on the Sale Motion, the Access Agreement was admitted into evidence by the Court.

[3] The Access Agreement contains the following relevant provisions:  [Recitals] Pursuant to the Documents Lender has been granted or will be granted, a security interest ("Lender's Lien") in all personal property of the Borrower, including without limitation the machinery and equipment described in Exhibit "A" attached hereto (the "Listed Equipment"), and all attachments, spare parts, change parts, tooling, plant support equipment, platforms, piping, electrical wiring and any other tangible personal property owned by Borrower used in connection therewith, and all proceeds thereof (collectively the "Collateral"); . . . 2. **Landlord Subordination**. Landlord hereby consents to Lender's Lien, to the extent such consent is required under the Lease, and agrees to unconditionally subordinate to the security interest of Lender in the Collateral any and all liens, claims, demands or rights however arising, including without limitation, the right to levy, distrain, sue, execute or sell for unpaid rent or otherwise. . . . Landlord agrees that the Collateral *(a) is and shall remain the personal property of Borrower, and (b) is not and shall not become or be deemed affixed to or part of the Premises*.  Emphasis added.

(2) Approving Distribution of Sale Proceeds, and (3) Granting Related Relief ("**STORE Supplemental Objection**") objecting to the Sale Motion "solely to the extent the Debtor seeks to sell fixtures that have become affixed to the Property and are not property of the Debtor's estate." [ECF No. 204] wherein STORE claimed that certain of the assets listed on Schedule 1.01(c) to both the TSK and FRG APAs include equipment that are owned by STORE because they have become part of the real estate and are no longer property of the Debtor's estate. *Id*.

18. The Debtor filed a Reply ("**Debtor Reply**") to STORE's Supplemental Objection on February 19, 2025, through which the Debtor joined in the Loeb Reply, noted STORE's delay in raising such argument and silence at every preceding hearing on the matter, and argued that STORE agreed that the Sale Assets "would not become or be deemed affixed" to the Real Estate pursuant to the Access Agreement. [ECF No. 230].

19. On February 18, 2025, STORE filed a complaint against the Debtor initiating Adversary Number 25-01002 ("**Adversary Proceeding**"), seeking a declaratory judgment that certain Sale Assets are property of STORE. [Adv. No. 25-01002, ECF No. 1]. The Adversary Proceeding does not seek injunctive relief to stay the sale. Despite the Summons being served and the answer being due on March 21, 2025, the Debtor has not responded to STORE's Complaint.

20. Pursuant to the Bidding Procedures Order, an auction ("**Auction**") was held before the Bankruptcy Court on February 20, 2025. [ECF No. 239].

21. TSK was the highest bidder at the Auction, with a bid of $6,650,000.

22. FRG was the second-highest bidder at the Auction, with a bid of $6,575,000.

23. At the Auction, the Court continued the sale hearing to February 25, 2025, at which point the matter of STORE's Objection was scheduled for an evidentiary hearing on March 17, 2025.

24.     The Debtor filed a Notice on March 10, 2025, purporting to designate FRG as the winning bidder.  [ECF No. 258].

25.     The Objectors filed an objection to the Notice on March 14, 2025.  [ECF No. 262].

26.     An evidentiary hearing was held on March 17, 2025 [ECF No. 277], and a continued telephonic evidentiary hearing was held the next day, March 18, 2025 ("**Continued Hearing**") [ECF No. 279].

27.     At the Continued Hearing, "the Court raised several concerns regarding Debtor's compliance with the Bidding Procedures in the selection of a winning bidder," and entered a text order the following day scheduling a telephonic hearing for March 27, 2025.  [ECF No. 280]

28.     Pursuant to the text order entered March 19, 2025, the parties briefed the issues of the legal effect of the Debtor's designation at Auction, the legal effect of the Notice, and whether the parties substantially complied with § 4(e) of the Bidding Procedures.  [ECF Nos. 280, 300, 303, 304].

29.     Another telephonic hearing was held on March 27, 2025 [ECF No. 307], and the Court entered an Order Denying the Sale Motion the same day [ECF No. 308].

30.     On April 1, 2025, the Debtor solicited additional, "final bids" from TSK and FRG.

31.     On April 3, 2025, TSK submitted a final bid ("**TSK Final Bid**") offering cash in the amount of $6,850,000, expense reimbursements to Debtor in the amount of $215,000, a waiver of the Ellwood Companies' request for administrative expenses in the amount of $184,092.72 [ECF No. 302], and subordination of the Ellwood Companies' unsecured claims totaling $762,142.95 to all allowed unsecured priority claims and all allowed general unsecured claims.[4]

---

[4] Ellwood placed a value of $152,428.59 on that subordination based upon an anticipated minimum distribution to unsecured creditors of 20%. Obviously if a distribution were larger, that consideration would be greater as well.

Ellwood Companies also agreed to be the backup bidder on the condition that Ellwood Companies would have access to the Real Property for a reasonable time to remove the Sale Assets.

32.    FRG also submitted a final bid ("**FRG Final Bid**") on the same day, in the amount of $6,575,000 (the same as its prior bid) with a condition that "Closing pursuant to the Sale Order will be no later than April 30, 2025 ("Outside Date") . . . ."

33.    On April 11, 2025, the Debtor filed a Second Notice Regarding Successful Bidders ("**Second Notice**") [ECF No. 313], again designating the FRG Final Bid as the winning bid.

34.    On April 14, 2025, Debtor filed the Motion, seeking to sell the Sale Assets to FRG and sought expedited consideration of the Motion.

35.    A hearing ("**Sale Hearing**") has been scheduled for April 30, 2025.  [ECF No. 321].

## OBJECTIONS TO SALE

36.    The Bankruptcy Code provides that a trustee or debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).

37.    In order for a Bankruptcy Court to approve a sale under § 363, "[t]he Debtor must show (1) that a sound business reason  exists for the sale; (2) there has been adequate and reasonable notice to interested parties, including full disclosure of the sale terms and the Debtor's relationship with the buyer; (3) that the sale price is fair and reasonable; and (4) that the proposed buyer is proceeding in good faith."  *In re Med. Software Sols.*, 286 B.R. 431, 439-40 (Bankr. D. Utah 2002).

38.    The Bankruptcy Court has power to disapprove a proposed sale recommended by debtor in possession if it has awareness that there is another proposal in hand which, from the estate's point of view, is better or more acceptable. *In re Broadmoor Place Invs., L.P.*, 994 F.2d

744, 24 Bankr. Ct. Dec. (LRP) 460, Bankr. L. Rep. (CCH) ¶ 75297, 1993 U.S. App. LEXIS 30174 (10th Cir. 1993), cert. denied, 510 U.S. 1071, 114 S. Ct. 877, 127 L. Ed. 2d 73, 1994 U.S. LEXIS 985 (1994).

39.     The Debtor's Motion should be denied because: (i) there are issues with the FRG Final Bid; (ii) the Debtor is not entitled to the benefit of a business judgment presumption, (iii) the Debtor is not acting in good faith; (iv) the alleged litigation risk is manufactured; (v) the alleged execution risk is a red herring; (vi) the Motion is a 9019 Motion disguised as a Sale Motion; and (vii) the proposed sale is fundamentally unfair.

### *Issues with the FRG Final Bid*

40.     The FRG Final Bid requires a closing by April 30, 2025, the same date as the scheduled Sale Hearing.

41.     FRG's condition to closing gives the FRG Final Bid a significant execution risk which Debtor has not adequately considered.

42.     Further, FRG deleted the Title to Personal Property and Tangible Personal Property representations from its APA, but only because FRG will be paying STORE money to buy the Real Property from STORE, and STORE has agreed to withdraw the STORE Objection (and apparently dismiss the Adversary Proceeding), but only if FRG is the successful bidder.

43.     In the Sale Motion, Debtor admits that (a) its parent Fidelis will benefit from the Sale to FRG and (b) its affiliate Duenner which had also guaranteed the STORE Lease, "has agreed to sign a promissory note to STORE for $1,000,000 to facilitate the Non-Debtor Sale." [ECF No. 317, ¶ 54-55].

44.     While the Debtor asserts it has no interest in Duenner [ECF No. 317, ¶63], it cannot be disputed that Duenner is an insider. [5]

45.     STORE has filed litigation asserting ownership claims that are clearly belied by its own Access Agreement, and the Debtor's affiliates are paying over a million dollars to STORE which is not to the benefit of the Estate, provided that Debtor designates FRG as the winning bidder even though FRG Final Bid is inferior to the TSK Final Bid.

46.     The litigation tactics of STORE along with its agreements with FRG and <u>insiders of the Debtor</u> for the benefit of STORE and Fidelis, *and not for the benefit of the Estate*, constitute an improper attempt to influence the sale price whereby Debtor has accepted a lower bid for the Sale Assets.

### ***Debtor is Not Entitled to Benefit of Business Judgment Presumption***

47.     The Debtor is a limited liability company and is run by its manager, Jim Connor. [Connor Dep. 23:10-11, Feb. 18, 2025].  Mr. Connor is also the CFO of Fidelis, the owner of the Debtor. [Connor Dep. 23:6-8, Feb. 18, 2025].  Accordingly, Mr. Connor owes duties to both the Debtor and Fidelis.  He is in a conflicted position.  *See, e.g., Claybrook v. Morris (In re Scott Acquisition Corp.)*, 344 B.R. 283, 286 (Bankr. D. Del. 2006) ("directors and officers of an insolvent wholly-owned subsidiary owe fiduciary duties to the subsidiary and its creditors").  Here, Mr. Connor's duty to Oklahoma Forge's creditors conflicts with his duty to Fidelis.

48.     Given the circumstances and the fact that Fidelis, an insider of the Debtor, is to benefit from a sale to FRG, the Court should not defer to the Debtor's business judgment.

---

[5] Under 11 U.S.C. §101(31) an insider includes an affiliate. The definition of "affiliate" includes a corporation, 20 percent or more of whose outstanding voting securities are directly or indirectly owned or controlled by the debtor or by an entity that directly or indirectly owns and controls 20 percent or more of the stock of the debtor. 11 U.S.C. §101(2)(B). Thus, corporations with common ownership are affiliate and, therefore, insiders of each other.(citations omitted).  *In re Nilhan Developers, LLC,* Nos. 15-58443-WLH, 15-58444-WLH, 2021 Bankr. LEXIS 1036, at *64 (Bankr. N.D. Ga. Apr. 19, 2021).

49.     The Debtor is choosing to pursue a deal which favors its parent, the guarantor of the STORE Lease, at the expense of the recovery to the Debtor's creditors.

50.     When an insider benefits from a lower bid and the high bid is then not chosen, that warrants greater scrutiny and Debtor is not entitled to the benefit of a presumption that it is properly exercising its business judgment.  "The 'business judgment' test applies to determine whether a sale under § 363(b) should be approved."  *Allen v. Absher (In re Allen)*, 607 F. App'x 840, 843 (10th Cir. 2015).  Under this standard, the party seeking approval of the sale must show "sound business reasons for the sale."  *Id*.  "In making this determination, courts consider evidence of '[a]ny improper or bad motive,' whether '[t]he price is fair and the negotiations or bidding occurred at arm's length,' and whether the trustee followed '[a]dequate procedures, including proper exposure to the market and accurate and reasonable notice to all parties in interest.'"  *Id*. (citing *In re Castre, Inc*., 312 B.R. 426, 428 (Bankr. D. Colo. 2004)).

51.     The business judgment rule is not applicable to transactions among a debtor and an insider of the debtor and courts apply a heightened standard of scrutiny in transactions involving insiders of the Debtor.  *See, In re LATAM Airlines Grp. S.A*., No. 20-11254 (JLG), 2022 Bankr. LEXIS 649, at *121-22 (Bankr. S.D.N.Y. Mar. 15, 2022) ("In applying heightened scrutiny, courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration.") *See also, e.g., In Re Pilgrim's Pride Corp.,* 401 B.R. 229, 237 (Bankr. N.D. Tex. 2009) ("when a transaction is proposed between a debtor and its insiders, the court cannot simply rely on the debtor's business judgment to ensure creditors and the debtor's estate are being properly cared for. Given the obvious conflict of interest between a debtor's estate and insiders—who may themselves have been responsible in whole or

part for devising and internally approving the proposed transaction—the argument underlying application of the business judgment rule (that officers and directors will fulfill their fiduciary responsibilities) lacks its usual weight.").

52.     The business judgment rule does not apply to director conflict-of-interest transactions.  *See, e.g., In re Croton River Club, Inc.*, 52 F.3d 41, 44 (2d Cir. 1995) ("It is black-letter, settled law that when a corporate director or officer has an interest in a decision, the business judgment rule does not apply.").

53.     Here, the Debtor as the decision maker is conflicted and not entitled to deference because: (i) the manager of the Debtor is also the CFO of Fidelis and the manager of Duenner, (ii) Fidelis, a guarantor of the Lease, will receive a reduction of its liability on its guaranty of the Lease by at least $3,600,000 if FRG purchases the real estate from STORE; and (iii) Duenner (also a statutory insider under 11 U.S.C. § 101(31) and another Fidelis subsidiary) will receive significant benefits including reduction of its liability on its guaranty of the Lease and not being evicted from its business location by STORE in the event that TSK is the successful bidder and the Lease is ultimately rejected.[6]  [Connor Dep. 13:5-9, Feb. 18, 2025].

54.     Consultation with a financial advisor and counsel does not remove the taint of the obvious conflicts applying to Mr. Connor and Fidelis.  *Bevel v. Higginbottom*, No. CIV-98-474-X, 2001 U.S. Dist. LEXIS 17977 at *59 (E.D. Okla. Oct. 4, 2001) ("Conflicts or potential conflicts of interest require that a fiduciary . . . consult with independent advisors").

55.     The Sale Assets must be liquidated pursuant to a fair process for the benefit of creditors, not as is most convenient for the Debtor or the Debtor's parent.

---

[6] In paragraph 55 of the Motion, the Debtor continues its pattern of disclosing key facts in dribs and drabs throughout this case when it says "Duenner has also guaranteed the STORE Lease and has agreed to sign a promissory note to STORE for $1,000,000 to facilitate the Non-Debtor Sale."

49.     Not only is FRG NOT the high bidder, but all the issues which were present in December, when the Court denied the Private Sale Motion, continue to cloud the fairness and transparency of this Sale process and this bankruptcy case, especially as the Debtor, with the sealed bid process, is no longer proceeding pursuant to the Bid Procedures Order.

50.     Approving the Debtor's conflicted selection of FRG as the successful bidder creates a dangerous perception of the unfairness of this process and will discourage the participation of buyers in bankruptcy sales, to the detriment of the bankruptcy system as a whole.

### *Debtor's Lack of Good Faith*

51.     "In order to obtain good faith status under § 363(m), a purchaser must (i) buy the property without 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders' and (ii) pay 'at least 75% of the appraised value of the assets.'" *Crowder v. Given (In re Crowder)*, 314 B.R. 445, 450 (B.A.P. 10th Cir. 2004) (citing *In re Bel Air Assocs., Ltd*., 706 F.2d 301, 305 (10th Cir. 1983) (decided under predecessor to § 363(m)).

52.     "Although appellate courts are hesitant to overcome § 363(m)'s mootness rule, an appellate court will void a completed bankruptcy sale if the purchaser was not a good faith purchaser." *Raskin v. Malloy*, 231 B.R. 809, 817 (N.D. Okla. 1997) (citing *Plotner v. AT&T*, 172 B.R. 337, 341 (W.D. Okla. 1994)). "Neither the Bankruptcy Code not the Bankruptcy Rules define a good faith purchaser. The Tenth Circuit has, however, held that a 'good faith purchaser' is one who buys in 'good faith' and for 'value.'" *Raskin*, 231 B.R. at 817 (citing *In re Bel Air*, 706 F.2d at 305). "The type of conduct which will destroy a purchaser's good faith involves 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" *Raskin*, 231 B.R. at 817 (citing *In re Bel Air*, 706 F.2d at 305).

53.     Collusion is not often found and requires "an intention or an objective to influence the price." *Lone Star Indus., Inc. v. Compania Naviera Perez Company., S.A.C.F.I.M.F.A., SUDACIA, S.A. (In re N.Y. Trap Rock Corp.)*, 42 F.3d 747, 752 (2d Cir. 1994).

54.     Through the Motion, the Debtor asks this Court to approve a sale to FRG where an insider of the Debtor is agreeing to pay $1 million to STORE, the Debtor's landlord, in exchange for STORE's withdrawal of the STORE Objection and agreement to sell the Sale Assets to FRG.

55.     Rather than being transparent in its motives and disclosing all relevant material facts and relationships between the Parties at the beginning of the Sale process, the Debtor has alleged its selection of FRG's lower offer is due to "litigation risk" and "execution risk" with a sale to TSK. "Litigation risk" remains a ubiquitous term, which no party has defined or valued. The Debtor has been unable to quantify it, instead demanding from TSK a full indemnity, including defense costs, as set forth in the attached email from Mark Craig dated March 12, 2025, marked as Exhibit "A".

56.     Debtor's characterization of the "litigation risk" as a determinative factor is misleading and the product of the conflicted Debtor's manipulation of the sale process to direct the sale to its preferred buyer, FRG, which is also purchasing the real estate to the benefit of Fidelis and Duenner. And this leads to the additional question which is not disclosed in the Motion: is there an agreement between FRG and Duenner to allow Duenner to continue to lease a portion of the real estate after FRG buys the real estate?

57.     The severity of the alleged litigation is belied by the Debtor's conduct. There are two straightforward issues for the court to resolve: (i) what is the effect of the Access Agreement,

an unambiguous and integrated agreement; and (ii) can the equipment be removed from the real estate without destroying the Real Estate (as provided in the trial testimony of Brendan Noone).[7]

58.     Given the importance of this issue, the Debtor could have timely responded to the Adversary Proceeding and this matter could have been disposed of by the Court long ago.  Instead, Debtor sat on its hands and did nothing in the Adversary Proceeding so it could preserve the "litigation risk" MacGuffin to justify its selection of FRG as the winning bidder.

59.     STORE filed the STORE Objection on January 6, 2025, the STORE Supplemental Objection on February 14, 2025, and the Adversary Complaint on February 18, 2025.  The Debtor filed a reply to the STORE Supplemental Objection stating that STORE's arguments lacked merit.[8]

60.     However, the Debtor has not prosecuted any defense to the Adversary Proceeding, including the defense it already raised its reply to the STORE Supplemental Objection regarding the Access Agreement and the lack of support for STORE's position under Oklahoma law.  Debtor could have, and should have, moved to dismiss.  Debtor could have sent a Rule 11 letter given STORE's intentional omission of the Access Agreement from the Complaint and its potential lack of candor to this tribunal.  But Debtor hasn't even filed any responsive pleading.  It has stalled and

---

[7] *See* Transcript 3/17/2025 Hrg., 88:17-89:2 (Objectors' expert witness, Brendan Hill Noone, testifies to removal and describes in detail how the equipment could be removed); *id.* at 89:3-5 (Mr. Noone testifies that removal of the equipment "would not" cause any kind of permanent damage to the building); *id.* at 89:17-20 (Mr. Noone answers affirmatively when questioned whether he could "oversee the removal of the equipment at Oklahoma Forge without causing any permanent damage to the building"); *id.* at (91:7-10) (Mr. Noone answers affirmatively when asked whether, "in [his] opinion as an expert in the removal of equipment, [he] believe[s] that this equipment could be removed within three months without damaging the building.").

[8] Not only does the Debtor's own statements disprove its assertion of an alleged litigation risk but also support an objection pursuant to Federal Rule of Bankruptcy Procedure 9011, the "bankruptcy counterpart" to Federal Rules of Civil Procedure 11, the purpose of which "is to deter frivolous litigation."  *Maritan v. Todd*, 203 B.R. 740, 743 (N.D. Okla. 1996).  As noted above, the Debtor could have sent a Rule 11 letter to STORE upon STORE's meritless Objection, Supplemental Objection, and Adversary Proceeding, yet failed to do so.  The Debtor did, however, file a response to STORE's objection stating that the objection lacks merit because they signed the access agreement.  STORE's filings are frivolous and meant to control the outcome of the Sale.  The Debtor's failure to adequately respond to STORE's filings have resulted in a controlled sale that benefits the Debtor, Fidelis, and STORE, rather than the Debtor's creditors.  As a direct result of such conduct, the Objectors have incurred substantial fees, costs, and time in attempting to engage in what they hoped was an open and fair bankruptcy sale that turned out to be a disguised settlement with a pre-determined outcome.  The TSK Final Bid included $25,000 in funds to provide for Debtor's counsel fees to move to dismiss the Adversary Proceeding and to issue a Rule 11 letter.

14

delayed to preserve the red herring of the litigation risk to provide cover for its conflicted decision to select FRG as the winning bidder. And given the clear surplus above secured claims that will be generated by a sale, there would be proceeds to pay professional fees for such an effort.

61.     The following factors strongly suggest collusion, coordination, lack of good faith, and improper efforts to control the outcome of the sale: (i) the Debtor's failure to adequately respond to the STORE Objection and Adversary Proceeding to preserve the "litigation risk" MacGuffin; (ii) the decrease of the purchase price for the real estate from $4,500,000 in the first FRG APA to not more than $3,600,000 in the current FRG APA, (iii) the obvious benefits of the sale to Fidelis and Duenner; (iv) the recently disclosed agreement to pay $1,000,000 to STORE (which is quite similar to the amount by which STORE agreed to reduce the purchase price of the real estate being sold to FRG); and (v) the obvious conflicts of interest tainting the decision making of the Debtor. There is a clear and improper scheme to control the price of the Sale Assets and attempt to take unfair advantage of TSK.

### *Alleged Execution Risk is Also a Red Herring*

62.     As demonstrated throughout this Bankruptcy Case, the Objectors are prepared to close promptly on a sale order. *See* Transcript 3/18/2025 Hrg., 7:24-8:11 (Objectors' witness Richard R. Davis, Vice President and Chief Financial Officer for EGI, answers in the affirmative when asked whether the Objectors have sufficient cash on hand to pay a $6.65 million purchase price for the Sale Assets, to pay for the cost of removing the Sale Assets, and to pay for insurance, rent, utilities, security, and other expenses during removal of the Sale Assets); *id.* at 8:18-9:6 (Mr. Davis testifies to the authenticity of Exhibit 10, a letter from KeyBanc, stating that EGI has "significant liquidity, including an undrawn $150 million revolving credit facility, coupled with the capability to arrange other financing as needed"); *id.* at 10:18-11:1 (Mr. Davis answers

affirmatively when questioned whether the Objectors are prepared to pay for any remediation or repair required after removal of the Sale Assets and that they have sufficient liquidity to do so); *id.* at 11:2-5 (Mr. Davis confirms that if TSK is the successful bidder, the Objectors are prepared to act promptly to add the Debtor's plant to its commercial general liability and property insurance policies).

63.     If anything, there is execution risk on FRG which the Debtor conveniently ignores. At the Sale Hearing, the representative of FRG admitted that it needed financing to purchase the assets, was unable to testify that it had received a commitment letter from its bank and instead testified that it was confident the bank would do the deal and testified that it had not obtained a Phase II environmental report. *See* Transcript 3/17/2025 Hrg., 130:11-12 (FRG's witness Jeffrey T. Jones, President of FRG, states ability to close is dependent on financing); *id.* at 132:21-22 (Mr. Jones admits that FRG has not yet ordered a Phase II environmental report); *id.* at 133:7 (Mr. Jones states, "I have not seen a draft loan document."); *id.* at 133:20-134:3 (Mr. Jones testifies that the only financing letter received from the bank is not a commitment letter and is unaware whether anyone has begun drafting loan documents).

64.     It would be a miscarriage of justice if the Court rewards the Debtor's intentional foot dragging with respect to seeking a resolution of the STORE litigation, with a finding that the risk that STORE could be entitled to receive a portion of the sale proceeds is an execution risk that justifies the Debtor's selection of FRG as the successful bidder.

65.     TSK also notes that: (i) STORE does not appear to contest that Loeb and Pathward should be paid more than $5,000,000 from the proceeds of the sale, (ii) that STORE does not contend that it owns a substantial portion of the Debtor's assets including 24 forklift trucks, specialized mobile equipment, bandsaws, lathes, air compressors, mixers, and welders ("**Non-**

**STORE Equipment**"); and (iii) the TSK bid allocates significant value to Non-STORE Equipment. These factors serve to further mitigate the "execution risk" that the Debtor manufactured to accompany the Debtor manufactured "litigation risk".

### *The Motion is a 9019 Motion Disguised as a Sale Motion*

66.     What the Debtor attempts to present to the Court as a fair and open bankruptcy sale process is instead a scheme to settle litigation without Bankruptcy Court approval while orchestrating a particular outcome under the guise of a § 363 sale that benefits Fidelis and Duenner at the expense of the Debtor's creditors.

67.     The Debtor alleges that it "chose the FRG Final Bid because the benefit to the estate is better than the TSK Final Bid and has no litigation cost or risk" [ECF No. 317, ¶ 62], and that "if FRG is deemed the Winning Bidder, these issues do not need to be resolved with STORE because FRG is also purchasing STORE's real property and fixtures along with the Debtor's personal property" [ECF No. 317, ¶ 93].

68.     However, the TSK Final Bid would result in a greater distribution to creditors, and the alleged litigation risk is fabricated by the Debtor and STORE, parties who stand to benefit from a sale to FRG at the expense of creditors.

69.     The transaction between the Debtor, FRG, and STORE is a settlement, not a sale. Through the proposed transaction, STORE is clearly agreeing to dismiss the Adversary Proceeding and withdraw its objections to the sale if the Sale Assets and the Real Estate are both sold to FRG and Duenner agrees to pay an additional $1,000,000 to STORE.

70.     Such a settlement of claims must be approved by the Court pursuant to Federal Rule of Bankruptcy Procedure 9019(a), which provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019.

71. Four factors guide the bankruptcy court's analysis of a proposed settlement agreement: "(1) the chance of success of the litigation on the merits; (2) possible problems in collecting a judgment; (3) the expense and complexity of the litigation; and (4) the interest of the creditors." *Liberty Bank, F.S.B. v. D.J. Christie, Inc.*, 681 F. App'x 664, 668 (10th Cir. 2017) (citing *Rich Global, LLC v. Zubrod (In re Rich Global, LLC)*, 652 F. App'x 625, 631 (10th Cir. 2016); *Korngold v. Loyd (In re S. Med. Arts Cos.)*, 343 B.R. 250, 256 (B.A.P. 10th Cir. 2006); 8 Norton Bankr. Law & Prac. § 167:2).

72. These factors must also be met when a proposed sale resolves litigation. *Simantob v. Claims Prosecutor, L.L.C. (In re Lahijani)*, 325 B.R. 282, 284 (B.A.P. 9th Cir. 2005) ("sale of avoiding actions may simultaneously implicate § 363 'sale' analysis and 'compromise' analysis under Federal Rule of Bankruptcy Procedure 9019"); *Fitzgerald v. Ninn Worx SR, Inc. (In re Fitzgerald)*, 428 B.R. 872, 884 (B.A.P. 9th Cir. 2010) ("The sale at issue here was both a sale under section 363 and a compromise under Rule 9019. The bankruptcy court erred when it issued the Sale Order without performing the analysis required by the case law regarding compromises under Rule 9019.").

73. As detailed below, all of these factors weigh *against* approval of a settlement. Perhaps for this reason, the Debtor has not even tried to plead the existence of those factors.

> (i) **Litigation Risk**. The Sale Motion is devoid of a discussion of the merits of STORE's Adversary Proceeding and its claim that it owns assets that it expressly agreed it did not own in the Access Agreement. The Debtor does not discuss the merits of the position it took in its Reply to the STORE Sale Objections. Nor does the Debtor justify its failure to attempt to level the playing field and eliminate the litigation risk by seeking to dismiss or otherwise resolve the Adversary Proceeding on an expedited basis to create a true level playing field and maximize the value of its assets at an auction for the benefit of creditors. This factor clearly weighs against approval of a settlement.

> (ii) **Problems in Collecting Judgment**. This factor also weighs against approval of a settlement. At best, STORE is entitled to a portion of the sale proceeds after payment of Loeb and Pathward. And it is in the interest of creditors of the

Debtor to allocate the assets that STORE is claiming ownership of to payment of Loeb and Pathward so the proceeds of the Non-STORE Equipment can be used to pay unsecured creditors (which includes STORE) and costs of administration of the estate.

(iii)   **Expense and Complexity of Litigation**.   This also weighs against approving a settlement.   Here, STORE has admitted that it executed the Access Agreement and couldn't explain why the Access Agreement didn't apply.[9]   By and large, the issue has been framed in the Debtor and Loeb replies.   This can almost certainly be promptly resolved on the papers, regardless of what will likely be strenuous (but self-serving) claims to the contrary by STORE. Additionally, any delay in resolving this issue has been caused by the Debtor's decision to not actively defend the litigation.   It would be unfair to reward this conduct and consider it a factor in favor of a settlement.

(iv)   **Interest of Creditors.**  The TSK offer maximizes the return to creditors, as it provides the largest amount of money to the Debtor.   As discussed at length in this objection, "litigation risk" and "execution risk" are red herrings that should not change the obvious fact that the higher TSK bid gives more money to creditors and is in the interest of creditors.   There is also no discussion of what benefits are being received by non-Debtors Duenner and Fidelis through this settlement, which makes it harder for the Debtor to argue that this settlement is in the interests of creditors.

74.   The Court cannot approve the Motion under these circumstances, especially when the Sale Motion hides the fact that it contains a litigation settlement controlled by Rule 9019 and utterly fails to address that fact.   This, in and of itself, requires the sale motion be denied.

75.   The precedent from such a decision is dangerous: it would encourage parties (including debtors, landlords, secured creditors, creditor committees, etc.) to threaten litigation, no matter how frivolous, to force the outcome of a § 363 sale.

76.   This Sale is objectionable and does not represent a normal bankruptcy process.

---

[9] *See* Transcript 3/17/2025 Hrg., 124:24-125:2 (STORE'S witness Ashley Short, Vice President of Portfolio and Asset Management, confirms that Access Agreement provides that Sale Assets are not "and shall not become or be deemed to be affixed to or part of the [Real Estate]."); *id.* at 125:3-15 (Ms. Short confirms that the Access Agreement was properly executed by Angela Donahoe, STORE's Senior Vice President, and that Ms. Donhoe was authorized to sign on behalf of STORE.).

## *The Proposed Sale is Fundamentally Unfair*

77.     The Debtor's solicitation of final bids was not approved by any bid procedure order. The Debtor never consulted with the Ellwood Companies and TSK, either as DIP Lender or bidder regarding the solicitation of final bids, and apparently also never consulted with the United States Trustee. Sealed bids are not in the spirit of the Bankruptcy Code. The Debtor did not share the TSK Final Bid or the FRG Final Bid with the creditors' committee until after it made its decision in secret.

78.     The Debtor's conduct begs the question of how many conversations transpired between FRG and the Debtor about how to formulate the FRG Final Bid, while the Debtor had no communication with the Objectors regarding the TSK Final Bid aside from the Debtor's demand for an unlimited indemnity against the very litigation risk that the Debtor itself created.

79.     The Debtor has exhibited a clear pattern of non-disclosure, worsened by the Disclosure Section of the Motion. [ECF No. 317, ¶¶ 49, 54-66]. The fact that several disclosures contained in the Motion are being made for the first time at this point is additional proof of the Debtor's misconduct and lack of candor to the Court.

80.     Specifically, prior to the motion, the Debtor never disclosed that Duenner guaranteed the Lease and agreed to sign a promissory note to STORE for $1,000,000 to "facilitate the Non-Debtor sale." [ECF No. 317, ¶ 55].

81.     This raises a myriad of questions: Why hasn't it been disclosed before that the Debtor's affiliate is agreeing to pay $1 million to STORE to facilitate the sale to FRG, and why isn't that $1 million available to TSK to increase its bid by $1 million for the benefit of the Debtor's creditors or to repay the insider transfers to Duenner that are disclosed on the Debtor's Statement

of Financial Affairs [ECF No. 97, p. 57]?  Why didn't the Debtor attach the Duenner $1 million promissory note to the Sale Motion?

82.     In fact, the Debtor has not disclosed any sale documents between STORE and FRG, exacerbating the problem created by the Duenner $1 million note, and raising additional issues such as how the litigation settlement can be approved between STORE and Debtor without disclosing any documents relating to the sale of the Real Estate, which remains a condition of the dismissal of the Adversary Proceeding and of FRG's obligation to close on the asset purchase.

83.     The Motion also represents the first time the Debtor has disclosed that Duenner is a guarantor of the Lease.  No information on the Duenner guaranty of the Lease is provided in the Debtor's Schedule H, despite the disclosure of Duenner's guaranty of the Pathway debt.  The pattern of omissions begins to suggest intentional conduct.

84.     Additionally, the Debtor did not disclose Fidelis as the Debtor's owner or the guarantor of the Lease in the prior sale motion [ECF No. 122] or in the Debtor's schedules [ECF No. 97], but did so only after the Ellwood Companies conducted discovery and raised the issue in connection with the prior sale and Bid Procedures Motion.

85.     Through the Motion, the Debtor discloses to the Court for the first time that "Fidelis is wholly owned by Integra Irrevocable Trust UAD 4-18-19."  What other assets are owned by Integra Irrevocable Trust UAD 4-18-19?  Who are the beneficiaries of the Integra Irrevocable Trust UAD 4-18-19?  What connection(s) do those beneficiaries have to the Debtor, STORE, FRG, and the other insiders and affiliates of the Debtor?

86.     Furthermore, the Objectors sought discovery from Debtor, STORE and FRG.  On the evening of April 23, 2025, Objectors received 5,947 pages of documents with promises from STORE and the Debtors of additional documents to follow.  Additional documents have been

received on April 24, with a total of over 6,000 pages that must now be reviewed in advance of the expedited hearing set for April 30.

87.     The Debtor also makes various statements in the Motion which are inaccurate at best.  The good faith and exercise of reasonable business judgment is certainly at issue.  The allegation that "the Debtor's marketing efforts resulted in multiple bidders that substantially increased the sale price" is a patent fabrication.  The Debtor was going to do a private sale to FRG for $3,5000,000, an amount that would not even pay Loeb in full until the intervention of the Ellwood Companies in filing the involuntary bankruptcy case.  Then, in the Bankruptcy Case, the Debtor again tried to proceed with the private sale to FRG.  It was the intervention of the Ellwood Companies and the bringing of TSK to the table that led to a "competitive" bid process which increased the total consideration for the Sale Assets by more than $3,000,000.

## CONCLUSION

88.     The relief sought in the Sale Motion to sell to FRG should be denied and TSK as back up bidder (subject to a reasonable extension of time to remove the Sale Assets from the Property) should be confirmed as the successful bidder.

WHEREFORE, the Ellwood Companies respectfully requests that the Court enter an Order denying the relief to sell the Sale Assets to FRG and instead order that TSK as "back up" bidder is the high bidder and successful bidder and granting such other and further relief as is just and proper.

Dated: April 24, 2025                    Respectfully submitted,

/s/ *Stephen J. Moriarty*

Stephen J. Moriarty (OK ID 6410)
FELLERS, SNIDER, BLANKENSHIP, BAILEY &
TIPPENS, P.C.
100 N. Broadway, Suite 1700
Oklahoma City, OK 73102
(405) 232-0621
smoriarty@fellerssnider.com

-and-

Michael A. Shiner (PA ID 78088)
*Admitted pro hac vice*
Beverly Weiss Manne (PA ID 34545)
*Admitted pro hac vice*
TUCKER ARENSBERG, P.C.
1500 One PPG Place Pittsburgh, PA 15222
(412) 566-1212
mshiner@tuckerlaw.com
bmanne@tuckerlaw.com

*Counsel for Ellwood National Steel Company,*
*Ellwood Quality Steels Company, Ellwood Group, Inc.,*
*and TSK Partners LLC d/b/a McInnes Rolled Rings*

TADMS:20776028-1:031218-202345