**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

| In re: | ) | |
|---|---|---|
| | ) | |
| OKLAHOMA FORGE, LLC, d/b/a | ) | |
| OKLAHOMA FORGE, INC. | ) | Case No. 24-11060-T |
| | ) | Chapter 11 |
| | ) | |
| Debtor. | | |

**Declaration of Jeffrey T. Jones**
**in Support of Sale Motion [Doc. 317]**

I, Jeffrey T. Jones, state under penalty of perjury as follows:

1. I am the managing member of Forge Group OKF LLC, an Illinois limited liability company ("Buyer"), as buyer designee of Forge Resources Group LLC, an Illinois limited liability company. I am also in direct or indirect control of the following direct and indirect affiliates of Buyer: (a) Forge Resources Group LLC, an Illinois limited liability company ("FRG"), (b) Forge Group Dekalb LLC, (c) Forge Group Star LLC, (d) Forge Group Rockford LLC, (e) Forge Group Cardinal LLC, (f) Forge Group Illinois LLC, (g) Forge Group KD LLC, (h) Forge Group Michigan LLC, (i) Forge International Group, LLC, (j) E&P Management, LLC, (k) Forge Property Holdings, LLC, an Illinois limited liability company, and (l) Forge Property Holdings II, LLC ("Holdings II"). Each of the entities identified in clauses (a) through (l) above is sometimes referred to as a "Buyer Related Party" and collectively referred as the "Buyer Related Parties" in this declaration.

2. I have personal information and knowledge of the facts in this declaration, those facts are true and correct, and, if called on to testify, I am competent to do so. All capitalized but undefined terms used in this declaration are intended to have the meanings ascribed to those terms in the APA (as defined in paragraph 4 below).

3. This declaration and the direct testimony set forth herein is proffered in support of the Sale Motion [Doc. 317], certain findings of fact set forth in the proposed order authorizing and approving the Sale Motion (a copy of which is appended to the Sale Motion as Exhibit A [Doc. 317-1], the "Sale Order"), and the authorization and approval of the sale of the Purchased Assets to Buyer pursuant to the APA and the Sale Order. In addition, I also reaffirm the truth and accuracy of the statements made in my prior declaration dated February 18, 2025 [Doc. 222].

4. On or about April 3, 2025, I caused Buyer to deliver to Debtor a letter ("April 3 Letter") identifying the Final Qualified Bid of Buyer, which was filed with the court in the Debtor's Second Notice Regarding Successful Bidders ("Second Notice") at docket number 313, page 16-17 of 64. Also, included in the Second Notice was an unsigned Asset Purchase Agreement dated as of April 3, 2025 (as it may be further modified, amended, supplemented or restated, the "APA") between Buyer and Debtor. An unsigned copy of the APA has also been filed with the Court as Exhibit E to the Sale Motion [Doc. 317-1].

5. The April 3 Letter provided in paragraph 2(e) that the closing pursuant to the Sale Order would be by no later than April 30, 2025. In the APA filed with the Second Notice and Sale Motion, Buyer agreed to extend this date to May 31, 2025. *See* Doc. No. 313 at page 33 of 64, section 7.01(c); Doc. No. 317-1 at page 57 of 90, section 7.01(c). Accordingly, the argument raised by the Ellwood Companies in their objection that there was "significant execution risk" with the APA due to a required closing by April 30, 2025, is false and incorrect because the required closing is actually by May 31, 2025. Objection, Doc. No. 331, ¶¶ 40-42. Subject to entry of the Sale Order, Buyer is ready, willing and able to close and consummate the APA in accordance with its terms and the terms of the Sale Order.

6. Buyer has a binding commitment in place from FNBO to provide financing in the amount of $10.2 million. This is an amount in excess of the amount necessary to close and consummate the APA and REPA (as defined below). FNBO has not, and will not, require or conduct any environmental due diligence related to the financing. As such, there is little, if any, execution risk in approving the APA and entering the Sale Order. Attached to this declaration as Exhibit 1 is a true and correct copy of a letter dated March 14, 2025, addressed from FNBO to FRG (the "Commitment Letter"), committing FNBO to provide financing to FRG for the purchase through Buyer of the Purchased Assets from the Debtor's estate pursuant to the APA and the Sale Order. The Commitment Letter remains in full force and effect. I have a strong, long-standing, business relationship and track record with FNBO. FNBO has financed a number of asset purchase transactions for certain of the Buyer Related Parties in the past and has always honored its financing commitments with those Buyer Related Parties.

7. The closing and consummation of the APA is contingent upon the contemporaneous closing and consummation of the ownership interest in certain real estate and fixtures located in Tulsa, Oklahoma (the "Real Estate and Fixtures") currently leased by the Debtor from and owned by STORE Master Funding XIV, LLC ("STORE"). STORE and one of the Buyer Related Parties, Holdings II, have entered into a Real Estate Purchase Agreement ("REPA"), whereunder Holdings II has agreed to purchase from STORE, and STORE has agreed to sell to Holdings II, the Real Estate and Fixtures for a cash purchase price of $3.55 million.

8. The current cash purchase price of $3.55 million under the REPA is a significant reduction from the original cash purchase price negotiated by STORE under the REPA of $4.5 million (*see* Doc. No. 151 at page 7 of 106). Buyer has used the cash it saved under the renegotiated REPA to bid a higher amount under the APA. Indeed, Buyer's original cash offer

to the Debtor's estate was $3.55 million (*see* Doc. No. 90-2 at page 4 of 45) and its current offer is $6.575 million. *See* Sale Motion, Doc. No. 317-1 at page 49 of 90. Accordingly, the suggestion in the Ellwood Objection that the decreased purchase price under the REPA has somehow been detrimental to the Debtor and its estate is false and incorrect. Ellwood Objection ¶61(ii). To the contrary, the reductions in the cash purchase price under the REPA have provided direct economic benefit to the Debtor's estate as a result of the corresponding increased cash purchase price being paid to the Debtor's estate for distribution to its creditors.

9. The Commitment Letter provides sufficient financing to enable FRG to purchase through Holdings II the Real Estate and Fixtures under the REPA from STORE. As such, there is little, if any, execution risk in Holdings II closing and consummating the REPA. Holdings II is ready, willing and able to close and consummate the REPA in accordance with its terms.

10. Since my initial conversations with the Debtor and its professionals in the summer of 2024 and prior to the commencement of this bankruptcy case, it has been FRG's sole intention to acquire both substantially all of the operating personal property assets of the Debtor and the Real Estate and Fixtures of STORE in order to own, operate, and maintain an ongoing, operating, forging business in Tulsa, Oklahoma. FRG has had and has no other purpose or motive.

11. Neither I, FRG, Buyer, Holdings II or any other Buyer Related Party, nor any affiliate, subsidiary, officer, director, or member of FRG, Buyer or any other Buyer Related Party, has any interest in, or is an "insider" or "affiliate" of, (a) the Debtor, (b) Fidelis Holdings LLC, (b) JDIN, LLC, (c) Loeb Term Solutions, LLC, (d) Pathward, NA, (e) Duenner Supply, LLC ("Duenner"), (f) Oilfield Improvements, LLC, (g) James Connor, or (h) to the best of my knowledge, information or belief, any of their respective affiliates, subsidiaries, officers,

directors or members (each of the entities identified in clauses (a) through (h) above, an "Other Party" and, together, the "Other Parties"). To the extent any of the Ellwood Companies or TSK (defined in paragraph 13 below) alleges or suggests, whether directly, indirectly, by implication, innuendo, or association, in their objection to the Sale Motion ("Ellwood Objection") [Doc. 331] or otherwise, that I, FRG, Buyer, Holdings II or any other Buyer Related Party is an "insider" of the Debtor or of any of the Other Parties, that allegation or suggestion is untrue.

12. Furthermore, there is, and has been, no common identity of directors, officers or controlling equity security holders or members at any time, whether now or in the past, between the Debtor or any of the Other Parties, on the one hand, and me, FRG, Buyer, Holdings II or any other Buyer Related Party, on the other hand.

13. I, FRG, Buyer and all Buyer Related Parties recognize, and have always recognized, that the Debtor and its professionals were free to enter into an agreement or otherwise negotiate or deal with any other interested party, including TSK Partners, LLC d/b/a/ McInnes Rolled Rings, a Pennsylvania limited liability company, or its designee ("TSK"), any of the Ellwood Companies, or STORE on whatever terms it or they determined appropriate or advisable, in acquiring all or any portion of the Purchased Assets or in connection with any related matter or issue. I, FRG, Buyer and all Buyer Related Parties have complied in good faith in all respects and in all aspects of the sale process and this bankruptcy case generally.

14. The Purchase Price for the Purchased Assets is fair and reasonable and was determined at arm's length through a fair and open sale process held upon appropriate notice to all interested parties, in addition to a marketing process that occurred in the summer of 2024 and before bankruptcy, as outlined and described in more detail in the Sale Motion [Doc. 317]. All negotiations and all bidding for the Purchased Assets occurred at arm's length in all respects.

15. I understand that Buyer, as the designated winning bidder for the Purchased Assets, was selected by the Debtor, after taking a number of economic and non-economic factors into account, including, but not limited to, gross purchase price, as more particularly outlined in Debtor's Second Notice Regarding Successful Bidders [Doc. 313]. More specifically, I understand that although the bid submitted by TSK (the "TSK Bid") was for a higher gross purchase price than the Buyer's bid, after taking into account all of the factors to be considered in the Bidding Procedures Order [Doc. 157] and the Additional Bid Solicitation, a copy of which was filed with the Court as Exhibit 1 to the Debtor's Second Notice Regarding Successful Bidders [Doc. 313], including, without limitation, the far greater execution risk and uncertainty of the TSK Bid, the Buyer's bid was determined to be the highest or best bid for the Purchased Assets and, in the business judgement of the Debtor, would result in more certain and less risky realizable value to the estate.

16. All payments to be made by the Buyer or any Buyer Related Party and any other agreements or arrangements entered into by the Buyer or any Buyer Related Party in connection with the sale transaction contemplated by the APA have been disclosed (including, although not relevant to the amount or terms of the Buyer's offer to the Debtor's estate under the APA and the Sale Order or the evaluation of that offer, the purchase price Holdings II will be paying to STORE for the Real Estate and Fixtures).

17. More specifically, contrary to any allegation or suggestion in the Ellwood Objection, there are no material details that have not been disclosed by Buyer regarding the relationship between the Debtor and Buyer or any Buyer Related Party or between Buyer or any Buyer Related Party and any of the Other Parties in connection with the APA and the Sale Order or that might otherwise affect the Debtor's estate.

18. In response to a wholly irrelevant question posed in the Ellwood Objection (Ellwood Objection, ¶56), there have been negotiations among Duenner, its potential purchaser, and FRG or its counsel regarding a post-closing lease of a portion of the Real Estate by Holdings II to Duenner or Duenner's potential purchaser. However, those negotiations do not in any way affect how much and on what terms FRG is willing to pay the Debtor's estate under the APA and Sale Order, or the evaluation of the merits of Buyer's bid on the Debtor's estate and distributions to its creditors.

19. The negotiation and execution of the APA were at arm's length, and in good faith within the meaning of section 363(m) of the Bankruptcy Code, between the Debtor and the Buyer and the Buyer Related Parties, and were without collusion, conflict or fraud of any kind or nature.

20. At no time have I, Buyer, any of the Buyer Related Parties, or any of our professionals, ever asked STORE or any of STORE's professionals not to discuss or enter into any agreement or other arrangement with Debtor, TSK or any of the Ellwood Entities concerning the Real Estate and Fixtures or anything else, for that matter, and we have recognized, and continue to recognize, that STORE and its professionals are free to do so at any time prior to the approval of the APA by this Court.

21. Neither Debtor nor the Buyer nor any Buyer Related Party engaged in any conduct (i) that would prevent the application of section 363(m) of the Bankruptcy Code or (ii) that would cause the application of or implicate section 363(n) of the Bankruptcy Code to the Buyer, to the APA, or the consummation of the sale transaction contemplated by the APA and transfer of the Purchased Assets to the Buyer.

22. Based on the foregoing and otherwise, Buyer is entitled to a "good faith" finding under section 363(m) of the Bankruptcy Code in the Sale Order (or in any other sale order entered by this Court in connection with the Sale Motion).

23. For additional transparency and perspective, one or more of the Ellwood Companies or their affiliates is a direct competitor of one or more of the Buyer Related Parties.

I declare under penalty of perjury that the above is true and correct to the best of my personal information, knowledge and belief.

Jeffrey T. Jones

Dated: April 28, 2025.

Exhibit 1







March 14, 2025

Forge Resources Group
Jeff Jones, President
1832 Pleasant Street
DeKalb, IL 60115

Re: Purchase of Oklahoma Forge Business Assets and Real Estate

Dear Jeff:

Providing this letter to confirm our previous discussion regarding FNBO's commitment to provide the subject financing in an amount up to $10.2 million. The subject financing has been approved by FNBO and we are just waiting on you to provide the loan proceeds needed to close on this transaction.

We value your long-term relationship and appreciate the opportunity to provide the subject financing, as we have done on FRG's past asset acquisitions when needed.

We further understand that this letter may be disclosed to the Bankruptcy Court.

Sincerely,

Ron Bemis

Ronald A. Bemis
Director