

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

IN RE:

OKLAHOMA FORGE, LLC d/b/a
OKLAHOMA FORGE, INC.,

Debtor.

Case No. 24-11060-T
Chapter 11

## MEMORANDUM OPINION

This matter comes before the Court pursuant to: Debtor's Motion for an Order (1) Authorizing Sale of Substantially all of the Debtor's Assets Free and Clear of all Liens, Claims, Encumbrances and other Interests, (2) Approving Distribution of Sale Proceeds, and (3) Granting Related Relief (the "Third Sale Motion"),[1] filed by Oklahoma Forge, LLC ("Debtor"); a Statement and Reservation of Rights,[2] filed by the Official Committee of Unsecured Creditors (the "Committee"); an Objection,[3] filed by Ellwood National Steel Company, Ellwood Quality Steels Company, Ellwood Group, Inc., and TSK Partners LLC d/b/a McInnes Rolled Rings ("TSK") (collectively the "Ellwood Companies" or "Ellwood");[4] and a Reply,[5] filed by Store Master Funding XIV, LLC, an affiliate of STORE Capital, LLC ("STORE"). The Court held an evidentiary hearing in this matter on April 30, 2025. After receiving evidence and hearing argument, the Court took the Third Sale Motion under advisement. The following "Findings of Fact" and "Conclusions of Law" are being made pursuant to Federal Rule of Bankruptcy Procedure

---

[1] ECF No. 317.
[2] ECF No. 330.
[3] ECF No. 331.
[4] Ellwood National Steel Company, Ellwood Quality Steels Company, have filed claims in this case. *See* Claims Register at 28-1 & 29-1. Ellwood Group, Inc. provided post-petition credit to Debtor, at ECF No. 139.
[5] ECF No. 340.

7052, which is made applicable to this contested matter pursuant to Federal Rule of Bankruptcy Procedure 9014.[6]

## Jurisdiction

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(b). Venue is proper pursuant to 28 U.S.C. § 1409. Reference to the Court of this matter is proper pursuant to 28 U.S.C. § 157(a). Matters concerning administration of the estate and orders approving the sale of property are "core" proceedings as defined by 28 U.S.C. § 157(b)(2)(A & N).

## Findings of Fact

Debtor is an independent operator of a metal forge facility that was founded in September of 2004. Debtor owns equipment and other assets (the "Purchased Assets") necessary to operate the metal forge business. STORE presently owns the real property upon which Debtor's operating facility is located (the "STORE Real Property"). The STORE Real Property is currently leased to Debtor for $37,410.83 per month under a long-term lease (the "STORE Lease").

On August 16, 2024, an involuntary petition for relief under chapter 7 of the United States Bankruptcy Code was filed against the Debtor.[7] On November 22, 2024, an order for relief under chapter 7 was entered by this Court,[8] as well as an Agreed Order converting the case to a case under chapter 11.[9] Debtor has continued as a debtor in possession pursuant to §§ 1107 and 1108;

---

[6] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*
[7] ECF No. 1.
[8] ECF No. 59.
[9] ECF No. 60.

no trustee has been requested or appointed. The Committee was appointed on December 13, 2024.[10]

Soon after the conversion to chapter 11, Debtor filed a motion to sell the Purchased Assets in a private sale to Forge Resources Group LLC, an Illinois limited liability company ("FRG").[11] That motion was later withdrawn. Debtor then filed a second sale motion (the "Second Sale Motion") which included a stalking horse bid by FRG.[12] On motion of the Debtor, the Court entered an order approving bidding procedures ("Bidding Procedures") that would apply to the sale of the Purchased Assets.[13] Operating under the Bidding Procedures, Debtor identified two qualified bidders: FRG and TSK.

The FRG bid, as the Stalking Horse Bid, included a separate agreement to purchase the STORE Real Property from STORE. The TSK bid did not contain any agreement with STORE regarding the STORE Real Property. Instead, TSK's bid was contingent on Debtor or TSK reaching an agreement with STORE for access to the STORE Real Property for purposes of removing the Purchased Assets. As anticipated under the Bidding Procedures, the presence of more than one qualified bidder resulted in an auction being scheduled in the courtroom. The Bidding Procedures also anticipated that the scheduled auction would be immediately followed by an announcement of a winning bid and winning bidder and a hearing on the Second Sale Motion.

Prior to the scheduled auction, STORE filed an objection to the Second Sale Motion (the "STORE Objection").[14] The STORE Objection alleges that virtually all the Purchased Assets have become affixed to the STORE Real Property and no longer belong to Debtor. STORE also

---

[10] ECF No. 95.
[11] ECF No. 90.
[12] ECF No. 122.
[13] ECF No. 157, Exhibit A.
[14] ECF No. 204.

3

objected to the extent it would be compelled to enter an agreement with TSK to facilitate the removal of any of the Purchased Assets from the STORE Real Property. STORE filed an adversary proceeding based on the same allegations (the "STORE AP").[15]

On February 20, 2025, the Court held the scheduled auction in the courtroom (the "Auction"). The Bidding Procedures stated that at the conclusion of the Auction, Debtor would evaluate the bids according to "all relevant factors, including, but not limited to, cash consideration, the terms and conditions of the proposed agreement, the aggregate value offered by the Qualified Bidder, the effect of the Termination Fee on the net return to the bankruptcy estate, and the speed and certainty of closing a sale."[16] Despite this language, and the vast difference in the non-monetary conditions of the FRG and TSK bids, the Auction proceeded with a singular focus on cash to the estate.[17] At the end of the bidding, TSK submitted its final bid of $6,650,000. FRG submitted its final bid of $6,575,000. Although Debtor made statements at the Auction indicating TSK had made the winning bid, the Court continued the hearing on the Second Sale Motion because TSK and STORE were unable to reach an agreement regarding TSK's access to the STORE Real Property to remove the Purchased Assets.[18] On February 25, 2025, the Court further continued the hearing on the Second Sale Motion to be set for evidentiary hearing.[19]

On March 10, 2025, Debtor filed a Notice Regarding Successful Bidders (the "First Notice"),[20] in which it designated FRG as having submitted the winning bid. On March 12, 2025, Debtor sent an email to both qualified bidders outlining the factors it considered essential for a bid

---

[15] Adversary Proceeding No. 25-01002-T.
[16] ECF No. 157, at 10.
[17] ECF No. 249.
[18] *Id.*
[19] ECF No. 292.
[20] ECF No. 258.

4

by TSK to be competitive (the "March 12 Notice").[21] While the March 12 Notice did *not* require the winning bidder to include an offer to purchase the STORE Real Property, it *did* require the winning bidder to accept all risk of litigation of STORE's claims against Debtor. Instead of placing an estimated value on the risk of litigation with STORE, the Debtor simply required the winning bidder to eliminate the risk to Debtor, either by purchasing the STORE Real Property, or agreeing to intervene and take over any litigation that might ensue.

On March 17, 2025, the Court held an evidentiary hearing on the Second Sale Motion. Not being informed of the March 12 Notice, this Court denied the Second Sale Motion to FRG. The Court did not approve Debtor's selection of FRG as the winning bidder, because it was unclear to the Court whether all parties were informed of the selection criteria Debtor intended to apply to its choice of the highest and best bid. The Court now believes the March 12 Notice satisfies those concerns.

In response to the Court's denial of the Second Sale Motion, Debtor gave each of the qualified bidders an opportunity to submit a final sealed bid for consideration (the "April 1 Notice").[22] It noted Debtor would consider the following factors in its determination of the highest and best bid:

    i.    the provisions of paragraph 4(e) of the Bidding Procedures;[23]

---

[21] ECF No. 331-1, Exhibit A.
[22] ECF No. 313, at 6, Exhibit 1.
[23] *See* ECF No. 157, at 10. Paragraph 4(e) of the Bidding Procedures states:
    Promptly after the conclusion of the Auction on the day of the Auction, Debtor will designate the highest or best Qualified Bid (taking into account all relevant factors, including, but not limited to, cash consideration, the terms and conditions of the proposed agreement, the aggregate value offered by the Qualified Bidder, the effect of the Termination Fee on the net return to the bankruptcy estate, and the speed and certainty of closing a sale of the Purchased Assets to such Qualified Bidder) as the winning bid ("Winning Bid") and the Qualified Bidder submitting the Winning Bid (the "Winning Bidder") and shall designate the next highest or otherwise best

5

    ii.      the presence or absence of litigation risk and any terms of the offer to mitigate such risk;

    iii.     the provision for funding to the Debtor necessary to keep the estate revenue neutral for the period of time necessary to execute the terms of the offer; and,

    iv.     the execution risk and any terms of the offer to mitigate such risk.

The final bid submitted by TSK (the "TSK Bid") includes cash consideration in the amount of $6,850,000, expense reimbursements in the amount of up to $215,000, a waiver of the Ellwood Companies' alleged administrative expense claim in the amount of $184,092.72 (for a "substantial contribution" claim), and subordination of the Ellwood Companies' unsecured claim in the amount of $152,428.59. The $215,000 expense reimbursement is comprised of payments for April, May, and June rent; utilities; insurance; security; and $25,000 for the Debtor's legal fees to litigate the STORE issues.[24]

The final bid submitted by FRG includes cash consideration in the amount of $6,575,000, without FRG receiving credit for or deducting the Termination Fee of $137,500 from the cash consideration. The closing will take place within two weeks after the date of the entry of a sale order. FRG also agrees to delete the "Tangible Personal Property" and "Title to Personal Property" representations and warranties in sections 3.05 and 4.05 of its Asset Purchase Agreement, the "Indemnification by the Debtor" in sections 5.09 and 5.10 of its Asset Purchase Agreement, and

---

Qualified Bid (the "Back-Up Bid") and the Qualified Bidder submitting the Back-Up Bid ("Back-Up Bidder"). Debtor will file a notice immediately after the Auction setting forth the identity of the Winning Bidder and the Back-Up Bidder ("Designation Notice").

[24] ECF No. 313, at 2.

the "Indemnity Holdback Amount" in the amount of $200,000 in section 1.04 of its Asset Purchase Agreement.[25]

On April 11, 2025, Debtor filed a Second Designation Notice identifying FRG as the Winning Bidder and Winning Bid.[26] Debtor also filed the Third Sale Motion, asking the Court to approve the sale of the Purchased Assets to FRG.[27] The Third Sale Motion makes additional disclosures of Debtor's connections to various insiders:

i. Debtor is a wholly owned subsidiary of Fidelis Holdings, LLC ("Fidelis"). Fidelis is a guarantor of the STORE Lease, a secured loan held by Loeb Term Solutions, LLC ("Loeb"), and a secured loan held by Pathward, Inc. ("Pathward").

ii. Therefore, Fidelis will benefit from the purchase of the STORE Real Property by FRG as a result of the reduction of its obligations under its guaranty to STORE.

iii. Fidelis is the sole owner of Duenner Supply LLC ("Duenner"), which sub-leases a small building from the Debtor that is located on the STORE Real Property.

iv. Duenner has also guaranteed the STORE Lease and has agreed to sign a promissory note to STORE for $1,000,000 to facilitate the purchase of the STORE Real Property by FRG.

v. James Connor, Debtor's representative and manager, is also the manager of Fidelis and Duenner, as well as other affiliated companies.[28]

On April 30, 2025, the Court held a hearing on Debtor's Motion to Extend Time to Assume or Reject the Store Lease ("Motion to Extend") and the Third Sale Motion. The Court heard

---

[25] *Id.*
[26] ECF No. 313.
[27] ECF No. 317.
[28] *Id.* at 15-18.

7

argument from the parties regarding the Motion to Extend, and ultimately held that it must be denied.[29] As a result, it appears that the TSK bid is no longer viable since it was conditional on the Debtor maintaining access to the STORE Real Property for a sufficient period to allow TSK to remove the Purchased Assets. The Court then took up the Third Sale Motion. Mr. Connor testified that despite his insider connections to Fidelis and Duenner, he did not consider these relationships when he exercised Debtor's business judgment to evaluate the competing bids and determined that FRG has presented the highest and best bid to maximize the value of Debtor's assets. The Court notes that the Third Sale Motion is supported by Loeb, Pathward, the Committee, STORE, and Metro Machine Works, Inc, an unsecured creditor. The Office of the United States Trustee has not taken a position.

Despite no longer offering a competing bid for the Purchased Assets, the Ellwood Companies stand on their objections to the Third Sale Motion. Those objections include:

i. issues with the FRG final bid;

ii. Debtor is not entitled to the benefit of a business judgment presumption;

iii. Debtor is not acting in good faith;

iv. the alleged litigation risk with STORE in the event TSK is selected the winning bid is manufactured;

v. the alleged execution risk in the event TSK is selected the winning bid is a red herring;

vi. the Third Sale Motion is a Rule 9019 Motion disguised as a sale motion; and

vii. the proposed sale is fundamentally unfair.[30]

---

[29] ECF No. 344.
[30] ECF No. 331.

No other creditors voiced objection to the sale.

To the extent that "Conclusions of Law" contain items that should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

### Conclusions of Law

Courts in this circuit apply the "business judgment" test to determine whether a sale under § 363(b) should be approved.[31] Under this standard, a trustee or debtor in possession seeking approval to sell property of the estate not in the ordinary course of business has the burden to show sound business reasons for the terms of the proposed sale. The factors for the Court to consider include:

  i. any improper or bad motive;
  ii. whether the price is fair and the negotiations or bidding occurred at arm's length; and
  iii. whether the trustee followed adequate procedures, including proper exposure to the market and accurate and reasonable notice to all parties in interest.[32]

The Court should evaluate the trustee's business judgment:

  i. as to the propriety of the proposed sale of a debtor's assets;
  ii. as to the preparation for and conduct of an auction under the chosen bidding procedures; and
  iii. as to the highest and best bid received.[33]

The first two factors address "process" issues. Here, Debtor's decision to sell its assets is sound. Debtor ceased operations in August 2024 and has no ability or plan to reorganize as a going

---

[31] *See, e.g., In re Castre, Inc.*, 312 B.R. 426, 428 (Bankr. D. Colo. 2004) (citing *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir.1983)); *Allen v. Cohen*, 2014 WL 2118293, at *4 (D. Colo. May 21, 2014), *aff'd*, 607 Fed. Appx. 840 (10th Cir. 2015) (unpublished) (adopting *In re Castre* test).
[32] *In re Castre,* 312 B.R. at 428 (internal quotations and citations omitted).
[33] *Id.*

concern. Notice of the Bidding Procedures and Third Sale Motion have been adequate. At an earlier hearing, the Court voiced concerns that the first auction did not comply with the Bidding Procedures and resulted in confusion about which party had been selected as the winner by Debtor. It was also unclear to the Court whether Debtor had been completely transparent with all parties regarding the selection criteria it intended to apply to its choice of the highest and best bid. As a result, the Court denied approval of the Second Sale Motion and allowed the parties to go back to the drawing board.

While not specified in the Bidding Procedures, the Court finds that the procedure chosen by Debtor to solicit a final sealed bid from each party was reasonable and within its broad discretion to determine the appropriate procedures for marketing and selling the Purchased Assets.[34] The Court also finds the procedure is consistent with ¶ 4(b) of the Bidding Procedures, which allows Debtor to announce "additional procedural, non-material substantive rules for bidding and other procedures that are reasonable under the circumstances . . . for conducting the Auction, so long as such rules are not inconsistent with these Bidding Procedures[.]"[35] Based on the March 12 Notice and the April 1 Notice, the Court is satisfied that both TSK and FRG were aware of the full range of criteria Debtor would use to evaluate the highest and best bid. Those criteria were designed to create a uniform risk profile between the bids that would leave the Debtor in the same position regardless of which bidder ultimately prevailed. The Court finds the bidding process has been fair and open to all parties that wished to submit a competitive bid for the Purchased Assets.

---

[34] *See In re 160 Royal Palm, LLC*, 600 B.R. 119, 127 (S.D. Fla. 2019) ("[T]he Debtor had broad discretion to determine the appropriate procedures for marketing and selling the bankruptcy estate's sole asset[.]"), *aff'd,* 785 Fed. Appx. 829 (11th Cir. 2019).
[35] ECF No. 157, at 10.

Although TSK and the Ellwood Companies now complain that the process was unfair, it did not raise any objection until TSK was not selected as the winning bidder. Nor does TSK raise any objection that it did not understand the criteria outlined by Debtor for submitting a prevailing bid. TSK has known about Mr. Conner's insider status and any resulting conflicts since at least January 20, 2025.[36] Despite being aware of potential conflicts regarding Duenner and Fidelis since that time, at no time did TSK make a formal request that the sale process be abandoned or that fairness required the appointment of a trustee under § 1104(a). The Court finds the objections of TSK and Ellwood to the sale process are without merit. Accordingly, the Court finds Debtor exercised sound business judgment as to the propriety of the sale of the Purchased Assets and as to the preparation and conduct of the auction process.

Having determined the process was sound, the Court will turn its attention to the "business" rationale offered by Debtor in its selection of FRG as the Winning Bidder. In conducting the sale process under § 363(b), a debtor in possession has a fiduciary duty to maximize the value of the estate.[37] That fiduciary duty does not require the debtor to mechanically accept a bid with the highest dollar amount.[38] Debtors are permitted, and in fact are encouraged, to evaluate other factors such as contingencies, conditions, timing, or other uncertainties in an offer that may render it less appealing.[39] If a court perceives any degree of fraud, unfairness or mistake with the sale, including

---

[36] ECF No. 148, ¶¶13, 15.
[37] *In re Family Christian, LLC*, 533 B.R. 600, 621 (Bankr. W.D. Mich. 2015).
[38] *Id.* at 622; *In re Broadmoor Place Invs., L.P.*, 994 F.2d 744 (10th Cir. 1993) (approving sale to bidder with lower monetary bid with fewer contingencies); *In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998) ("The Trustee carefully weighed the competing bids rather than mechanically recommending the facially higher bid.").
[39] *In re Family Christian*, 533 B.R. at 622; *In re Bakalis*, 220 B.R. at 532 ("The Trustee declined the temptation of jeopardizing virtually assured benefits by supporting a bid that exposes the estate to a much greater risk of, among other things, a failed closing and the associated chance of being left with a devalued asset.").

any flaws with an auction process, the court should assess the impact of these factors on the sale when the offer is compared to the court's finding of valuation of the assets to be sold.[40] Where a proposed sale would benefit an insider of a debtor, the court is required to give heightened scrutiny *to the fairness of the value provided by the sale* and the *good faith of the parties in executing the transaction*.[41] As noted by the Bankruptcy Court for the District of Colorado in *In re Castre, Inc.*,[42] the Court must be guided by the standards established by the Bankruptcy Code and the case law. Those standards provide that:

i. In enacting the Bankruptcy Code, Congress expressed its specific intent that Bankruptcy court judges should not participate in the administration of bankruptcy estates, but leave that task to the trustee.[43]

ii. A trustee or DIP is responsible for administering the bankruptcy estate and his, her or management's judgment on the sale of estate assets and the procedure for sale is entitled to respect and deference from the Court, as long as the burden of giving sound business reasons is met.[44]

iii. The Bankruptcy Court has the power to disapprove a proposed sale recommendation by the trustee or DIP if the Court has an awareness that there is another proposal in hand which, from the estate's point of view, is better or more acceptable.[45]

iv. However, the trustee or DIP is entitled to great judicial deference in deciding which bid to accept as the best and highest bid on the sale of the debtor's assets; and, although the

---

[40] *In re Family Christian*, 533 B.R. at 622.
[41] *Id.*
[42] 312 B.R. 426, 430 (Bankr. D. Colo. 2004).
[43] *Id.* (citing § 704; *In re Gulf States Steel, Inc.*, 285 B.R. 497, 516 (Bankr. N.D. Ala. 2002)).
[44] *Id.* (citing *In re Gulf States Steel*, 285 B.R. at 514).
[45] *Id.* (citing *In re Broadmoor Place Invs., L.P.*, 994 F.2d at 744.)

trustee's or DIP's discretion is not without limit, the Court should not step in and assume a role and responsibility properly placed by the Code in another's hands.[46]

This case bears many similarities to *In re Family Christian, LLC*.[47] That case also involved what the court called "mistakes" in conducting an auction for the debtor's assets, but ultimately found that allegations of fraud and unfairness were unfounded. The losing bidder in *Family Christian* accused the debtor of manufacturing so-called "risk factors" after the closing of an auction in order to justify selection of its preferred bidder. The losing bidder objected to the sale, noting that if it had known of these so-called risk factors, or the value placed on them by the debtor, then it would have increased its bid accordingly. The court found, contrary to the losing bidders allegations, that the debtor was upfront and clear about its concerns regarding the litigation risks throughout the process. For whatever reason, *the losing bidders just chose to ignore those concerns*. Given the complexity of the risks and contingencies involved, the court found it was not the duty of the debtor to place a dollar value on those risks.[48] The court in *In re Family Christian* ultimately agreed with the debtor that legitimately perceived risks in the lower monetary bid caused it to be deemed less attractive despite its purportedly higher dollar amount.[49]

From the beginning, the competing bids of TSK and FRG have presented a challenge because they included radically different non-monetary terms and conditions, which made them difficult to compare in an apples-to-apples type way. At the same time, Debtor has made it clear that it planned to condition the sale of its assets on the simultaneous resolution of its conflicts with

---

[46] *Id*. at 430-31 (citing *In re Gulf States Steel*, 285 B.R. at 516).
[47] 533 B.R. 600 (Bankr. W.D. Mich. 2015).
[48] *Id.* at 623. *See also In re Bakalis*, 220 B.R. at 525 (finding no requirement that competing bidders be given precise valuations of all of the non-dollar aspects of their bids, especially where the bidders are sophisticated entities who can assess the risks and benefits of their bids and the limits of the consideration they offer).
[49] *In re Family Christian*, 533 B.R. at 624.

its landlord, STORE. FRG chose to meet that condition by purchasing the STORE Real Property in conjunction with its purchase of Debtor's assets. TSK took a different approach. TSK believes STORE has a weak claim against Debtor's assets, and believes Debtor would prevail in any litigation against STORE. While TSK offered to provide financial resources to fund Debtor's litigation against STORE, it has been unwilling to accept all of the risk involved in such litigation.

On its face, after payment of the Termination Fee, the TSK bid appears to bring $137,500 more to the estate, making it the "highest" monetary bid. TSK believes this amount is more than enough to cover Debtor's litigation and execution risks related to STORE's claim. Debtor disagrees. While it has not provided a dollar amount that it would be willing to accept to offset those risks, Debtor has determined that $137,500 is not enough.

The Court will address each of the objections raised by the Ellwood Companies in turn. First, Ellwood asserts that the FRG bid involves unacceptable execution risks because it includes an unworkable closing date and the financing proposed by FRG lacks sufficient security. In response, FRG has extended its firm offer to accommodate a closing date of May 31, 2025.[50] FRG has also presented a commitment letter from First National Bank of Omaha ("FNBO") indicating its willingness to provide the necessary financing for the proposed sale.[51] The Court finds Mr. Jones, as managing member of FRG, credibly testified that FRG has a longstanding relationship with FNBO, and it will be able to secure the financing necessary for the purchase. To the extent there is execution risk in the sale to FRG, the Court finds it minimal.

Second, Ellwood complains that conflicts of interest created by the insider status of Mr. Conner and the multiple hats he wears as manager of Debtor's parent, Fidelis, and its affiliate

---

[50] ECF No. 313, at 33 (FRG Proposed APA).
[51] ECF No. 336, at 10, Exhibit 1.

Duenner, have irreparably harmed the sale process, and that only an independent trustee can right the ship. Ellwood specifically accuses Debtor of not acting in good faith because the sale ultimately benefits Debtor's insiders. They argue Debtor's position that the winning bidder must eliminate all risk associated with the STORE Lease, is both unfair and unreasonable.

The Court agrees that Mr. Connor's status as an insider requires it to apply heighted scrutiny to the Third Sale Motion. That scrutiny goes to the fairness of the value received by the estate and the good faith of the parties in executing the sale.[52] The fact that Debtor's parent or affiliates *also* benefit from the sale of the assets to FRG does not necessarily indicate that the sale was conducted in bad faith, or that the sale it does not maximize value to the estate. As noted earlier, the Court finds that Debtor's choice of FRG as the winning bidder is based on a reasonable evaluation that its bid minimizes risk to the estate. The Court finds it reasonable for Debtor to conclude that the additional risk of litigating with STORE contained in the TSK bid exceeds the benefit of an additional $137,500 to the estate. Regardless of whether insiders may *also* benefit from the sale to FRG, the Court finds that its designation by Debtor is a reasonable exercise of business judgment to maximize the value generated for the estate, even under a heightened standard.

Similarly, the Court does not find that Mr. Connor's insider status has led to an unfair or otherwise fraudulent result. Regarding fairness, the Court finds that since at least the March 12 Notice, both bidders were aware of Debtor's requirement to eliminate the litigation risk with STORE. Therefore, TSK cannot now claim to be surprised by that requirement. While Debtor's requirement that all bidders eliminate the litigation risk with STORE may seem extreme, it does not bleed into unreasonableness. It is clear that TSK places a much lower estimate on STORE's

---

[52] *See In re Family Christian*, 533 B.R. at 622.

chance of prevailing in litigation against Debtor. That does not mean Debtor, who has a duty to be risk adverse and protect its assets for the benefit of all creditors, must agree with TSK's assessment. Debtor has declared that it has no tolerance for the risk of losing all its assets to STORE. Many times over, Debtor identified its perceived risk and provided TSK with the opportunity to effectively eliminate the risk to Debtor and take it on itself. TSK chose not to do so. Here, Debtor has selected a lower monetary bid with less perceived risk and fewer contingencies as the "highest and best" bid. The Court finds Debtor has exercised its duties to the creditors in good faith, and its selection of FRG as the winning bidder is both reasonable and fair.

Third, Ellwood objects that Debtor has not followed the proper procedures for court approval of a compromise or settlement under Bankruptcy Rule 9019. In this litigation, STORE has made allegations, both in the form of objections to the sale[53] and the STORE AP, that the majority of the Purchased Assets have become fixtures that now belong to STORE and cannot be sold without STORE's consent. Ellwood alleges that the Third Sale Motion includes a compromise or settlement of Debtor's dispute with STORE, because of FRG's offer to purchases the STORE Real Property as part of the overall sale transaction. Ellwood argues that failure to specifically mention settlement of the STORE dispute in the Third Sale Motion is fatal to its approval.

The crux of Bankruptcy Rule 9019 is that "[o]n the trustee's motion and after notice and a hearing, the court may approve a compromise or settlement."[54] To the extent the Third Sale Motion

---

[53] ECF Nos. 204, 340.
[54] Federal Rule of Bankruptcy Procedure Rule 9019(a) states:
    **(a) Approving a Compromise or Settlement.** On the trustee's motion and after notice and a hearing, the court may approve a compromise or settlement. Notice must be given to:
        • all creditors;
        • the United States trustee;
        • the debtor;
        • all indenture trustees as provided in Rule 2002; and

contains a settlement of STORE's claims against Debtor, the Court finds that the motion contains an adequate description of the proposed compromise and gave parties sufficient notice of their opportunity to be heard on the issue at the hearing on the Third Sale Motion. The Third Sale Motion was served on all parties on the Official Matrix maintained by the Court, which includes all of the parties enumerated to receive service under Rule 9019.[55] The Court finds notice of the Third Sale Motion satisfies the requirements of Rule 9019. It is not necessary that such a notice make specific reference to Rule 9019 to meet the requirements of that rule. To the extent the nature of the proposed settlement is that STORE will dismiss any remaining claims to the Purchased Assets if those assets are sold to FRG, it is approved by the Court, for the same reasons it will approve the Third Sale Motion.

Lastly, Ellwood argues that the sale to FRG is not in the best interest of creditors of this estate. The Court notes all other creditors, both secured and unsecured, that have expressed an opinion support the sale to FRG. That includes the Committee, of which one of the Ellwood entities is a member.[56] These are all sophisticated parties who are entitled to speak for themselves regarding their best interests. Ellwood's objection to the Third Sale Motion appears to stem from its status as a losing bidder more than its role as a creditor. Ellwood now suggests that the sale has been so tainted by impropriety that a chapter 7 trustee is the only way to redeem the process and preserve judicial integrity. The Court respectfully disagrees. The appointment of a trustee would only increase expenses and cause further delay without any identifiable benefit to creditors or the estate. A trustee would have no more authority to rehabilitate the STORE Lease than did this Court

---

• any other entity the court designates.
Fed. R. Bankr. Proc. 9019(a).
[55] ECF No. 325.
[56] ECF No. 95.

after it expired under the terms of the Bankruptcy Code. Ellwood has not made a cogent argument that a trustee would be able to strike any better offer than is available to the Debtor under the Third Sale Motion. The Court finds approval of the Third Sale Motion to FRG is in the best interests of creditors and the estate and should be approved.

**Conclusion**

The objection filed by the Ellwood Companies is overruled. The Third Sale Motion, with Debtor's selection of FRG as the highest and best bid, is granted. Debtor is instructed to submit a proposed order in accordance with the Court's Local Rules.

Dated this 13th day of May, 2025.

BY THE COURT:

_____
PAUL R. THOMAS, CHIEF JUDGE
UNITED STATES BANKRUPTCY

8044.1