IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| In re:<br><br>**OKF, LLC**<br><br>*Debtor.* | Case No. 24-11060-T<br><br>Chapter 11 |

## AMENDED

## JOINT MOTION OF OKF, LLC AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO SURCHARGE PURSUANT TO 11 U.S.C. § 506(c) AND EXCLUDE CERTAIN FEES AND CHARGES FROM SECURED CLAIM

## AND

## NOTICE OF OPPORTUNITY FOR HEARING.

OKF, LLC, Debtor-in-Possession (the "Debtor") reports to the Court the results of the sale of substantially all of the Debtor's assets and hereby, with the Official Committee of Unsecured Creditors (the "Creditors' Committee"), move this Court to enter an order surcharging the professional fees against the secured claim of the secured creditor Loeb Term Solutions, LLC ("Loeb") and preserving the increase in value achieved by the chapter 11 sale process for the estate by reducing the amounts payable to Loeb as part of the payoff demand of its secured claim as follows:

I.  **REPORT ON THE SALE**

  1.  On May 16, 2025, this Court entered its Order (1) Authorizing Sale Of Substantially All Of The Debtor's Assets Free And Clear Of All Liens, Claims, Encumbrances And Other Interests, (2) Approving Distribution Of Sale Proceeds, And (3) Granting Related Relief (the

"Sale Order") approving and authorizing the sale of substantially all of the Debtor's assets to Forge Group OKF LLC, an Illinois limited liability company, as buyer designee of Forge Resources Group LLC, an Illinois limited liability company ("Buyer") [Doc. 356] (the "Sale Order").

2. On June 19, 2025, the Debtor filed an Amended Report of Sale [Doc. 371], which is incorporated herein by reference (the "Report of Sale"). As detailed in the Report of Sale, on June 3, 2025, the Debtor closed the Sale to the Buyer and as a result, received net cash proceeds of $6,526,483.00 (the "Sale Proceeds") and in accordance with the Sale Order the Debtor made payments totaling $5,854,280.54 from the Sale Proceeds to various parties including Loeb. After closing, the Debtor's estates netted $672,202.46 from which it must pay the chapter 11 administrative expenses and provide for the recovery for unsecured creditors.

3. The Debtor paid Loeb its payoff demand of $4,907,421.96 based upon the following received from counsel for Loeb:

|  | Proof of Claim 8/16/2024 | Payoff 5/27/2025 | Claim Not Included in POC |
|---|---|---|---|
| Principal | $ 3,733,114.34 | $ 3,733,114.34 | $ - |
| Pre-Payment Fee | $ 175,643.20 | $ 175,643.20 | $ - |
| Accrued Interest | $ 148,311.46 | $ 753,347.59 | $ 605,036.13 |
| Forbearance Fee | $ 15,000.00 | $ 15,000.00 | $ - |
| Late Fees | $ 1,000.00 | $ 5,500.00 | $ 4,500.00 |
| Insurance Expense | $ - | $ 182,970.37 | $ 182,970.37 |
| Legal Fees | $ - | $ 69,978.73 | $ 69,978.73[1] |
| Utility Expense | $ 25,073.02 | $ 25,073.02 | $ - |
| Total | $ 4,098,142.02 | $ 4,960,627.25 | $ 862,485.23 |
| Daily Interest Per Diem |  | $ 2,096.68 | $ 2,096.68 |

---

[1] In the application for compensation of fees and reimbursement of expenses [Doc. 392], Loeb requested reimbursement for fees of $87,536.50 and expense of $1,333.53, which is $18,891.30 more than what it requested at closing.

4. The amount paid to Loeb based upon demand as payoff of its secured claim was $862,485.23 more than the $4,098,142.02 amount asserted in its Proof of Claims No. 20 filed January 6, 2025.

5. In the order approving the sale [Doc. 356] (the "Sale Order"), the Court expressly preserved the Debtor and the Committee's ability to reduce and recover the amounts paid to Loeb. In particular, Paragraph 16 of the Sale Order provides:

> The Debtor and the Debtor's estate reserve the right to object to any claim of any party that receives payment under this paragraph and seek disgorgement and return of any funds to the extent that their respective claims are disallowed or allowed for less than the amount they received. . . . Any rights, claims, remedies, or any other causes of action that the Committee and its members, the Debtor, the estate, any trustee, any other successor in interest to the interests of the Debtor or its estate, or any other party in interest may have against . . . the Prepetition Secured Lenders . . . expressly shall be preserved.

By this Motion, the Debtor and the Committee seek to recover a portion of the amounts paid to Loeb on account of its secured claim.

## II. THE EQUITIES OF THE CASE REQUIRE THAT THE INCREASED VALUE ACHIEVED BY THE CHAPTER 11 SALE PROCESS INURE TO THE UNSECURED CREDITORS.

6. The Debtor requests that this Court exercise the discretion afforded to it under sections 105, 552(b) and 506(b) of the Bankruptcy Code to consider the specific facts and circumstances of this chapter 11 case to balance the equities so that a meaningful portion of the approximately $3 million of additional value achieved through the efforts of the Debtor, the Creditors' Committee and the Ellwood Companies[2] inures to the benefit of unsecured creditors and not predominantly to Loeb.

---

[2] Ellwood National Steel Company, Ellwood Quality Steels Company, and Ellwood Group, Inc. are collectively referred to as the "Ellwood Companies". The Ellwood Companies have been involved as DIP Lender, petitioning

7. Under the 'equities of the case' doctrine, the work done by the Debtor, the Creditors' Committee and the Ellwood Companies for the benefit of the Debtor's estate should enable them to share jointly in the proceeds made possible by their contribution, rather than allow a secured creditor to receive a windfall at the expense of their creditor constituents. *See In re Barbara K. Enters., Inc.*, 2008 WL 2439649, at *11 (Bankr. S.D.N.Y. June 16, 2008) (stating the doctrine "is intended to ensure that secured creditors do not receive a windfall benefit in situations where the change in value is brought about by a party in the bankruptcy."); *In re Crouch*, 51 B.R. 331, 332 (Bankr.D.Or.1985) ("The purpose behind the 'equities of the case' rule ... is, in a proper case, to enable those who contribute to the production of proceeds during chapter 11 to share jointly with pre-petition creditors secured by proceeds."); *In re Patio & Porch Systems, Inc.*, 194 B.R. 569, 575 (Bankr.D.Md.1996) ("This 'equities of the case' provision is intended to prevent secured creditors from receiving windfalls and to allow bankruptcy courts broad discretion in balancing the interests of secured creditors against the general policy of the Bankruptcy Code.").

8. The equities of the case doctrine is most commonly applied under section 552 of the Bankruptcy Code, which typically extends a secured creditor's pre-bankruptcy lien to property acquired after the bankruptcy filing, such as proceeds from the sale of collateral. The "equities of the case" exception under section 552(b) allows the bankruptcy court to limit or end the lien on such proceeds. In particular, "[t]he equity exception of § 552(b) provides that a party's lien in proceeds survives § 552(a) 'except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.' What constitutes the equities of a particular case is left to the discretion of the bankruptcy judge." *In re Airport Inn Assoc., Ltd.*, 132 B.R. 951, 959 (Bankr. D. Col. 1990).

---

creditors, affiliates of the competing bidder and have been recognized as having made a substantial contribution to this chapter 11 case. *See* Doc. 381.

9. The purpose of this exception is to prevent secured creditors from disproportionately benefiting from collateral that has appreciated in value due to the use of estate resources. Courts consider factors such as: (a) the amount of time and funds expended on the collateral; (b) the position of the secured party (e.g., whether they are over-secured); and (c) the rehabilitative nature of the bankruptcy. *See In re Airport Inn Assoc., Ltd.*, 132 B.R. at 959.

10. Prior to the Petition Date and at the start of the case, Loeb had consented to a private sale of the Debtor's assets for $3,500,000, which would have required it to take a discount and less than the principal amount of its claim. The Debtor, the Creditors' Committee and the Ellwood Steel Companies and their professionals pursued and completed a sale process that increased the value of the collateral by more than $3 million. Loeb did not fund those expenses, but merely sat back and received the benefit of the efforts of those parties. Loeb had been willing to accept almost $1.5 million less on account of its secured claim, and it should not now demand and be granted a claim of almost $5 million. The increase in the value of Loeb's collateral was a direct result of the chapter 11 process and the efforts of the parties that pursued and funded that sale process. The efforts of the Debtor, the Creditors' Committee and Ellwood Steel Companies and their respective professionals funded this increased recovery through their efforts without assurance of payment, and the estate and the creditors they represent should be the primary beneficiaries of this increase in value.

11. Although the Debtor agrees that Loeb could receive the principal amount of its claim, plus interest, plus any out-of-pocket third-party reasonable expenses it paid (e.g., insurance, legal fees and utilities) as part of its secured claim, the equities of the case require that, at a minimum, default interest, late fees and prepayment premium be excluded from any recovery

on account of its secured claim and that a substantial portion of the $3 million in increased value generated by the chapter 11 case be preserved for the benefit of unsecured creditors.

### III. THE DEFAULT RATE OF INTEREST, LATE FEE AND PREPAYMENT PENALTY SHOULD BE DISALLOWED.

12. In addition to the equities of the case, Loeb's requested default interest, late fees and prepayment premium can be excluded from its secured claim under section 506(b) of the Bankruptcy Code if they are unreasonable or if payment of those amounts would be inequitable. Section 506(b) authorizes an "oversecured creditor" to recover "reasonable fees, costs, or charges provided for under the agreement..." 11 U.S.C.A. § 506(b). The Supreme Court has held that an oversecured creditor is entitled to post-petition interest. *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235 (1989). But "neither the Bankruptcy Code nor the Supreme Court has resolved the issue of whether an oversecured creditor is entitled to interest at a higher, though contracted for, default rate of interest." *Matter of Timberline Prop. Dev., Inc.*, 136 B.R. 382, 385 (Bankr. D.N.J. 1992). "Section 506(b) provides that interest and reasonable fees and costs can become part of an oversecured creditor's secured claim to the extent of the collateral value with allowance of such claims being accomplished pursuant to § 502. *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.*, 549 U.S. 443, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007); *In re Welzel*, 275 F.3d 1308 (11th Cir.2008); *In re New Power*, 313 B.R. 496, 509–510 (Bankr.N.D.Ga.2004). In order to be included in the secured portion of a claim, fees, costs and charges are subject to a reasonableness standard whereas interest is not so limited. *Welzel* at 1314." In re Brandywine Townhouses, Inc., 518 B.R. 671, 676 (Bankr. N.D. Ga. 2014).

13. To recover fees, costs, and charges, the Tenth Circuit BAP has said "(1) the claim must be an allowed secured claim; (2) the creditor holding the claim must be oversecured; (3) the entitlement to fees, costs, or charges must be provided for under the agreement or state statute

under which the claim arose; and (4) the fees, costs and charges sought must be reasonable in amount." *In re Sun 'N Fun Waterpark LLC*, 408 B.R. 361, 366 (10th Cir. BAP 2009). Bankruptcy courts have broad discretion in determining whether charges are "reasonable." *In re Latshaw Drilling, LLC.*, 481 B.R. 765, 798 (Bankr. N.D. Okla. 2012).

14. In analyzing default interest rates in a 506(b) case, courts should consider each situation on a case-by-case basis. *In re Haldes*, 503 B.R. 441, 445 (Bankr. N.D. Ill. 2013) (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235 (1989)). Although there is a rebuttable presumption in favor of the default rate in the contract, this presumption is rebuttable and has been rebutted in cases whether the default rate was significantly higher than the non-default rate without justification. *Id.*

15. In *Haldes*, the court found that a 160% increase from the non-default rate to the default rate was inequitable. *Id.* at 446 (non-default rate of 6.25% with a default rate of 16.25%). The court found that the 10% increase was too high, especially given the creditor was being compensated in other ways, and it lessened the default rate increase to 4%. *Id.* at 447. The court still allowed some increase because the Debtor in this case was solvent and stood to receive profits from the sale of property. *Id.* Here, the Debtor is insolvent and all of the sale proceeds as well as any other recoveries will be paid to creditors rather than the Debtor's equity holder.

16. In a Colorado bankruptcy case, the court tackled a question of whether it was "bound to apply the default interest rate that the parties agreed to when contracting, or does the flexibility exist to enable this Court to **balance the equities** in determining the applicability of the contract default rate?" *In re Hollstrom*, 133 B.R. 535, 538 (Bankr. D. Colo. 1991) (emphasis added). In deciding against the 36% default interest rate, the court found the default rate served as a penalty against other creditors, not the debtor. *Id.* at 541. This rationale is especially true

where the unsecured creditors are the parties that will suffer by the oversecured creditor's default interest rate. *Id.* In holding that the oversecured creditor was entitled to the 12% non-default interest rate (instead of the 36% default interest rate), the court said it was equitable in light of the "complete absence of any evidence submitted by the creditor that the default rate is reasonable, market-based, within the 'range of acceptable commercial rates,' or based on actual loss." *Id.*

17. In an Arizona Bankruptcy case, the court found that a collection of Ninth Circuit cases stood for a two-pronged proposition on this issue stating than an "[1] oversecured creditor is ordinarily entitled to interest at its contract rate pursuant to Section 506(b), although [2] the court retains '***broad equitable discretion***' to determine an appropriate interest rate as circumstances require." *In re Boardwalk Partners*, 171 B.R. 87, 91 (Bankr. D. Ariz. 1994) (emphasis added). The Court found that the 26% default rate was unnecessary and the 18% non-default rate amply compensated the creditor's risk. *Id.* at 92. And again, the parties that would suffer if the 26% rate stood would be the creditors junior to the oversecured creditor. *Id.* Allowing it to be paid would have been contrary to the policy of ratable distribution of assets. *Id.* In addressing courts that have allowed for default rates to stand, the Arizona Bankruptcy Court found that a majority, if not all, of these cases rested their decision on the fact that the proposed default rate was still reasonable, and the result would not be inequitable. *Id.*

18. In this case, the Note held by Loeb, originally signed on August 11, 2022, by the Debtor, provides for a 6% increase in the interest rate upon an event of Default. Debtor submits a 6% increase in the interest rate which was already 7% plus the Prime Rate (*i.e.*, a more than 40% increase in the amount of interest), is unreasonable and unduly penalizes the unsecured creditors in this case. The Court should disallow the default interest charged by Loeb.

19. In addition to the Default Rate of Interest demand by Loeb and paid by the Debtor, Loeb also included a "prepayment fee" of $175,643.20. Such fee is not part of the Note signed by the Debtor, but rather it was added to the Security Agreement as part of an amendment thereto dated September 15, 2023. "Prepayment penalties are intended to protect the lender from any loss it may incur because of changing interest rates between the time of the prepayment and the maturity date of the loan." *In re Brandywine Townhouses, Inc.*, 518 B.R. 671, 678 (Bankr. N.D. Ga. 2014). It is important to note that in this case, the Note held by Loeb already provides protection to Loeb for changes in interest rates because Note provides, "The Effective Rate hereunder shall change each time there is a change in the Prime Rate." In light of the variable interest rate and the equities of the case, Loeb's prepayment fee is an unreasonable penalty and should be excluded from the amounts payable as part of its secured claim.

20. Here, Loeb demanded and received payment of interest at the default rate, a prepayment "fee" and late charges. Courts have found that late charges coupled with default interest may amount to a double-recovery by the creditor and as such may be unreasonable. *In re Cliftondale Oaks, LLC,* 357 B.R. 883, 884 (Bankr.N.D.Ga.2006).

21. "In *Cliftondale Oaks,* the Court held that late charges are "fees" or "charges" within the meaning of § 506(b) and allowance requires a finding that the charge is reasonable. The Court concluded further that late charges imposed in conjunction with default interest were not reasonable. *Id.* at 887." *In re Brandywine Townhouses, Inc.*, 518 B.R. 671, 680 (Bankr. N.D. Ga. 2014).

22. These cases all stand for the proposition that the Court can balance the equities to determine what reasonable charges and interest may be included in Loeb's secured claim, and the

Debtor and the Creditors' Committee assert that default interest, the prepayment premium and the late fees should be excluded as unreasonable.

## IV. SURCHARGE PURSUANT TO 11 U.S.C. §506(c)

23. The Debtor has incurred claims for the fees and expenses of Crowe & Dunlevy in the amount of approximately $250,000. In addition, there are other unpaid administrative fees directly arising from the Sale that are due or will become due upon allowance for the following: (a) Ellwood National Steel Company, Ellwood Quality Steels Company, and Ellwood Group, Inc. (collectively, the "Ellwood Companies") in the amount of $140,000 per agreed order entered July 11, 2025 [Doc. 381], (b) Counsel for the Official Committee of Unsecured Creditors in the amount of approximately $115,000 per fee application filed August 13, 2025, (c) D.R. Payne and Associates in the amount of approximately $30,000 per fee application to be filed and (d) the fee paid to the United States Trustee of $47,747[3] for a total of approximately $580,000 (all of these claimants are collectively referred to herein as the "Claimants"). There are known additional administrative claims of at least $250,000 plus anticipated additional professional fees for preparation and filing of a Plan and Disclosure of at least $150,000. There are less than only $625,000 in currently available funds in the Estate to pay any and all administrative claims for the entirety of this case. Consequently, the Debtor asserts on behalf of the Estate and the Claimants that their fees and expenses should be charged against Loeb pursuant to 11 U.S.C. §506(c) as is necessary to avoid placing the burden of all costs of administration of this Debtor upon the unsecured creditor.

24. To support a surcharge against a secured creditor, not only must the post-petition expenditures be "necessary" and "reasonable," but the expenditures must have resulted in a

---

[3] The substantial quarterly fee paid to the United States Trustee is directly attributable to the distribution to Loeb.

quantifiable, direct benefit to the creditor and must have been made primarily for the creditor's benefit. When such a creditor receives a direct and quantifiable benefit from the work done, such creditor is liable for a surcharge under 11 U.S.C. §506(c). *In Re Senior-G&A Operating Co.*, 957 F.2d 1290 (5th Cir. 1992). Administrative expenses or general costs of reorganization may not generally be charged against secured collateral, except where expenses were incurred primarily for the benefit of the secured creditor or when the secured creditor caused or consented to the expense. To satisfy the benefit test, the Debtor-in-Possession must establish in quantifiable terms that it expended funds directly to protect and preserve the collateral. *In Re Cascade Hydraulics and Utility Service, Inc.*, 815 F.2d 546 (9th Cir. 1987). *See also Brookfield Production Credit Association v. Borron*, 738 F.2d 951, 952 (8th Cir. 1984); *In Re Sonoma V*, 24 B.R. 600, 603 (9th Cir. BAP 1982); *In re North County Place, Ltd.*, 92 B.R. 437 (Bankr. C.D. Cal. 1988); *In Re Proto-Specialties, Inc.*, 43 B.R. 81, 83 (Bankr. D. Ariz. 1984).

25. The Debtor seeks recovery of the administrative fees and costs of the Claimants. Attorney fees may be recovered from property securing an allowed secured claim as the cost of preserving property so long as the services were necessary to preserve or dispose of secured creditors property, the amounts charged for services were reasonable, and the expenses were incurred for the primary benefit of secured creditor. *In Re Croton River Club, Inc.*, 162 B.R. 656 (Bankr. S.D.N.Y. 1993). *See also In Re Dinsmore Tire Center, Inc.*, 81 B.R. 136 (Bankr. S.D. Fla. 1987); *In Re J.R. Research, Inc.*, 65 B.R. 747 (Bankr. D. Utah 1986).

26. The efforts of the Professionals have clearly benefited Loeb. The real question is, did Loeb receive a direct and quantifiable benefit from the efforts of the Professionals such that their portion of the proceeds is subject to the assessment of the fees of the Professionals? The answer is clearly, yes.

27. Had the Professionals not done everything they did herein to ultimately close the sale of the assets as a going concern, Loeb would not have received all of its principle of $3,733,114.34 much less any interest, fees, or expenses because the original sale price offer from Forge Resource Group was approximately $3,500,000[4]. Due to the efforts by the Claimants, Loeb's collateral sold for more than $6,500,000.00. Loeb's collateral was sold as a going concern through the efforts of the Claimants for about $3,000,000 more than such collateral would have brought in if it were sold at the outset of the petition. There is no question that Loeb did in fact receive a significant, direct, and quantifiable benefit from the efforts of the Claimants.

28. If the sale had been made to original offer, Loeb would not have even been paid the principal amount of the loan. Due to the work done by the Claimants, Loeb was not only paid the entire principal on the loan, but also for the increased default interest rate, late fees and the early payment penalty.

29. Substantial work was done directly on the sale. There were numerous calls with potential buyers, preparation of the Motion to sell, notice of sale and the order approving the sale, conducting the sale itself, contested evidentiary hearing to litigate objections to the sale by various parties and closing the sale. It is submitted that these are reasonable and necessary activities undertaken in this case and that have resulted in a direct and quantifiable benefit to Loeb. The benefit is the difference in the price of the original estimated sale of close to $3,500,000 and the proceeds actually obtained by the final sale of $6,526,483.00.

## NOTICE OF OPPORTUNITY FOR HEARING

**Your rights may be affected. You should read this document carefully and consult your attorney about your rights and the**

---

[4] The net available to pay Loeb would have been substantially less after repayment of the $200,000 DIP Loan, United States Trustee Fees and other similar expenses.

**effect of this document.** If you do not want the Court to grant the requested relief, or you wish to have your views considered, you must file a written response or objection to the requested relief with the Clerk of the United States Bankruptcy Court for the Northern District of Oklahoma, 224 South Boulder Ave., Tulsa, Oklahoma 74103 no later than fourteen (14) days from the date of filing of this request for relief. You should also serve a file-stamped copy of your response or objection to the undersigned movant's attorney and others required to be served and file a certificate of service with the Court. If no response or objection is timely filed, the Court may grant the requested relief without a hearing or further notice. **The 14-day period for response includes the three (3) days allowed for mailing provided for in Bankruptcy Rule 9006(f).**

**WHEREFORE,** Debtor and the Creditors' Committee pray this Court preserve the increase in the value of the proceeds of the collateral from the sale of the Debtor's assets for the estate and the unsecured creditor by excluding default interest, the prepayment premium and late fees from the secured claim of Loeb and order Loeb to pay the fees and costs associated with the benefits bestowed upon them pursuant to 11 U.S.C. §506(c) by the Claimants totaling $580,000 and for such other relief as is just and proper.

*Signature on Following Page*

Respectfully submitted,

*s/Mark A. Craige*
Mark A. Craige, OBA #1992
Alexander Sokolosky, OBA #33614

-Of the Firm-

CROWE & DUNLEVY
A Professional Corporation
222 North Detroit Avenue
Suite 600
Tulsa, OK 74120
(918) 592-9800
(918) 592-9801 (Facsimile)
mark.craige@crowedunlevy.com
alex.sokolosky@crowedunlevy.com

*Attorneys for OKF, LLC,*
*Debtor In Possession*

and

*/s/ Gus Kallergis*

Gus Kallergis, Esquire (OH 0071557)
**BERNSTEIN-BURKLEY, P.C.**
1360 East Ninth Street, Suite 1250
Cleveland, Ohio 44114
Telephone: (412) 456-8100
Facsimile: (412) 456-8135
gkalleris@bernsteinlaw.com

*Counsel to the Official*
*Committee of Unsecured Creditors*

## Certificate Of Electronic Service

The record herein reflects that on the same day this pleading was electronically filed, a copy was electronically served upon counsel of record and other parties as shown in the record herein.

*/s/Mark A. Craige*
